# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT COURT OF PENNSYLVANIA

_____

KOBE PINKNEY,                               :

        **Plaintiff**                   :

                                   :   **CIVIL ACTION**

        **v.**                        :

                                   :   **1:19-cv-00167-RAL**

**MEADVILLE, PENNSYLVANIA,**         :

        **&**                       :

**POLICE CHIEF MICHAEL J. TAUTIN,**   :

        **&**                       :

**PATROLMAN JARED FRUM,**         :

        **&**                       :

**ALLEGHENY COLLEGE,**           :

        **&**                       :

**SERGEANT WILLIAM MERCHBAKER,**   :

        **&**                       :

**FIRST ASSISTANT DISTRICT ATTORNEY PAULA DIGIACOMO**   :

        **&**                       :

**MEADVILLE TRIBUNE,**           :

        **&**                       :

**COMMUNITY NEWSPAPER HOLDING, INC.,**   :

        **&**                       :

**KEITH GUSHARD,**               :

              **Defendants,**              :

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

The within Memorandum of Law in support of Plaintiff's Response in Opposition to Defendant's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6), on behalf of the Plaintiff, Kobe Pinkney, by and through his attorney, Earl Raynor, Esquire, hereby represents the following:

## I.   STATEMENT OF THE CASE

On June 6, 2019, the Plaintiff, Kobe Pinkney, filed the within civil rights action arising under the Fourth, Fifth, Eighth and Fourtenth Amendments to the United

States Constitution, specifically brought under 42 U.S.C. Section 1983, seeking compensatory and punitive damages for false arrest, false imprisonment, malicious prosecution, and the violation of the constitutional guarantee of equal protection against Defendants, Patrolman Jared Frum and Sergeant William Merchbaker, who while acting under color of state law, detained, arrested, charged and imprisoned the Plaintiff, Kobe Pinkney, for allegedly committing a heinous criminal assault at a Meadville, Pennsylvania bar, without any credible evidence supporting reasonable suspicion and/or probable cause that he committed the assault, on account of racial animus and bias.

This Complaint also raises supplemental state claims, including the intentional infliction of emotional distress and invasion of privacy through defamatory publicity placing Plaintiff in a false light, by Defendants First Assistant District Attorney Paula Digiacomo, Keith Gushard, Meadville Tribune, and Community Newspaper Holding Inc. In a May 15, 2019 Meadville Tribune article written by Mr. Gushard, ADA Paula DiGiacomo stated that Plaintiff was still a suspect for committing the assault, after the criminal case against him had been withdrawn, due to the overwhelming evidence available to the Commonwealth making it abundantly clear that Plaintiff was innocent and the assault had been committed by another man identified by eyewitnesses. The Meadville Tribune is owned by Community Newspaper Holding, Inc. These claims also extend to Defendants Merchbaker and Allegheny College, where Sergeant Merchbaker, while acting as the Interior Director of Public Safety for Allegheny College detained Plaintiff, a student at Allegheny College, while he was attending a Philosophy class. (Doc 1., Exhibit A). The actions and conduct of

Patrolman Frum and Sergeant Merchbaker, are the result of a policy, practice, custom and deliberate indifference on the part of the Defendants Meadville, Pennsylvania, Allegheny College, and Meadville Chief of Police, Michael J. Tautin, as well as the policies promulgated by Merchbaker, as the Interim Director of Public Safety for Allegheny College.

On July 31, 2019, Plaintiff served complaints on Defendants Meadville Tribune, Community Holdings, Inc., Keith Gushard, Meadville, Pennsylvania, Officer Jared Frum, Police Chief Michael Tautin, and Sergeant William Merchbaker. (Docs. 7, 8, 9, 10, 11, 12, 13 and 14). However, the Return of Service filed by the undersigned counsel with the Court was defective, necessitating the filing of corrections.

Defendants Meadville, Pennsylvania, Jared Frum, Michael Tautin, Meadville Tribune, and Paula DiGiacomo waived service of summons on August 20, 2019. (Docs. 18, 19, 20 and 21). Also on August 20, 2019, coincident with waiving service of summons, Defendants Frum, Tautin and Meadville, Pennsylvania filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Pennsylvania Rules of Civil Procedure, and supporting brief. (Docs. 16 and 17). The following day, August 21, 2019, Defendants Meadville Tribune, Community Newspaper Holdings, Inc. and Keith Gushard filed a motion for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and accompanying brief (Docs. 23 and 24).

On August 22, 2019, Plaintiff filed corrected return of service for Defendants Meadville Tribune, Community Holdings, Inc., Keith Gushard and William Merchbaker. (Docs. 26, 27, 28 and 29). On August 23, 2019, Plaintiff executed a

waiver of service on behalf of Defendant Allegheny College. Also, On August 23, 2019, Plaintiff and Defendants Allegheny College and William Merchbaker filed a joint motion for extention of time for Allegheny College and William Merchbaker to file an answer to Plaintiff's Complaint. (Doc. 32) On August 27, 2019, United States District Court Judge, for the Western District of Pennsylvania, the Honorable Richard A. Lanzillo filed an order granting the joint motion for extension of time.    (Doc. 33).

On August 29, 2019, Defendant Paula DiGiacomo filed a motion to dismiss Plaintiff's complaint for failure to file a claim pursuant to Rule 12(b)(6) of the Pennsylvania Rules of Civil Procedure and supporting brief.    (Docs. 35 and 36).

Defendants motion to dismiss collectively raise the following grounds:

*Defendants Meadvile, Pennsylvania, Jared Frum and Michael Tautin's*

*Grounds for Dismissal*

(1)  Plaintiff has failed to state claims or set forth a cause of action for false arrest, false imprisonment and malicious prosecution under the Fourth Amendment in Counts II, III and IV respectively of his Complaint because Patrolman Frum's actions were supported by probable cause;

(2)    Plaintiff has failed to state a claim or set forth a cause of action for Equal Protection under the Fourteenth Amendment and 42 U.S.C. Section 1981 at Count V of his Complaint.

(3)  Plaintiff has failed to state a <u>Monell</u> claim against the City of Meadville or Police Chief Michael Tautin because he has failed to identify any policy, practice, custom, or lack thereof, that violated his constitutional rights;

(4)  Plaintiff has failed to establish the personal involvement of Police Chief Michael J. Tautin;

(5)  Defendant Frum is entitled to Qualified Immunity;

(6)  Plaintiff's state law claim for conversion at Count X fails because Plaintiff has failed to plead or prove otherwise that he has exhausted his adequate post-deprivation remedy in state court for return of the subject property; and

(7)  Amendments to Plaintiff's complaint would be futile.

*Defendants' Sergeant Merchaker's and Allegheny College's*

*Grounds for Dismissal*

*(8)  Plaintiff's claims fail because Merchbaker is not a State Actor, and Even if he was, Merchbaker is Immune from Prosecution.*

*(9)  The Complaint fails to adequately state a claim for "Unlawful Stop and Detention" against Merchbaker.*

*(10)  The Complaint fails to state a claim for racial discrimination against Merchbaker.*

*(11)  The Complaint fails to State a Claim for "Deliberately Indifferent Policies, Practices, Customs, Training and Supervision" against Allegheny and Merchbaker.*

*(12)  The Complaint fails to State a Claim for false light against Allegheny and Merchbaker.*

*(13)  The Complaint fails to State a Claim for Intentional Infliction of Emotional Distress Against Allegheny and Merchbaker.*

*Defendants Meadville Tribune, Community Holdings, Inc. and*

*Keith Gushard's Grounds for Dismissal*

(14)    Count IX should be dismissed because the publication of true and non-defamatory information is not considered an intentional infliction of emotional distress as a matter of law;

(15)  Count VII should be dismissed because Plaintiff's home address is not a private fact and the information is of legitimate concern to the public;

(16)  Count VII should be dismissed because Plaintiff has failed to plead that the Media Defendants recklessly and selectively printed false statements in a manner that would create a false impression regarding governmental actions;

(17)  In the alternative, Counts VII, IX, and IX must be dismissed because the Media Defendants are protected from liability under the fair report privilege.

*Defendant Paula DiGiacomo's Grounds for Dismissal*

(18)  Plaintiff fails to state a claim for False Light Invasion of Privacy against Defendant DiGiacomo;

(19)  Plaintiff's Invasion of Privacy Intrusion Upon Seclusion Count (Count X) fails to set a proper claim against Defendant DiGiacomo;

(20)  Plaintiff's claim that Defendant DiGiacomo Intentionally Inflicted Emotional Distress (Count IX) is deficient as a matter of law;

(21)  The Defendant Paula DiGiacomo is Immune from Plaintiff's Claims as

a High Public Official and under the Political Subdivision Tort Claims Act.

Now comes the Plaintiff, Kobe Pinkney and responds to Defendants' second

motion to dismiss for failure to state a claim pursuant to Federal Rule of

Civil Procedure 12(b)(6).


## II.    FACTUAL ALLEGATIONS

On April 7, 2019, at approximately 1:30 am, Patrolman Jared Frum of the

Meadville Police was on routine patrol in the area of Meadville Academy Theatre,

when he observed four males walking in middle of the street, just west of Julian's

Bar.    Two of the men were carrying a third male, later identified as Rhett Happel,

whose left side of his face was swollen to the point that his left eye was swollen

shut.    Patrolman Frum instructed the men to walk to the south side sidewalk, then

radioed for an ambulance. None of the men saw what happened to Happel, however

while they waited for the ambulance, one of the males volunteered that he believed

that Happel had been assaulted and speculated that the attack stemmed from

Happel being accused of drugging a female that had been found unconscious in the

bathroom of Julian's Bar by police the previous night.

The following evening, April 8, 2019, Patrolman Frum spoke with Happel's

mother who reported that he had to undergo emergency surgery during which three

plates and fifteen pins were placed in the left side of his face.

On April 10, 2019, three days after Happel was injured, Patrolman Frum

interviewed a witness at the Allegheny College Public Safety Building, with the

assistance of Defendant, William Merchbaker, the Interim Director of Public Safety for Allegheny College.    The witness, allegedly, told Patrolman Frum and Sergeant Merchbaker that the assailant was an African-American male approximately six feet tall, wearing braids, who walked up to Happel when he was in the bathroom at Julian's Bar tapped Happel's shoulder from behind then punched Happel on the left side of his face as Happel turned around.    The witness further reported that after striking Happel, the assailant walked to the tavern side of Julian's Bar, then eventually left the establishment without being seen.

    After the assault, the witness was contacted by Happel's friend, Evan Haines, who sent the witness a facebook photo of Jared Shaw, a white male that had been observed at Julian's Bar with the assailant on the evening of the assault, and an African-American male, later identified as the Plaintiff, Kobe Pinkney.    Both Shaw and Pinkney are football players for Allegheny College.    The witness recognized Plaintiff as the man who punched Happel.    Haines sent the witness two additional photographs of Plaintiff and Shaw, both times the witness identified Plaintiff as the assailant.

    Based on further investigation, Happel is regaining his memory and recalls that, moments prior to the assault, Jared Shaw and his girlfriend, who has a first name of "Chole," confronted him inside the bar, accusing him of drugging Chole the night before, causing her to fall unconscious.

    Shaw and Chloe followed Happel to the men's bathroom, where Happel recalls being punched after being touched on the shoulder from behind.    Apparently these facts were known by the Meadville Police Department, because Shaw deemed a

-8-

person of interest, for possibly consipiring with the assailant out of retaliation for Happel drugging his girlfriend, was offered immunity from prosecution, in exchange for Shaw identifying the assailant. Despite the offer of immunity, Shaw refused to cooperate and hired a local Crawford County attorney, Joseph Ferguson, Esquire.

Without Shaw's cooperation, based on the albeit egregiously suggestive post incident identification by the witness, a warrant was issued for the arrest of Plaintiff.

The next day, April 11, 2019, Sergeant Merchbaker removed Plaintiff from a Philosophy lecture, after which Plaintiff was arrested by the Defendant Frum. Plaintiff was arraigned by Crawford County Magisterial District Court Judge, the Honorable Samuel V. Pendolino, on the charges of Aggravated Assault, **18 Pa.C.S.A. Section 2702(a)(1), (F1)**, Simple Assault, **18 Pa.C.S.A. Section 2701(a)(1)**, and Harassment, **18 Pa.C.S.A. Section 2709(a)(1), (S). (Kobe Pinkney Criminal Complaint and Affidavit of Probable Cause, attached hereto and marked Exhibit "A").** Judge Pendolino set bail at $5,000.00, ten percent. Plaintiff's preliminary hearing was set for April 25, 2019, but eventually continued to May 22, 2019, at 10:00 am.

Plaintiff's arrest and the alleged circumstances surrounding the assault of Rhett Happel were reported by Meadville Tribune reported, Defendant, Keith Gushard.

After Plaintiff's arrest numerous eyewitnesses came forward and claimed that Plaintiff did not assault Rhett Happel and had not even been at Julian's bar on the night of the assault. Among the witnesses, were Joe Hayes and Bryan Hill, who informed Plaintiff's counsel that they were at Julian's Bar on the night of the assault of Rhett Happel, did not see Plaintiff at the Bar anytime that evening, but did see the aftermath of the assault and recognized the likely assailant to be Josiah Williams of

Syracuse, New York, an African-American male with braids, who was a former football player at local St. Francis University, who transferred to the University of Buffalo. Plaintiff's counsel immediately relayed the information provided by Hayes and Hill, as well as their contact information to Meadville, Pennsylvania Assistant Chief of Police Michael Stefanucci.

Plaintiff's counsel also provided Assistant Chief Stefanucci with contact information for Josh Miller, Plaintiff's roommate who would have told Chief Stefannuci that Plaintiff was at a Theta Chi fraternity party for the better part of the evening of April 6th, and that Plaintiff returned to the dorm at approximately 1:15 am, where shortly thereafter Plaintiff received a phone call from Jared Shaw detailing Josiah William's assault against Rhett Happel. Plaintiff's counsel also provided the identity of Josiah Williams, as well as Mr. Williams' Syracuse address to Assistant Chief Stefanucci.

Unlike Josiah Williams, Plaintiff does not have braids in his hair. Plaintiff's mother, Mia Johnson, was also able to provide Assistant Chief Stefanucci with Plaintiff's receipt from McDonald's which had a stamped date and time of 4/07/2019, 1:00 am, which was coincident with the date and time of the assault against Happel. **(Printed Copy of McDonald's Receipt, attached hereto and marked Exhibit "B")**. Further, the police were provided with time cards, showing that Plaintiff checked back into his dorm at 1:15 am. **(Plaintiff Kobe Pinkney's Allegheny College Access Log, attached hereto and marked Exhibit "C")**.

Plaintiff's counsel emailed the foregoing exculpatory information to Defendant, Keith Gushard, who reported the assault of Rhett Happel and Plaintiff's arrest in the

Meadville Tribune, but Defendant Gushard did not respond and did not report the information relayed by Plaintiff's counsel. **(April 15, 2019 Press Release of Plaintiff's Criminal Defense attached hereto and marked Exhibit "D")**.

Gushard's article depicting Plaintiff as the assailant, also shockingly, included publishing Plaintiff's home address in Maryland, a malicious and intentional intrusion upon Plaintiff's fundamental right to seclusion of private concerns. **(April 15, 2015 Meadville Tribune Article of Keith Gushard, attached hereto and marked Exhibit "E")**.

Additionally, as Plaintiff's preliminary hearing date of May 22, 2019 approached Plaintiff's counsel accumulated an additional statement from Jacob Reidenbach, who provided the Defense with an Affidavit attesting that sometime in the early morning hours of April 7, 2019, he was outside of Julian's Bar when he saw Josiah Williams approach Rhett Happel and the men carrying Happel out of Julian's Bar and tell the group that he was the person that beat up Happel and, then threatened to fight the entire group. **(Affidavit of Jacob Reidenbach, attached hereto and marked Exhibit "F")**.

The Defense was also provided with affidavits from Rosslin Watson attesting that on the evening of April 6, 2019 they went to a party at the Theta Chi fraternity house, at approximately 11:00 am and remained there with Plaintiff until they all went to McDonald's at 1:00 am, after which they all returned to their dorm at Allegheny College. **(Affidavit of Rosslin Watson, attached hereto and marked Exhibit "G")**.

Before the Defense could provide this information over to the Meadville Police Department, on May 15, 2019, apparently based on further investigation, the Commonwealth withdrew the charges against Plaintiff.

The witness who had identified Plaintiff as the assailant after viewing the facebook photos of Plaintiff with Jared Shaw, recanted his or her identification of Plaintiff and admitted that Plaintiff was not the man he or she saw attack Rhett Happel.

As part of the investigation which exonerated Plaintiff, a ring that had been confiscated from Plaintiff and believed to be a foreign object utilized in the assault against Happel yielded negative results from forensic testing analysis. Additionally, Plaintiff was not observed in a videotape obtained from the Julian's Bar, which apparently shows both Rhett Happel and Josiah Williams, but did not include Plaintiff.

Nevertheless, after the case was closed, despite the overwhelming evidence of Plaintiff's innocence, including the eyewitness recanting his claim that Plaintiff was the assailant, the Defendant, First Assistant District Attorney Paula DiGiacomo, stated in a Meadville Tribune article, written by Defendant, Kevin Gushard, that even though the case had been closed, Plaintiff remained a suspect.   **(May 16, 2019 Meadvile Tribune Article written by Keith Gushard, attached hereto and marked Exhibit "H")**.

There was clearly no legal cause to justify the prosecution of Plaintiff for Aggravated Assault, Simple Assault, and Harassment.    To the extent that there was legal cause to support the stop, detention and/or arrest of Plaintiff, the Defendants,

Patrolman Frum and Sergeant Merchbaker, failed to take reasonable steps to investigate and pursue information that would have indisputably negated any such legal cause, where Plaintiff's defense team actually ascertained the identity of the person who assaulted Rhett Happel.

Clearly, where the purported eyewitness was permitted to make a post incident identification of Plaintiff through an egregiously suggestive identification procedure, wherein the victim having given a vague description of the assailant as an African-American male with braids who was seen with Jared Shaw, the witness was only shown photos of Jared Shaw accompanied by Plaintiff, who is African-American but does not have braids, race was the only motivating factor in the decision to show photographs of Plaintiff to the witness.

At all times relevant to this Complaint, the conduct of Defendants Frum and Merchbaker was in willful, reckless and callous disregard of Plaintiff's rights under federal and state law. The deliberate indifference displayed by Patrolman Frum in violating Plaintiff's constitutional rights to not be arrested without probable cause, and to be free of racial discrimination, stemmed from the failure of Defendant, Meadville, Pennsylvania Police Chief Michael J. Tautin as the principle policymaker and implementer of practices, procedures and customs used by Meadville, Pennsylvania Police, to provide adequate supervision and training of Meadville, Pennsylvania Police Officers so that they would make arrests solely upon the establishment of a sufficient basis of probable cause, and be free of the taint of race based decision making.    The deliberate indifference displayed by Sergeant Merchbaker in detaining Plaintiff without reasonable suspicion, while Plaintiff was

attending a college lecture, solely because of race, stemmed from Sergeant Merchbaker's failure as the principle policymaker and implementer of practices, procedures and customs used by Allegheny College Department of Public Safety, to provide adequate supervision and training of Allegheny College Police Officers so that they would detain criminal suspects, solely upon the establishment of reasonable suspicion that they had engaged in criminal activity, and be free of the taint of race based decision making.

As a direct and proximate result of the conduct of all defendants, Plaintiff suffered substantial damages, including psychological harm, some or all of which may be permanent.

The statement by Defendant, First Assistant District Attorney, Paula DiGiacomo, that Plaintiff continues to be a suspect in the investigation of the brutal assault of Rhett Happel, which was published in a Meadville Tribune article, written by Defendant Keith Gushard, where Happel was in fact assaulted by Josiah Williams and Plaintiff was not even present during the incident, is an egregious invasion of privacy which placed Plaintiff in false light before the public and eviscerated Plaintiff's fundamental right to have a reputation of good standing in the community.

**(Exhibit I, Complaint, Paragraphs 17 through 56)**.

### III.  STANDARD OF REVIEW

A claim may be dismissed under Federal Rule of Civil Procedure (12)(b)(6) for "failure to state a claim upon which relief can be granted."    A Rule 12(b)(6) motion requires the court to examine the sufficiency of the complaint. **Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102 L.Ed. 80, 84 (1957) (abrogated in other respects by Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))**. Generally, in ruling on a motion to dismiss, the court relies on the complaint, attached exhibits, and matters of public record, including other judicial proceedings. **Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 208)**.

Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."    Rule 8(a)(2) does not require heightened fact pleading or specifics, but only enough facts to state a claim that is plausible on its face.    **Twombly, 550 U.S. at 570, 127 S.Ct. At 1974, 167 L.Ed.2d at 949**.

In determining whether a complaint is sufficient, the court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief.    **Fowler, 578 F.3d at 210 (citing Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008))**.

Although "conclusory" or "bare bones allegations" will not survive a motion to dismiss, **Fowler, 578 F.3d at 210,** a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on

the merits.   **Phillips, 515 F.3d at 231**.   Nonetheless, to survive a Rule 12(b)(6)

motion, the complaint must provide enough facts to raise a reasonable expectation

that discovery will reveal evidence of the necessary elements."   **Id. at 234 (quoting**

**Twombly, 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940) (internal**

**quotations omitted)**.

The court is required to conduct a two-part analysis when considering a rule

12(b)(6) motion.   First, the factual matters averred in the complaint, and any

attached exhibits, should be separated from legal conclusions asserted asserted.

**Fowler, 578 F.3d at 210**.   Any facts pled must be taken as true and any legal

conclusions asserted may be disregarded.   **Id. At 210-211**.

Second, the court must determine whether those factual matters averred are

sufficient to show that plaintiff has a "plausible claim for relief."   **Id. at 210-211**.

**(quoting Iqbal, 556 U.S. at 679, 129 S.Ct. At 1950, 178 L.Ed.2d at 884)**.

Ultimately, this two-part analysis is "context-specific" and requires the court to

draw on "its judicial experience and common sense" to determine if the facts pled in

the complaint have "nudged [plaintiff's] claims" over the line from "[merely]

conceivable [or possible] to plausible."   **Iqbal, 556 U.S. at 679-680, 129 S.Ct. at**

**1950)**.

### IV.  ARGUMENT

Plaintiff's constitutional claims are actionable against Defendants Meadville,

Pennsylvania, Patrolman Jared Frum, and Chief of Police Michael Tautin, through **42**

**U.S.C. Section 1983**.   **Section 1983** is an enabling statute that does not create any

substantive rights, but provides a remedy for the violation of federal constitutional

or statutory rights.   **Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000)**.    Section

1983 states:

> Every person who, under color of any statute, ordinance,
> regulation, custom, usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person wihtin the
> jurisdiction thereof to the deprivation of any rights,
> privileges or immunities secured by the Constitution and
> laws,shall be liable to the party injured in an action at law,
> suit in equity, or other proceeding for redress.

**42 U.S.C. Section 1983**.

   Thus to state a claim under Section 1983, a plaintiff must demonstrate that

defendant, acting under color of state law, deprived plaintiff of a federal

constitutional or statutory right.   **Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct.**

**1908, 1913, 68 L.Ed.2d 420, 428 (1986);Chainey v. Street, 523 F.3d 200, 219 (3d Cir.**

**2008) (quoting Kaucher v. County of Bucks, 45 F.3d 418, 423 (3d Cir. 2006))**.

   A defendant acts under color of state law when he exercises power "possessed

by virtue of state law and made possible only because the wrongdoer is clothed with

the authority of state law."   **West v. Adkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255,**

**101 L.Ed.2d 40, 49 (1988);Boneburger v. Plymouth Township, 132 F.3d 20, 23 (3d**

**Cir. 1997)**.

A. **PLAINTIFF'S CLAIMS FOR UNLAWFUL STOP AND DETENTION AGIANST SERGEANT MERCHBAKER, AND FALSE ARREST AND FALSE IMPRISONMENT AGAINST PATROLMAN FRUM SHOULD NOT BE DISMISSED BECAUSE THERE WAS NO CREDIBLE EVIDENCE SUPPORTING, REASONABLE SUSPICION TO DETAIN PLAINTIFF OR PROBABLE CAUSE TO ARREST PLAINTIFF, WHERE APPELLANT DID NOT MATCH THE PHYSICAL DESCRIPTION PROVIDED BY PURPORTED EYEWITNESS, WHO MADE EGREGIOUSLY SUGGESTIVE POST INCIDENT IDENTIFICATION OF APPELLANT AS ASSAILANT, WHICH THE WITNESS ULTIMATELY RECANTED, AND THERE WAS OVERWHELMING EVIDENCE OF THE IDENTITY OF THE ACTUAL ASSAILANT.**

The constitutionality of a seizure that is not an arrest depends upon "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."   **Terry v. Ohio, 392 U.S. 1, 19 (1968)**.   "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope," the latter of which must be strictly tied to and justified by the circumstances which rendered it permissible."   **Id. at 18-19 (citations and internal quotation marks omitted)**.   Therefore, in determining reasonableness, we consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."   **Id. at 20**.

An arresting officer violates a person's right to be free from false arrest and false imprisonment when the officer arrests that person without probable cause.

See, e.g., **Hanks v. County of Delaware, 518 F.Supp.2d 642, 647 (E.D. Pa. 2007)**.

Probable cause exists if the facts and circumstances within the arresting officer's

knowledge at the moment of the arrest are sufficient to warrant a reasonable

person's believing that an offense had been or is being committed.    **See, e.g.,**

**Pittman v. McDuffy, 240 Fed.Appx. 524, 526 (3d Cir. 2007) (citations**

**omitted);Cherry v. Garner, 204 WL 3019241, at *9 (E.D. Pa. Dec. 30, 2004)**.

The Third Circuit has held that "[p]robable cause to arrest requires more than

mere suspicion; however, it does not require that the officer have evidence sufficient

to prove guilt beyond a reasonable doubt. **Orsatti v. New Jersey State Police, 71**

**F.3d 480, 482-83 (3d Cir. 1995)**.    Rather, an arresting officer has probable cause

"when the facts and circumstances within [his] knowledge are sufficient in

themselves to warrant a - reasonable person to believe that an offense has been or

is being committed by the person to be arrested."    **Id. At 483**.

"A false imprisonment claim under 42 U.S.C. Section 1983 is based on the

Fourteenth Amendment protection against deprivation of liberty without due

process of law."    **Groman v. Township of Manalapan, 47 F.3d 628, 636 (3d Cir.**

**1995) (citing Baker v. McCollan, 443 U.S. 137, 142 (1979))**.    In this context, the

Fourth Amendment- as incorporated through the Fourteenth Amendment--"requires

the States to provide a fair and reliable determination of probable cause as a

condition for any significant pretrial restraint of liberty."    **Baker, 443 U.S. at 142**

**(citing Gerstein v. Pugh, 420 U.S. 103, 125 (1975)**.

On April 10, 2019, three days after the alleged assault against Rhett Happel,

Defendants Patrolman Jared Frum of the Meadville Police Department and Sergeant

William Merchbaker of the Allegheny College campus police purportedly interviewed an eyewitness to the assault against Happel at the Allegheny College Public Safety Building.   Allegedly, the witness reported that the assailant was an African-American male approximately six feet tall, wearing braids, who walked up to Happel when he was in the bathroom at Julian's Bar tapped Happel's shoulder from behind then punched Happel on the left side of his face as Happel turned around. The witness then reported that after striking Happel, the assailant walked to the tavern side of Julian's, then eventually left the establishment without being seen.

The witness was shown a facebook photo of Jared Shaw, a white male that had been observed at Julian's Bar with the assailant on the evening of the assault, and an African-American male, later identified as the Plaintiff, Kobe Pinkney.   Unlike the description given by the purported eyewitness, the Plaintiff was not wearing braids while depicted in the photograph and has never wore a braids hairstyle. Nevertheless, the witness identified Plaintiff as the man that assaulted Rhett Happel in Julian's Bar on the evening of April 7th.

As a result of the identification of Plaintiff as the assailant, filed an affidavit of probable cause, seeking an arrest warrant for the arrest of Plaintiff.   The following day, April 11th, Sergeant William Merchbaker removed Plaintiff, a student at Allegheny College, from a philosophy class, after which Defendant Frum arrested Plaintiff.   Unlike the description of the assailant given by the alleged eyewitness, Plaintiff did not braids in his hair, but had a regular hair cut.

Plaintiff was not shown to the alleged eyewitness for identification purposes, and the eyewitness ultimately recanted his identification and denied that

Appellant was the man that assaulted Rhett Happel.

Clearly, where Plaintiff in no way matched the description of the assailant given by the unidentified witness, and was not identified in person by said witness, the facts and circumstances within Patroman Frum's knowledge at the moment of arrest are insufficient to warrant a reasonable person's believing that Plaintiff was the man that assaulted Rhett Happel. Therefore, Sergeant Merchbaker's detention of Plaintiff, was wholly supported by reasonable suspicion, which violated Plaintff's right to a lawful stop and detention under the Fourth Amendment of the United States Constitution.

Contrary to the absurd assertion of Defendant Frum, a showing of fraud or dishonesty is not required to establish that Frum did not have probable cause to arrest Plaintiff, where clearly no reasonable police officer would arrest someone who did not match the physical description given by the witness, and as a college scholarship athlete with no criminal history, was not predisposed to engage in such heinous conduct.

That there was no probable cause to support the arrest of Plaintiff, was borne out by further investigation which showed that coincident with the time of the April 7th assault against Happel, Plaintiff got a bite to eat at McDonalds then went home to his dorm. Additionally, other witnesses identified at the scene reported to police that Plaintiff was not at the scene of the assault, and identified another male, Josiah Williams, as the actual assailant.

Finally, the inadequacy of Defendant Frum's investigation is underscored by the fact that he apparently did not actually question Jared Shaw, who was observed at

the scene accompanied by the actual assailant.    Clearly, Frum's failure to interview Jared Shaw was wholly unreasonable and precluded forming a basis of probable cause to arrest anyone.

Accordingly, for the foregoing reasons, there was no reasonable suspicion probable cause supporting Plaintiff's detention and subsequent arrest for the assault of Rhett Happel.    Therefore, Plaintiff's claims for unlawful stop and detention, false arrest and false imprisonment should not be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Evidence, where Defendants' actions were unreasonable in detaining and arresting Plaintiff even though he did not match the physical description given by the putative eyewitness, and did not bother to interview the one man that was observed with the assailant.

### B.  PLAINTIFF'S CLAIM FOR MALICIOUS PROSECUTION SHOULD NOT BE DISMISSED, WHERE PATROLMAN FRUM INITIATED THE PROSECUTION OF PLAINTIFF WITHOUT PROBABLE CAUSE.

In order to prevail on a Section 1983 malicious prosecution claim, a plaintiff must show the following:

> (1)    the defendant initiated a criminal proceeding; (2) the criminal proceeding in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

**Dibella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)**.

Clearly, Defendant Patrolman Frum's conduct arose to malicious prosecution. Patrolman Frum initiated the criminal proceeding against Plaintiff by swearing out a affidavit of probable cause for his arrest then subsequently personally arresting Plaintiff. The prosecution against Plaintiff culminated in the case being nolle prossed by the Commonwealth, after it was clear that Plaintiff was arrested without probable cause as evidenced by the preceding section. Clearly, Defendant Frum's conduct was wholly malicious, motivated solely by racial animus and not the pursuit of justice, where despite receiving clear and convincing evidence of the identity of the actual assailant Patrolman Frum and the Meadville, Pennsylvania Police Department have not lifted a finger to apprehend and arrest the person.

Accordingly, for the foregoing reasons, Defendant's motion to dismiss Plaintiff's claim for malicious prosecution should be denied, where Patrolman initiated the prosecution, such conduct was clearly malicious, where there was no probable cause for Plaintiff's arrest, and the prosecution initiated by Patrolman Frum was ultimately withdrawn by the Commonwealth.

### C. DEFENDANTS PATROLMAN FRUM AND SERGEANT MERCHBAKER ARE NOT ENTITLED TO QUALIFIED IMMUNITY WHERE THEIR CONDUCT IN DETAINING, ARRESTING AND PROSECUTING PLAINTIFF WITHOUT PROBABLE CAUSE WAS WHOLLY UNREASONABLE.

"The doctrine of qualified immunity protects governmental officials "from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known.'"
**Pearson v. Callahan,** 555 U.S. 223 (2009) (quoting **Harlow v. Fitzgerald,** 457 U.S. 800, 818 (1982)).   Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'"   **Pearson,** at 815 (quoting **Mitchell v. Forsythe,** 472 U.S. 511, 526 (1985)).   "[The Supreme Court] has repeatedly stressed the importance of resolving immunity questions at the earliest stages in litigation.'"   **Scott v. Harris,** 550 U.S. 372, 376 n.2 (2007) (quoting **Hunter v. Bryant,** 502 U.S. 224, 227 (1991)).

The United States Supreme Court has articulated a two-part test to determine whether a state official is entitled to the defense of qualified immunity.   In **Saucier v. Katz,** 533 U.S. 194 (2001), the Supreme Court stated that the initial inquiry is "[t]aken in the light most favorable to the party aserting the injury, do the facts alleged show the officer's conduct violated a constitutional right."   **533 U.S. at 201.** If no such right would have been violated, then there is no need for the second step.

If a right were violated, then the next question to ask is whether a reasonable officer would have known that his or her conduct violated the right.   **Debellis v. Kulp,** 166 F.Supp.2d 255, 266 (E.D. Pa. 2001).

Clearly, reviewing the propriety of Plaintiff's arrest in the light most favorable to Plaintiff, Plaintiff was clearly arrested without probable cause, in violation of his right to a fair search and seizure under the Fourth and Fourteenth Amendments to the United States Constitution, where Plaintiff did not match the physical description given by the purported eyewitness, when he was arrested by Sergeant Merchbaker, and Defendant Patrolman Frum did not conduct a thorough investigation, where he

failed to qestion Jared Shaw, the man eyewitnesses saw with the purported assailant, Josiah Williams, and which would have elicited that Plaintiff had an airtight alibi, where coincident with the date and time of the assault against Happel he was returning to his Allegheny College dorm room from a trip to a local McDonald's and other eyewitnesses at the scene who witnessed the assault would have identified another man as the assailant.    Therefore, clearly, Defendant Patrolman Frum is not entitled to qualified immunity, where any reasonable law enforcement officer would know that in arresting Plaintiff without a scintilla of credible eyewitness or physical evidence to support probable cause, in violation of Plaintiff's constitutional rights, they were subjecting him to false arrest, false imprisonment and malicious prosecution.

Accordingly, Defendants Sergeant Merchbaker and Patrolman Frum do not enjoy qualified immunity against liability for violating Plaintiff's civil rights.

### D.  SERGEANT MERCHBAKER IS CLEARLY A STATE ACTOR, AND IS THEREFORE LIABLE UNDER 42 U.S.C. SECTION 1983, FOR VIOLATING PLAINTIFF'S CONSTITUTIONAL RIGHT TO A LAWFUL SEIZURE UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Defendant Merchbaker contention that he is not liable for violating Plaintiff's Fourth Amendment right to a lawful detention, under 42 U.S.C. Section 1983, because he was not a state actor even though he detained Plaintiff in his Philosophy class without reasonable suspicion is wholly erroneous.    To establish a prima facie case under Section 1983, a plaintiff must demonstrate 1) that a person acting under the color of state law 2) deprived him of a federal right.    **Grwoman v. Township of**

**Manalpan, 47 F.3d 628, 633 (3d Cir. 1995)**. The test for determining whether

someone is acting under 'color of law' is virtually idenitical to evaluating whether

there is state action." **Francis v. Lehigh University,** No. 10-4300, 2011 WL 204749,

***3 (E.D. Pa. Jan. 24, 2011) (citing Leshko v. Seris, 423 F.3d 337, 339 (3d Cir. 2005))**.

Therefore, in order to state a claim under Section 1983, a plaintiff "must allege that

he was deprived of a federal constitutional or statutory right by a state actor."

**Francis, 2011 WL 204749, at *3**.

In this respect, "the color of state law" element means that "merely private

conduct, no matter how discriminatory or wrongful, does not violate Section 1983."

(citing **Am. Mfrs. Mut. Ins. Co. V. Sullivan, 526 U.S. 40 (1999))**. When the relevant

actors are private individuals or associations, the Court must still assess whether

their actions were nevertheless "under color of state law," which is a fact-specific

inquiry. **Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995)**.

Conduct by a private actor satisfies the "color of state law" requirement if the

deprivation is "fairly attributable to the state." **Francis, 2011 WL 204749, at *4**

**(citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982))**. The notable

requirement regarding state action is that a defendant in a Section 1983 action

"exercised power possessed by virtue of state law and made possible only because

the wrongdoer is clothed with the authority of state law." **Groman, 47 F.3d at 638**

**(quoting West v. Adkins, 487 U.S. 42, 49 (1988))**. "A private action is not

converted into one under color of state law merely by some tenuous connection to

state action." **Id.**

In the instant case, Sergeant Merchbaker is clearly a state actor, where Plaintiff's

detention, arrest and prosecution were wholly attributable to the Meadville Police Department, through the actions of Trooper Frum, and Sergeant Merchbaker had more than a tenuous connection where he was the actor who detained and cuffed Plaintiff while he was sitting in an on campus Philosophy lecture.    Sergeant Frum's conduct as a state actor, clearly violated Plaintiff's Fourth Amendment rights against unlawful stop and detention, false arrest and false imprisonment.

Accordingly, for the foregoing reasons, the 1983 claims against Sergeant Merchbaker should not be dismissed,where he was clearly a state actor in the *case sub judice*.

### E.  THE DEFENDANTS MEADVILLE, PENNSYLVANIA AND CHIEF OF POLICE MICHAEL TAUTIN ARE LIABLE UNDER <u>MONELL</u>, BECAUSE THEY CLEARLY ARE DELIBERATELY INDIFFERENT TO THE CONSTITUTIONAL RIGHTS OF PLAINTIFF, WHERE THEY FAILED TO ADEQUATELY TRAIN DEFENDANT PATROLMAN FRUM, WHO CLEARLY DETAINED AND ARRESTED PLAINTIFF WITHOUT REASONABLE SUSPICION AND PROBABLE CAUSE.

A municipality cannot be liable for the actions of their employees under the theory of respondeat superior, but can be liable for constitutional violations when they are the result of an official policy, custom or failure to train. **Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).    A policy is a** "statement, ordinance, regulation, or decision officially adopted and promulgated by [the governing body's officers."    **Id. at 690**.    A custom is an act "that has not been

formally approved by an appropriate decision-maker, but that is so widespread as to have the force of law." **Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir. 2003)**.    A plaintiff must show the policy was the cause of the constitutional deprivation.    **Board of County Commissioners v. Bryan County Oklahoma v. Brown, 520 U.S. 397, 404 (1977)**.    It is insufficient to show that one particular officer was unsatisfactorily trained, since "the officer's shortcomings may have resulted from factors other than a faulty training program."    **City of Canton Ohio v. Harris, 489 U.S. 378, 390-91 (1989)**.    It is also insufficient to merely show a constitutional deprivation "could have been avoided if an officer had better or more training," or that a program was negligently administered.    **Id. at 391**.

The Supreme Court has held "the inadequacy of police training may serve as the basis for Section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."    **City of Canton, 489 U.S. at 388 (reversing a jury verdict for the plaintiff)**. A failure constitutes a policy when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need."    **Id.**

"Under Section 1983 [g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondent superior*."    **Peele v. Delaney, No. 12-4877, 2017 WL 4673457, at *3 (E.D. Pa. 3, 2017) (citation and internal quotation omitted)**.    "There are two ways that a supervisor may be held liable under Section 1983 for acts committed by his or her

subordinates.    A supervisor may be liable if they act [act] with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused [the] harm.    A supervisor may be liable also if he or she participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced to the subordinate's unconstitutional conduct."    **Id.**

To establish that supervisors are liable under Section 1983 for deliberate indifference to an unconstitutional policy or practice, [t]he plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this risk existed, (4) the supervisor was indifferent to the risk; and (5) the underlying violation resulted from the supervisor's failure to employ that supervisory practice or procedure.    **Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001).**    A Plaintiff must specifically identify the acts or omissions of the supervisors that show deliberate indifference, and suggest a relationship between the "identified deficiency' of a policy or custom and the injury suffered. **Id. at 233.**

Certainly, where Defendant Patrolman Frum arrested Plaintiff after receiving description of the assailant of Rhett Happel as wearing braids and Plaintiff did not have hair braids, and did not otherwise gather any other credible eyewitness or physical evidence implicating Plaintiff as the assailant through a reasonable and competent investigation, Patrolman Frum initiated the arrest and prosecution of

Plaintiff without probable cause, the City of Meadville, Patrolman Frum had received inadequate training to perform his duty as a police officer a fact to which Defendants Meadville, Pennsylvania and Defendant Michael Tautin as principle policy maker, were deliberately indifferent.

Defendant Patrolman Frum apparently objects to liabilty of Defendant Police Chief Michael Tautin, because he was not personally involved in the botched investigation and arrest of Plaintiff.    However, it was clearly established in **Delaney,** that there are two ways that police supervisors may be held liable under **Monell,** actual personal involvement in violating a plaintiff's constitutional rights, or exercising deliberate indifference to persons being falsely arrested and falsely imprisoned through acquiescence, which was clearly what happened in the ***case sub judice***, where Defendant Tautin, like everybody else in Meadville, Pennsylvania was clearly aware of Plaintiff's criminal case which was highly publicized by the local media, including Defendant Meadville Tribune.    For Police Chief MIchael Tautin to not intervene and correct the miscarriage of justice perpetrated by Patrolman Frum's lawless arrest of Plaintiff clearly evidenced a policy of harassing and persecuting African-American men in Meadville, Pennsylvania.

Accordingly, for the foregoing reasons, Defendants Meadville, Pennsylvania and Chief of Police Michael Tautin are liable under **Monell** for the unconstitutional conduct of Defendant Patrolman Jared Frum.

**F. PLAINTIFF'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY DEFENDANTS FRUM, TAUTIN, AND CITY OF MEADVILLE, ON ACCOUNT OF RACE, WHERE PLAINITFF WAS DETAINED, ARRESTED AND PROSECUTED WITHOUT PROBABLE CAUSE AND/OR REASONABLE SUSPICION, WHILE A SIMILARLY SITUATED WHITE PERSON OF INTEREST WAS WHO WAS PRESENT AT THE SCENE OF RHETT HAPPEL'S ASSAULT WAS OFFERED IMMUNITY, THE OPPORTUNITY TO COOPERATE, AND WAS NEVER ARRESTED.**

The Equal Protection Clause of the Fourteenth Amendment provides that states shall not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.  This clause "is essentially a direction that all persons similarly situated should be treated alike."  **City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 430 (1985)**.  To prevail on an equal protection claim, a plaintiff must present evidence that he has been treated differently from persons who are similarly situated."  **Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003)**. The Equal Protection Clause does not create substantive rights. **Vacco v. Quill, 521 U.S. 793, 799 (1997)**.  It is designed to "secure every person within the State's jurisdiction against internation and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  **Village of Willowbrook v. Willowbrook, 528 U.S. 562, 564 (2000)**.  A class of one can bring an equal protection claim when there is no rational basis for the difference in treatment.  **Id.**

In the *case sub judice*, Defendant Patrolman Jared Frum arrested Plaintiff after interviewing an unidentified person who stated that while in the bathroom of Julian's bar in Meadville, Pennsylvania, he observed an unidentified Afrian-American man wearing braids sneak up from behind Rhett Happel, tap him on the shoulder then slug him in the face. Apparently, this putative witness observed the assailant with a white man he recognized named Jared Shaw, a football player for Defendant Allegheny College. The witness was then shown facebook photographs of Jared Shaw pictured with the Plaintiff, Kobe Pinkney. Upon being shown the photographs, the alleged eyewitness identified as the assailant.

Based on the identification of the witness, Defendant Patrolman Jared Frum swore out an affidavit of probable cause for Plaintiff's arrest, then directed his arrest and apprehension with the assistance of Defendant Sergeant William Merchbaker, who pulled Plaintiff out of his philosophy class. Unlike the description of the assailant given by the alleged witness, Plaintiff did not wear braids and has never worn braids, including the photographs allegedly shown to the witness.

Clearly, the utterly ridiculous and suggestive post incident identification, wherein photographs of Plaintiff were shown to the witness, because he was seen with a person observed at the scene of the crime, on earlier occasions which had nothing to do with the incident is at once shocking and shameful. There was absolutely no basis to make Plaintiff a part of the criminal investigation of the brutal assault on Rhett Happel, where Plaintiff did not match the description given by the witness and was not otherwise observed by anyone at Julian's bar at anytime on the evening of the assault. Clearly, the police were looking for any black person that

-32-

accompanied Jared Shaw.   Obviously since Shaw was identified as being at the scene with the assailant, the prudent and responsible course of action for Defendant Frum was to simply ask Shaw, who the assailant was.   How hard would that have been.   Instead, apparently acting on the premise that every white person has their one African-American friend, Defendant Frum arrested Plaintiff.

Clearly, the manner and tenor of the investigation conducted by Defendant Frum was based solely based on the fact that Plaintiff is African-American, a discrete and insular suspect classification, and would not have been undertaken in this way had the suspect been white.   Particularly where the physical description given by the witness in no way matched Plaintiff's appearance.

Conversely, even though the police reasonably knew that Jared Shaw, who is white, was with the assailant and suspected that he was likely culpable for conspiring with the him, Patrolman Frum did not arrest Shaw, who was offered immunity in exchange for identifying the assailant.   Even though the case against Plaintiff was appropriately dismissed, Patrolman Frum and the Meadville police department have taken no further against Jared Shaw.     Clearly, the total unwillingness and failure to hold Shaw accountable, while arresting Plaintiff without a scintilla of credible evidence, is an egregious act of disparate treatment inflicted upon Plaintiff.

Accordingly, for the foregoing reasons, Defendant's motion to dismiss Plaintiff's claim for equal protection should be denied, where Plaintiff was singled out on account of race and arrested without probable cause, based on an egregiously suggestive post incident identification process, while a similarly situated white person of interest, who faced more damning evidence of being part of a

conspiracy with the assailant, was not prosecuted, but offered full immunity and ultimately not prosecuted.

> **G.  THE MOTION OF DEFENDANTS' MEADVILLE TRIBUNE, COMMUNITY HOLDINGS, INC., KEITH GUSHARD AND PAULA DIGIACOMO, TO DISMISS PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS SHOULD BE DENIED, WHERE DEFENDANTS' CONDUCT IN PUBLISHING AN ARTICLE IDENTIFYING PLAINTIFF AS THE ASSAILANT OF RHETT HAPPEL, WHILE REFUSING TO PUBLISH A PROFFERED PRESS RELEASE OF PLAINTIFF'S ATTORNEY REFUTING THE ALLEGATIONS AGAINST PLAINTIFF, TO ENSURE FAIR AND BALANCED COVERAGE THEN PUBLISHING A SECOND ARTICLE STATING THAT PLAINTIFF REMAINED A SUSPECT, AT THE BEHEST OF DEFENDANT DIGIACOMOMO, EVEN THOUGH THE CRIMNAL CASE HAD BEEN    WITHDRAWN, WHILE ONCE AGAIN REFUSING TO TAKE A STATEMENT FROM PLAINTIFF'S ATTORNEY CLARIFYING WHY THE OVERWHELMING EVIDENCE OF PLAINTIFF'S INNOCENCE CLEARLY MITIGATED AGAINST ANY FORESEEABLE FUTURE PROSECUTION INVOLVING PLAINTIFF, WAS EXTREME, OUTRAGEOUS, RECKLESS CONDUCT WHICH AROSE TO THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

To establish a claim under Pennsylvania law for IED, plaintiff must show that a defendant: (1) by extreme and outrageous conduct (2) intentionally or recklessly

caused (3) severe emotional distress.  **Manley v. Fitzgerald**, 997 A.2d 1235, 1241

**(Pa.Commw.Ct. 2010).**   Extreme and outrageous conduct is defined as conduct "so

outrageous in character, and so extreme in degree as to go beyond all possible

bounds of decency and to be regarded as atrocious, and utterly intolerable in a

civilized community."   **Hunger v. GrandCent. Sanitation,** 670 A.2d 173, 182

**(Pa.Super.Ct. 1996) (citing** Restatement (Second) of Torts, **Section 46 cmt. D (1977)**.

"Conduct that Pennsylvania courts have deemed sufficiently outrageous to

constitute IED includes: (1) killing the plaintiff's son with an automobile and then

burying the body, rather than reporting the incident to the police; (2) intentionally

fabricating documents that led to the plaintiff's arrest for murder; and (3) knowingly

releasing to the press false medical records diagnosing the plaintiff with a fatal

disease."   **Dull v. West Manchester Township Police Department,** 604 F.Supp.2d

**739, 756 (M.D. Pa, 2009) (citation omitted)**.

Shortly after the arrest of Plaintiff, Defendants Keith Gusard, Meadville

Tribune, and the parent company for Meadville Tribune, Community Holdings, Inc.,

hereinafter the "Media Defendants," published an article wherein it reported a

witness observed Plaintiff walk "up to the man, tapped him on the shoulder and,

when he turned around, he was punched once by [Plaintiff] who then walked away,

quoting Defendant Frum's affidavit of probable cause which was the basis for

Plaintiff's arrest warrant.   The article also oddly published Plaintiff's home address.

The same day, Plaintiff's attorney, the undersigned counsel, sent an email to

Defendant Gushard refuting the allegations against Plaintiff, averring that Plaintiff

was never at Julian's Bar on the night of the incident and enjoyed an air tight alibi, as

numerous observers would have reported that instead he attended a frat party at the Theta Chi fraternity house, as well as criticizing the investigation for simply picking Plaintiff out of photographs wherein he was depicted with Jared Shaw a white male who was at the scene and was observed accompanying Plaintiff. The letter also noted that the male with Shaw was another African-American male. . The Media Defendants refused to release Plaintiff's attoney's statement to the public.

One month later, on May 16, 2019, the Media Defendants did publish an article acknowledging that the charges against Plaintiff had been dropped. However, the article included the caveat that Plaintiff remained a suspect in the investigation, which apparently had been relayed by Defendant Paula DiGiacomo, the Crawford County Assistant District Attorney charged with prosecuting the case.

Shortly, thereafter the undersigned counsel once again contacted Defendant Keith Gushard, this time by phone to outline why Plaintiff's overwhelming evidence of alibi, as well as the statements of eyewitnesses who actually identified Josiah Williams as the assailant and African-American male accompanying Jared Shaw, once again to no avail.

Clearly, the biased coverage of the Media Defendants clearly designed to cast Plaintiff in the false light of assaulting Rhett Happel when he has never entered the bar where the incident happened, and Defendant DiGiacomo's statement that Plaintiff is somehow still a suspect despite his evidence of alibi and the accounts of others at the scene that Josiah Williams was the actual assailant, is outrageous, shocking and intentional conduct with reckless disegard to the truth and the impact

of such misleading journalism on Plaintiff's state of mind.    Such conduct is so

outrageous in character, and so extreme in degree that it is utterly intolerable in a

civilized society.

Accordingly, for the foregoing reasons, Plaintiff's claim for intentional

infliction of emotional distress against the Media Defendants and Defendant

Digiacomo, should not be dismissed, where these Defendants engaged in atrocious,

outrageous misconduct in falsely portraying Plaintiff as the assailant of Rhett Happel.

**H.   THE MEDIA DEFENDANT'S AND DEFENDANT PAULA DIGIACOMO'S**

**MOTION TO DISMISS PLAINTIFF'S CLAIM FOR CASTING IN FALSE LIGHT,**

**WHERE THEIR COVERAGE OF THE ASSAULT OF RHETT HAPPEL PLACED**

**PLAINTIFF IN A FALSE LIGHT SHOULD BE DENIED, WHERE THE**

**EVIDENCE WAS OVERWHELMING THAT PLAINTIFF WAS NOT THE**

**ASSAILANT OF RHETT HAPPEL AND ACTUALLY DECISIVELY POINTED TO**

**ANOTHER MALE, AND THE CHARGES AGAINST PLAINTIFF WERE**

**WITHDRAWN BY THE COMMONWEALTH.**

*This argument fully incorporates the facts outlined in the preceding argument.*

Pennsylvania courts recognize invasion of privacy as an actionable tort.

**Marks v. Bell Telephone Company of Pennsylvania,** **331 A.2d 424, 430 (Pa. 1975)**.

The Pennsylvania Superior Court has adopted the definition of invasion of privacy as

described by the **Restatement (Second) of Torts Section** 652(B)-E.    **Larsen v.**

**Philadelphia Newspapers, Inc.,** **543 A.2d 1181, 1188 (Pa.Super.Ct. 1988) (citing**

**Chicarella v. Passant,** 494 A.2d 1109 (Pa.Super. 1985)).   Invasion of privacy

includes "four analytically distinct torts," one of which is for publicity placing a

person in a false light as:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy if
> (a)  the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b)  the actor had knowledge of or acted in reckless disregard as to the falsity of the pubicized matter and the false light in which the other would be placed.

**Restatement (Second) of Torts** **652E (1977)**.   The Comments to Section **652E**

explain that defamation is not a necessary element of this tort.    "It is not enough

that [the plaintiff] is given unreasonable and highly objectionable publicity that

attributes to him characteristics, conduct or beliefs that are false, and so is placed

before the public in a false position."   **Id. At Section 6452E, cmt. b.**   A publication

may place one in a false light if its factual statements imply a falsehood, even if every

individual, discrete statement is true.   **Larsen, 543 A.2d at 1189.**   The "discrete

presentation of information in a fashion which renders the publication susceptible to

inferences casting one in false light" may establish a claim for this tort.

   The court "must initially decide whether the defamatory material was capable

of being reasonably understood as intended to refer to the plaintiff.   **Harris by**

**Harris v. Easton Publishing Company, 483 A.2d 1377, 1385 (Pa.Super.Ct. 1984)**.

Integral to that determination is the appearance of the publication as a whole.   In

deciding a motion to dismiss, we may consider an undisputed authentic document

that a defendant to a motion to dismiss if the plaintiff's claims are based on the

document.   **Pension Benefits Guaranty Corp., 998 F.2d at 1196**.

Although the articles published by the Media Defendants were largely verbatim accounts of the Crawford County District Attorney's prosecution of Plaintiff, clearly, the Defendant's publication of the Commonwealth's ultimately disproven allegations clearly placed Plaintiff in a false light.    Plaintiff did not assault Rhett Happel because he wasn't at Julian's Bar on the night of the alleged incident, and anyway it was Josiah Williams, another African-American male, who slugged Happel.    Clearly, the Media Defendants had ample information at their disposal, where Plaintiff's criminal defense attorney outlined the evidence clearly establishing that Plaintiff was not the assailant in the press release proffered immediately after the Media Defendants' first article.    Where the Media Defendants refused to relay Plaintiff's account to the general public, to provide a more nuanced, broader and fair accounting of the facts surrounding the case, they acted with reckless disregard of the truth in casting Plaintiff in a false light.

Similarly, Defendant DiGiacomo acted with reckless disregard for the truth in casting Plaintiff in a false light where she completely disregarded the overwhelming evidence of Plaintiff's airtight alibi, which showed that coincident with the assault, Plaintiff was actually home in his dorm, as well as the accounts of multiple eyewitnesses that the assailant was Josiah Williams.

Accordingly, for the foregoing reasons, the Media Defendant's and Defendant DiGiacomo's motion to dismiss Plaintiff's claim for casting in false light should be denied, where Defendant acted with reckless disregard of crucial facts at their disposal which would have discounted the veracity of the Commonwealth's

case-in-chief against Plaintiff, thereby unfairly casting Plaintiff, an innocent man, in a false light to the public, as the assailant of Rhett Happel.

### I.  THE MEDIA DEFENDANTS ARE NOT PROTECTED FROM LIABILITY UNDER THE FAIR REPORT PRIVILIGE, WHERE THE SOURCE OF THEIR BIASED AND UNFAIR COVERAGE OF THE PROSECUTION, WAS FROM DEFENDANT ASSISTANT DISTRICT ATTORNEY PAULA DIGIACOMO WHO MADE OFF HAND REMARKS ABOUT PLAINTIFF'S CASE TO THE MEDIA DEFENDANTS IN A PRIVATE SETTING, WHILE NOT ACTING IN HER OFFICIAL CAPACITY.

"The fair report privilege allows a publisher to repeat defamatory statements made during covered proceedings (judicial proceedings, official government actions, legislative and executive sessions, law enforcement efforts) without being liable for defamation." **Fanelle v. Lojack Corp., CIV.A. 99-4292, 2000 WL 1801270, at *6 (E.D. Pa.Dec.   7, 2000) (citing Thomas McCarthy, *The Rights of Publicity and Privacy* Section 8.67 p. 8-46 (1999), *see also* Sciandra v. Lynett, 187 A.2d 586, 688 (Pa. 1963) ("Upon the theory that it is in the public interest that information be made available as to what takes place in public affairs, a newspaper *has the privilege to report the actsof the executive or administrative officials of government.")* (emphasis added)**.    The media is privileged to publish what may otherwise be found to be defamatory information contained in investigations. ***See* Medico v. Time, Inc., 509 F.Supp. 268, 279 (E.D.Pa.1980),** *aff'd***, 643 F.2d 134 (3d Cir. 1981) (applying Pennsylvania law in concluding that the publication of a confidential investigation conducted by the Federal Bureau of Investigation was**

**afforded the protection of the fair report privilege).** Notably, the fair report privilege may be forfeited if the publisher out of the scope of the privilege." **Sciandra v. Lynett, 187 A.2d 586, 589 (Pa. 1963).**

Clearly, Defendant Paula DiGiacomo was not acting within the scope of her duties as the "First Assistant District Attorney of Crawford County," when she told Defendant Keith Gushard that Plaintiff was still a suspect in the Rhett Happel assault investigation, as well as other facts about the case, even though the case against Plaintiff had been nolle prossed. Accordingly, neither the Media Defendants or Defendant DiGiacomo can claim some kind of immunity against prosecution under the fair report privilege, which is essentially confined to speech undertaken in the course of official acts, official government records and statements made by public officials, not idle gossip on the good ole boy network.

Accordingly, for the foregoing reasons, the Media Defendants do not enjoy immunity against liability under the fair report privilege, where the source of their publications was Defendant DiGiacomo, while acting outside the scope of her official capacity.

### J. DEFENDANT PAULA DIGIACOMO IS NOT IMMUNE FROM LIABILITY UNDER THE POLITICAL SUBDIVISION TORT CLAIMS ACT, WHERE IN RELAYING GOSSIP TO DEFENDANT KEITH GUSHARD THAT PLAINTIFF WAS STILL A SUSPECT IN THE RHETT HAPPEL ASSAULT INVESTIGATION DEFENDANT DIGIACOMO WAS NOT ACTING IN HER OFFICIAL CAPACITY AS THE FIRST ASSISTANT DISTRICT ATTORNEY OF CRAWFORD COUNTY, PENNSYLVANIA.

The doctrine of absolute privilege for high public officials, as its name implies, is unlimited and exempts a high public official from all civil suits for damages arising out of false defamatory statement and even from statements or actions motivated by malice, provided the statements are made or the actionsare taken in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed within his jurisdiction.   **Linder v. Mollan, 677 A.2d 1194, 195 (Pa. 1996)**.

Defendant DiGiacomo told Defendant Gushard that Plaintiff was still a suspect in the Rhett Happel investigation, even though she had just nolle prossed the case against him.   Although she alleges in her motion to dismiss that she was acting in her official capacity, that is utterly ridiculous where the case against Plaintiff was over, because she herself closed it.   Therefore, there was no official business going on regarding the terminated prosecution of Plaintiff.   Clearly, Defendant DiGiacomo was attempting to somehow save face after so publicly crucifying an innocent man. Since Defendant DiGiacomo was no longer acting in her official capacity, she is clearly not immune to prosecution under the Political Subdivision Tort Claims Act.

Accordingly, Defendant DiGiacomo's motion dismiss Plaintiff claims against her because of immunity under the Political Subdivision Tort Claims Act should be denied, where she was clearly not acting in any official capacity when she recklessly cast Plaintiff in a false light.

### K. PLAINTIFF'S CLAIMS FOR INVASION OF PRIVACY FOR INTRUSION UPON SECLUSION AGAINT THE MEDIA DEFENDANTS AND PAULA DIGIACOMO FOR UNREASONABLE PUBLICATIONS ARE WHOLLY PROPER.

Pennsylvania law recognizes four torts under the umbrella of invasion of privacy: "[1] unreasonable intrusion upon the seclusion of another; [2] appropriation of another's name or likeness; [3] unreasonable publicity given to another's private life; and [4] publicity that unreasonably places the other in a false light before the public." *See* **Burger v. Blair Med. Assocs., Inc., 600 Pa. 194, 964 A.2d 374, 376-77 (2009) (citing Restatement (Second) of Torts Sections 652B-E (1977)).** To state a claim for intrusion upon seclusion of their private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused suffering, shame or humiliation to a person of ordinary sensibilities." **Pro Golf Mfg. v. Tribune Review Newspaper Co., 570 Pa. 242, 809 A.2d 243, 247 (2002) (citations omitted)**.

Clearly, the Media Defendants and Paula DiGiacomo published information which was an egregious intrusion upon the private concerns of Plaintiff, which would would be highly offensive to a reasonable person.

In its scathing article falsely reporting that Plaintiff assaulted Rhett Happel, the Media Defendants published Plaintiff's home address in Upper Marlboro, Maryland, which was not the scene of the crime and bore absolutely no relevance to the case. Clearly, the only purpose of publishing Plaintiff's address was to embarrass and intimidate him, and clearly placed both Plaintiff and his family at risk

of vigilante retaliation, where this was a potentially racially explosive case, based on a purported grievous assault committed by an African-American male against a white male.

Similarly, Paula DiGiacomo's public statement in the Meadville Tribune that Plaintiff remained suspect, even though the case against him was withdrawn, where there was zero evidence pointing to Plaintiff's culpability, was a shocking intrusion upon Plaintiff's private concern, which calculated to cause shame and humiliation, which by any measure is highly offensive to a reasonable person.

Accordingly, for the foregoing reasons, Plaintiff's amended complaint adequately states invasion of privacy claims for intrusion upon seclusion, against both Paula DiGiacomo and the Media Defendants, where they published information intended to cause Plaintiff suffering, humiliation, and shame.

L. **PLAINTIFF'S AMENDED COMPLAINT ADEQUATELY STATES A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALLEGHENY AND MERCHBAKER.**

Defendants Allegheny College and Sergeant Merchbaker, contend that Sergeant's Merchbaker's unconstituional stop and detention of Plaintiff, while sitting in his Philosophy class, does not arise to Intentional Infliction of Emotional Distress. They are incorrect.    To establish a claim under Pennsylvania law for IIED, a plaintiff must show that a defendant: (1) by extreme and outrageous conduct (2) intentionally or recklessly caused (3) severe emotional distress.    **Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa.Commw. Ct. 2010)**.    Extreme and outrageous conduct is defined as conduct "so outrageous in character, and so extreme in degree

as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." **Hunger v. GrandCent. Sanitation, 670 A.2d 173, 182 (Pa.Super.Ct. 1996) (citing Restatment (Second) of Torts Section 46 cmt. D (1977))**. "Conduct that Pennsylvania Courts have deemed sufficiently outrageous to constitute IIED includes: (1) killing the plaintiff's son with an automobile and then burying the body, rather than reporting the incident to the police; (2) intentionally fabricating documents that led to the plaintiff's arrest for murder; and (3) knowingly releasing to the press false medical records diagnosing the plaintiff with a fatal disease." **Dull v. West Manchester Township Police Department, 604 F.Supp.2d 739, 756 (M.D. Pa. 2009) (citation omitted)**.

In the instant case, Sergeant William Merchbaker, an employee of Allegheny College detained and arrested Plaintiff, while he was sitting in a Philosophy class, in plain view of his classmates and Professor. This conduct was outrageous and went beyond all bounds of decency, where such conduct inflicted egregious shame and humiliation, and Plaintiff did not even fit the physical description of the person identified as the shooter, Plaintiff's identification was based on a egregiously suggestive identification procedure, wherein he was the only suspect shown to the victim, and Plaintiff was completely innocent of any wrongdoing.

Accordingly, for the foregoing reasons, Plaintiff has adequately stated a cause of action for IIED claim and this claim should not be dismissed.

**M.   PLAINTIFF'S CLAIM FOR CONVERSION AT COUNT X DOES NOT FAIL, FOR FAILURE TO PLEAD OR PROVE OTHERWISE THAT HE HAS EXHAUSTED HIS ADEQUATE POST-DEPRIVATION REMEDY, WHERE THE DECISION HANDED DOWN BY THE UNITED STATES SUPREME COURT IN KNICK V. TOWNSHIP OF SCOTT, PENNSYLVANIA, ET AL., HELD THAT A PROPERTY OWNER MAY BRING A FIFTH AMENDMENT CLAIM FOR UNLAWFUL TAKING AT THE INCEPTION OF A SECTION 1983 LAWSUIT.**

Defendant Meadville, Pennsylvania argues that Plaintiff can not file a conversion claim, for the ring taken incident to his arrest, because he has not exhausted an available post deprivation by filing a standard petition for return of property with the Crawford County Court of Common Pleas.    However, In the United States Supreme Court opinion of **Knick v. Townshp of Scott, Pennsylvania, et al., No. 17-647, 588 U.S. _____, (2019)** held that a government violates the Takings Clause when it takes property without compensation, and a property owner may bring a Fifth Amendment claim at that time.    Pp. 5-20.    The Court departed from the holding in **Williamson County Regional Planning Commission v. Hmilton Bank of Johnson City, 473 U.S. 172**, which held that property owners must seek just compensation under state law in state court before bring a federal takings claim under Section 1983. The Court noted that within two years of **Williamson County,** the Court returned to its traditional understanding of the Fifth Amendment in **First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304**, where the Court held that the compensation remedy is required by the Constitution in the event of a taking.    A property owner acquires a right of

compensation immediately upon an uncompensated taking because the taking violates the Fifth Amendment.   ***See San Diego Gas and Electric Co. v. San Diego, 450 U.S. 621, 654 (Brennan, J. dissenting)***.   The property owner may therefore, bring a claim under Section 1983 for the deprivation of a constitutional right at that time.   Pp. 6-12.

Clearly, in light of **Knick,** Plaintiff is not bound to exhaust state remedies prior to pleading a conversion action in a 1983 lawsuit. Accordingly, for the foregoing reasons, Defendant Allegheny's motion to Count X of the amended complaint should be denied.

### N.   PLAINTIFF RESERVES THE RIGHT TO AMEND HIS COMPLAINT, IN THE EVENT OF FACTUALLY OR LEGALLY INSUFFIENT PLEADINGS.

Rule 15 of the Federal Rules of Civil Rules of Civil Procedure allows a plaintiff to amend a complaint once, as of right, but further provides that a party may seek the Court's permission to amend a pleading and such permission "should freely [be given] when justice so requires."   **Fed.R.Civ.P.15(a)(2)**.

Plaintiff reserves the right to amend his complaint pursuant to Rule 15, in the event of insufficient pleadings of law or fact.

### V.   CONCLUSION

Wherefore, for, the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be Denied.

Respectfully submitted:


  /s/ Earl Raynor                              
Earl Raynor, Esquire
PA Supreme Court I.D. No. 66849
1800 J.F.K. Boulevard
Third Floor
Box 103
Philadelphia, Pennsylvania 19103
(215)254-0299
Fax: (914)663-5116

*Counsel for Plaintiff*
*Kobe Pinkney*