IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| KOBE PINKNEY, | ) | Case No. 1:19-cv-167 |
|  | ) |  |
| Plaintiff | ) | UNITED STATES MAGISTRATE JUDGE |
|  | ) | RICHARD A. LANZILLO |
| v. | ) |  |
|  | ) | MEMORANDUM OPINION AND |
| MEADVILLE, PENNSYLVANIA, et al, | ) | ORDER ON DEFENDANTS' MOTIONS |
|  | ) | TO DISMISS AMENDED COMPLAINT |
| Defendants | ) |  |
|  | ) | [ECF NOS. 53, 55, 57 & 59] |
|  | ) |  |

MEMORANDUM OPINION AND ORDER

I.      Introduction

    This action arises out of a witness's mistaken identification of Plaintiff Kobe Pinkney as the perpetrator of a brutal assault upon a bar patron, Pinkney's resulting arrest on aggravated assault and related charges, followed by his exoneration and the dropping of all charges against him, and a prosecutor's statement to the press that Pinkney nevertheless remained a suspect of the crime. Pinkney brings this action against the City of Meadville, Pennsylvania (Meadville), Meadville Police Chief Michael J. Tautin (Chief Tautin), Meadville Police Officer Jared Frum (Officer Frum), Allegheny College (Allegheny), Allegheny College Police Sergeant William Merchbaker (Sergeant Merchbaker), Crawford County First Assistant District Attorney Paula DiGiacomo (ADA DiGiacomo), the Meadville Tribune (Tribune), Community Newspaper Holding, Inc. (CNH), and Tribune reporter Keith Gushard (Gushard).

    Pinkney's Amended Complaint (ECF No. 50), which is the operative pleading before the Court, asserts the following claims under federal law:  Fourth Amendment claims pursuant to 42

U.S.C. §1983 alleging "unlawful stop and detention" against Sergeant Merchbaker (Count I) and false arrest, false imprisonment and malicious prosecution against Officer Frum (Counts II-IV); a Fourteenth Amendment equal protection claim alleging racial discrimination pursuant to §1983 and 42 U.S.C. §1981 against Officer Frum and Sergeant Merchbacker (Count V); and municipal and supervisory liability claims pursuant to §1983 and §1981 against Meadville, Chief Tautin, Allegheny and Sergeant Merchbaker (Count VI). The Amended Complaint asserts the following claims under Pennsylvania state law: false light defamation against ADA DiGiacomo, Gushard, the Tribune and CNH (Count VII) as well as Allegheny and Sergeant Merchbaker (Count VIII); invasion of privacy against the Tribune, CNH and Gushard (Count IX) and ADA DiGiacomo (Count X); intentional infliction of emotional distress against Sergeant Merchbaker, Allegheny, ADA DiGiacomo, Gushard, the Tribune and CNH (Count XI), and conversion against Meadville (Count XII), which is erroneously designated as Count X of the Amended Complaint.

All defendants have moved to dismiss the claims against them pursuant to Fed.R.Civ.P. 12(b)(6) as follows: ADA DiGiacomo at ECF No. 53, Officer Frum, Meadville and Chief Tautin at ECF No. 55, CNH, Gushard and the Tribune at ECF No. 57, and Allegheny and Sergeant Merchbaker at ECF No. 59. For the reasons discussed herein, the Court will grant the motions filed on behalf of Officer Frum, Meadville, Chief Tautin, Allegheny and Sergeant Merchbaker to the extent they attack the sufficiency of Pinkney's federal law claims. The Court will decline to exercise supplemental jurisdiction over Pinkney's state law claims against these defendants as well as the claims against ADA DiGiacomo, Gushard, the Tribune and CNH. These claims will be dismissed without prejudice.[1]

---

[1] All parties have consented to the jurisdiction of a United States Magistrate Judge in this matter. ECF Nos. 39, 40, 40, 45, 48, 51, 52. *See also* 28 U.S.C. § 636(c).

II.     Material Facts

Pinkney's Amended Complaint alleges the following facts, which the Court accepts as true for purposes of all pending motions:

On April 7, 2019, at approximately 1:30 am, Officer Frum, while on routine patrol in the area of the Meadville Academy Theatre, observed four males walking near an establishment known as Julian's Bar.  ECF No. 50, ¶17.  Two of the men were carrying a third male, later identified as Rhett Happel, whose left side of his face was severely swollen and who later underwent emergency surgery to treat serious injuries to his face.  *Id.*, ¶¶18, 21.  Officer Frum summoned an ambulance to the scene, and while the group waited for the ambulance to arrive, one of the males volunteered that he believed that Happel had been assaulted and speculated that the attack had been motivated by a report that Happel had drugged a female the police had found unconscious in the bathroom of Julian's Bar the previous night. *Id.*, ¶¶19-20.

Three days later, on April 10, 2019, Officer Frum interviewed a witness at the Allegheny College Public Safety Building, with the assistance of Sergeant Merchbaker, the Interim Director of Public Safety for Allegheny.  *Id.*, ¶22.  The witness told Officer Frum and Sergeant Merchbaker that the assailant was an African American male, approximately six feet tall, with braided hair, who walked up to Happel when he was in the bathroom of Julian's Bar, tapped Happel's shoulder from behind and then punched Happel on the left side of his face as Happel turned around.  *Id.*, ¶23. According to the witness, the assailant walked to another area of Julian's Bar and eventually existed the establishment.  *Id.*, ¶24.  After the assault, the witness was contacted by Happel's friend, Evan Haines, who sent the witness a Facebook photo of Jared Shaw, a white male who had been observed at Julian's Bar with the assailant on the evening of the assault, and an African-American male, later identified as Pinkney.  *Id.*, ¶25.  Both Shaw and Pinkney are football players at Allegheny.  *Id.*, ¶¶28.

3

"The witness recognized [Pinkney] as the man that he saw punch Rhett Happel." *Id.*, ¶26.  Haines showed the witness two additional photographs of Shaw and Pinkney together, and "both times the witness identified [Pinkney] as the assailant." *Id.*, ¶27.  Happel later recalled "that, moments prior to the assault, Jared Shaw and his girlfriend, who has a first name of 'Chloe,' confronted him inside the bar, accusing him of drugging Chloe the night before, causing her to fall unconscious." *Id.*, ¶29.  Shaw and Chloe followed Happel to the men's bathroom where Happel was attacked. *Id.*, ¶30.

The Amended Complaint further alleges that the Meadville Police Department deemed Shaw a "person of interest, for possibly conspiring with the assailant out of retaliation for Happel drugging Chloe" and, therefore, was apparently aware the foregoing facts. *Id.*, ¶31.  "Consequently, the police offered [Shaw] immunity from prosecution, in exchange for [Shaw] identifying the assailant."[2] *Id.*, ¶32.  Despite this offer of immunity, Shaw refused to cooperate with the police. 33.

On April 11, 2019, Officer Frum filed a criminal complaint and affidavit of probable cause against Pinkney charging him with aggravated assault in violation of 18 Pa.C.S.A. §2702(a)(1), simple assault in violation of 18 Pa.C.S.A. §2701(a)(1), harassment in violation of 18 Pa.C.S.A. §2709(a)(1), and disorderly conduct in violation of  18 Pa.C.S.A. §5503(a)(1).  Consistent with the allegations of the Amended Complaint, Officer Frum's affidavit of probable stated that a witness had described Happel's attacker as "an African American male approximately six feet tall with braided hair" and specifically identified Pinkney as the assailant:

> On April 10, 2019, at approximately 16:30 hours, I interviewed a witness at the Allegheny College Public Safety building.  The witness provided an audio recorded statement and stated that they were standing in line for the bathroom. They stated that ***an African American male approximately***

_____

[2] The Amended Complaint alleges that the Meadville Police considered Happel a "person of interest" in his own assault and that the police offered Happel immunity from prosecution.  During oral argument on March 25, 2020, Pinkney's counsel appeared to correct this error when he repeatedly referred to Shaw as the person who the police offered immunity.

> *six feet tall with braided hair walked up to Happel.* They
> stated that he then tapped Happel on the shoulder and when
> Happel looked around the male punched him once int eh left
> side of the face. They stated that the male then walked to the
> town tavern side of the establishment. They stated a short
> time later they walked into that area and did not see the male
> anymore.
>
> The witness stated that they were contacted by Happle's (sic)
> friend, Evan Haines, and was sent picture of a white male and
> a black male. they recognized the white male as Jared Shaw
> and the black male as Kobe Pinkney. *they recognized
> Pinkney as the black male that punched Happel.* They
> stated that Haines sent two more picture and they were both
> pictures of Pinkney.

ECF No. 55-1, p. 6 (emphasis added).[3]

A magisterial district judge issued a warrant for Pinkney's arrest on April 11, and that same

day, Sergeant Merchbaker removed Pickney from his college philosophy lecture, and Officer Frum

proceeded to place him under arrest. ECF Nos. 50, ¶34; 50-1. Following Pinkney's arrest,

Meadville Police secured a search warrant for his dormitory room at Allegheny to seize a ring

believed to have been worn by Pinkney on the night of the assault so that forensic testing could be

performed upon the ring. ECF No. 50, ¶54 & Exhibit 2. Pinkney was later released on bail. ECF

No. 50, ¶37.

Gushard first reported Pinkney's arrest and the alleged circumstances surrounding the

assault upon Happel in an article published in the Tribune on April 15, 2019. ECF No. 50, ¶39;

ECF No. 50-1, pp.16-17. The April 15 article reported the factual allegations against Pinkney as

recited in Officer Frum's affidavit of probable cause and other public records associated with the

---

[3] The final page of Officer Frum's affidavit of probable cause, which included the quoted information, was omitted from Exhibit 1 (ECF No. 50-1) attached to Pinkney's Amended Complaint, but Officer Frum produced the entire affidavit of probable cause at ECF No. 55-1. At oral argument, counsel for Pinkney acknowledged that the foregoing quoted excerpt was included in the affidavit of probable cause. Because the entire affidavit of probable cause is indisputably authentic and Pinkney relies upon it in support of certain of his claims, this Court may consider it without converting Officer Frum's motion to dismiss to a motion for summary judgment. *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993).

charges against Pinkney. *Id.* Specifically, Gushard's April 15 article identified Pinkney by name and home address and reported that he was "facing charges that he hit another man in the face so hard the victim had to have emergency surgery" and that "Pinkney punched the man in the face sometime between 1 and 1:28 a.m. April 7 at Julian's Bar & Grill for allegedly drugging a female, but the victim 'was wrongfully being accused,' according to court documents." *Id.* The article went on to report the information provided by the eyewitness as recounted in the affidavit of probable cause, including the details of Pinkney's alleged assault upon Happel. *Id.*

After Pinkney's arrest, numerous witnesses came forward and claimed that Pinkney did not assault Happel and that he had not even been at Julian's bar on the night of the assault. At least one witness specifically identified a different African American male, Josiah Williams, as Happel's assailant. Williams more closely fit the eyewitness's description of the assailant, including the fact that Williams had braided hair. ECF No. 50, ¶¶41, 45. This information was provided to Pinkney's criminal defense attorney who immediately relayed it to Meadville Assistant Chief of Police Michael Stefanucci. *Id.*, ¶43. Pinkney's defense counsel also provided Stefanucci with contact information for Pinkney's college roommate who would have told Stefanucci that Pinkney was at a Theta Chi fraternity party for the better part of the evening of April 6th and that Pinkney returned to his dormitory at approximately 1:15 am, where shortly thereafter Pinkney received a phone call from Jared Shaw detailing Josiah Williams' assault upon Happel. *Id.*, ¶43. Pinkney's mother also provided Stefanucci with a receipt that Pinkney received from a McDonald's with an electronic date and timestamp of April 7, 2019, 1:00 am, which coincided with the date and time of the assault upon Happel. *Id.*, ¶46 & Exhibit A. Further, the police were also provided with timecards showing that Pinkney checked back into his dormitory on April 7 at 1:17 am. *Id.*, ¶47 & Exhibit B.

After the Tribune published the April 15 article regarding the charges against Pinkney, Pinkney's counsel emailed a letter to Gushard outlining the evidence of Pinkney's innocence.[4]  ECF No. 50, ¶48; ECF No. 50-1, p.12.  Gushard did not respond to the letter or publish a further article reporting the information provided by Pinkney's counsel.  ECF No. 50, ¶48.

As the date for Pinkney's May 22, 2019 preliminary hearing approached, his counsel accumulated further affidavits and evidence exculpating Pinkney from the assault upon Happel and supporting that Williams was the actual attacker.  *Id.*, ¶¶50-51, 53.  Before Pinkney's defense counsel was able to provide this information to the Meadville Police Department, however, the Commonwealth of Pennsylvania withdrew the charges against Pinkney, apparently based upon its own further investigation.  *Id.*, ¶52.  The further investigation that exonerated Pinkney included the results of forensic tests performed upon the ring the police had seized from Pinkney's dorm room pursuant to the search warrant.  Forensic testing revealed no evidence that Pinkney had committed the assault.  *Id.*, ¶54.  Finally, a video recording obtained from Julian's Bar showed both Happel and Williams present in the bar on April 7, but did not include Pinkney.  *Id.*, ¶55.

On May 16, 2019, after the Commonwealth dropped the charges against Pinkney, Gushard published another article in the Tribune under the headline, "Charges withdrawn against Allegheny student."  *Id.*, ¶56; ECF No. 50-1, pp.23-24.  The text of the article began by reporting that "[c]harges have been withdrawn against a Maryland man accused of punching another man so hard in the face last month that the victim needed emergency surgery requiring plates and 15 pins in the man's face."  *Id.*  Like the April 15 article, this one went on to recount the factual allegations against Pinkney as stated in the original probable cause affidavit and charging documents.  *Id.*  The article

---

[4] Although the allegations of the Amended Complaint are unclear whether Pinkney's counsel sent the exculpatory information to Gushard before or after the Tribune published the April 15 article (ECF No. 50, ¶¶48-49), the letter itself, which Pinkney attached as Exhibit D to his Amended Complaint, specifically stated that it was responding to the article.  ECF No. 50-51, p.12.

did not include any of the exculpatory information that Pinkney's lawyer had previously provided to Gushard, including counsel's representation that the witness had recanted his identification of Pinkney as the assailant or the asserted identification of another individual as the perpetrator of the assault. Despite the substantial evidence of Pinkney's innocence, ADA DiGiacomo told Gushard that Pinkney remained a suspect in the crime, and Gushard reported this statement in the May 16 article. *Id.* According to the article, ADA "DiGiacomo declined further comment when asked if that meant charges may be refiled against Pinkney and additional people." *Id.* Although the article did not refer to the asserted exculpatory information provided by Pinkney's lawyer, it did note that Pinkney was a junior at Allegheny, a member of the 2018 football team and had served as one of 30 Allegheny student volunteers at the Meadville Volunteer Income Tax Assistance program that offers the public free tax preparation. *Id.*

III.     Standard of Review:  Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955 (rejecting the traditional Rule 12 (b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In making this determination, the court must accept as true all well-pled factual

allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions disguised as factual allegations. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. *See also McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the following three-step approach:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).  This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

IV.     Analysis

    A.  Pinkney's Fourth Amendment Claims Against Officer Frum: False Arrest (Count II),
        False Imprisonment (Count III) and Malicious Prosecution (Count IV)

        i.     Elements of Claims

The Fourth Amendment prohibits police from making an arrest except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes–Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995); *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)). A defendant is insulated from false arrest liability so long as "[p]robable cause .... exist[ed] as to any offense that could be charged under the circumstances." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994). *See also Startzell v. City of Phila.*, 533 F.3d 183, 204 n.14 (3d Cir. 2008) (where a plaintiff is arrested for multiple charges, establishing probable cause on one charge is enough to defeat a false arrest claim). Thus, "there need not have been probable cause supporting charges for every offense for which an officer arrested a plaintiff for the arresting officer to defeat a claim of false arrest." *Johnson v. Knorr*, 477 F.3d 75, 84–85 (3d Cir. 2007).

Although similar in nature, a false imprisonment claim is not synonymous with a false arrest claim. A false imprisonment claim arises when a person is arrested without probable cause and is subsequently detained pursuant to that unlawful arrest. *See Adams v. Officer Eric Selhorst*, 449 Fed. App'x. 198, 201 (3d Cir. 2011) (citing *Groman*, 47 F.3d at 636). Thus, a claim of false imprisonment in this context is derivative of a claim for arrest without probable cause. *See Johnson v. Camden Cnty. Prosecutors' Office*, 2012 WL 273887, at 4 n.2 (D.N.J. Jan. 31, 2012) (citing *Groman*, 47 F.3d at 636). A false imprisonment cause of action derives from the Fourteenth Amendment bar against a

deprivation of liberty without due process of law.  *Baker v. McCollan*, 443 U.S. 137, 142, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

In order to state a claim for malicious prosecution under § 1983, a plaintiff must allege facts that show: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007).

ii.      Probable Cause

As the foregoing summary illustrates, the absence of probable cause is an essential element of each of Pinkney's false arrest, false imprisonment and malicious prosecution claims.  None of these claims can proceed if probable cause existed to arrest Pinkney and initiate criminal proceedings against him.  *Swops v. City of Pittsburgh*, 90 F. Supp. 3d 400, at 406 (W.D. Pa. Dec. 1, 2014).

Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090, 1103, 188 L.Ed.2d 46 (2014) (citations omitted). "Far from demanding proof of guilt beyond a reasonable doubt," it requires only a "fair probability" that the suspect "committed the crime at issue.'" *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467–68 (3d Cir. 2016) (internal quotations omitted). Significantly, this "standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility were, in retrospect, accurate." *Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005).  In other words, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).  Accordingly, an assessment of

11

"probable cause 'deals with probabilities and depends on the totality of the circumstances.'" *D.C. v. Wesby*, ⸺ U.S. ⸺, 138 S. Ct. 577, 199 L.Ed.2d 453 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)). Typically, the question of whether the police had probable cause is one of fact for the jury. *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir.1998) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir.1978)); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995). Where, however, the evidence, viewed in the light most favorable to the plaintiff, reasonably would not support a contrary factual finding, then the court may conclude that probable cause exists as a matter of law. *Basile v. Twp. of Smith*, 752 F. Supp. 2d 643, 651 (W.D. Pa. 2010) (citing *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788-89 (3d Cir.2000)).

Turning to the facts of the present case, the charges filed against Pinkney included aggravated assault and simple assault in violation of Pennsylvania law.[5] Pinkney's Amended Complaint acknowledges that, prior to his arrest, an eyewitness identified Pinkney as the individual who attacked Happel and caused his serious injuries. This identification alone is weighty, but not conclusive, support for a finding of probable cause. Instead, "[a]n eyewitness identification is generally sufficient to establish probable cause for an arrest, unless 'there is an apparent reason for the officer to believe that the eyewitness was lying' or was otherwise mistaken." *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 874 (6th Cir. 2012) (quoting *United States v. Lanier*, 636 F.3d 228, 233 (6th Cir.2011)); *Hargroves v. City of New York*, 411 Fed.Appx. 378, 383 (2d Cir.2011) ("Ordinarily, the identification, by an eyewitness, of a suspect will likely be sufficient to establish probable cause for an arrest."); *Miloslavsky v. AES Engineering Soc., Inc.*, 808 F.Supp. 351, 355 (S.D.N.Y.1992), aff'd, 993 F.2d 1534 (2d Cir.1993) ("[I]t is well-established that a law enforcement

---

[5] Under Pennsylvania law "[a] person is guilty of aggravated assault if he: (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life…." 18 Pa.C.S.A. §2702(a)(1). A person is guilty of simple assault "if he: (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." 18 Pa.C.S.A. §2701(a)(1).

official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth"). Similarly, "[a] positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest." *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) (citing *Bail v. Ramirez*, 2007 WL 959045, at *8 (S.D.N.Y. Mar.29, 2007)).

The Amended Complaint also acknowledges that the exculpatory evidence demonstrating Pinkney's innocence was not communicated to Officer Frum or any other defendant until after the filing of charges against Pinkney and his arrest. While Officer Frum was obliged to consider exculpatory evidence known or presented to him when he applied for the warrant, he was not required to continue investigating after a judicial officer found probable cause for Pinkney's arrest. *Id.* As the *Celestin* court explained:

> The police must not ignore exculpatory evidence that would void probable cause if taken into account. (citation omitted). However, once the evidence establishes probable cause, an officer is not required to continue investigating, sifting and weighing information, nor is an officer obligated to investigate the suspect's plausible claims of innocence. *See Panetta v. Crowley*, 460 F.3d 388, 396–98 (2d Cir.2006). It is not the role of police officers "to sit as prosecutor, judge, or jury. Their function is to apprehend those suspected of wrongdoing...." *McDermott [v. City of New York]*, 1995 WL 347041 at *4 [(E.D.N.Y. May 30, 1995)] (quoting *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir.1989)).

*Id.*

The same is true regarding the eyewitness's recantation of his statement identifying Pinkney as the assailant and the production of evidence supporting that Josiah Williams was Happel's actual attacker. The Amended Complaint does not allege that any of this information was disclosed or known to Officer Frum until after Pinkney's arrest.

In support of his position that Officer Frum lacked probable cause for his arrest, Pinkney emphasized that his physical appearance did not conform to the description of the assailant in at least one material respect—Pinkney did not have braided hair. As discussed below, however, Officer Frum did not conceal or misrepresent this discrepancy to the judicial officer who issued the warrant for Pinkney's arrest. Officer Frum's submissions to the magisterial district judge included the witness's description of the assailant as wearing "braided hair" as well as a photograph of Pinkney showing that he did not.[6] The magisterial district judge apparently found that probable cause for arrest existed despite this discrepancy. Officer Frum's disclosure and the magisterial district judge's independent finding of probable cause distinguish the facts of this case from *Watson v. Witmer*, 183 F. Supp. 3d 607, 610 (M.D. Pa. 2016), where the Court found that it was premature to determine the issue of probable cause on a Rule 12(b)(6) motion to dismiss. Unlike Pinkney's Amended Complaint in the present case, the complaint in *Watson* alleged that the defendant officer arrested the plaintiff at a time when he already possessed significant evidence of his innocence. Further, unlike Pinkney's Amended Complaint, the complaint in *Watson* did not acknowledge that a judicial officer had issued a warrant for the plaintiff's arrest following presentment of an affidavit of probable cause that included only accurate information and did not omit known exculpatory information. *Id.*

Pinkney also argues that the photographs Haines provided to the witness were unduly suggestive, particularly given that he was the only African American male depicted. Although the Court tends to agree with this observation, the Amended Complaint does not allege that Officer Frum or any other defendant created the suggestive identification or otherwise used the

---

[6] Pinkney's counsel acknowledged during oral argument that Officer Frum's submissions included the photograph of Pinkney.

photographs to put the probable cause "bunny in the hat." Rather, it was Haines who selected the photographs that included Pinkney and may have contributed to the witness's misidentification of him as Happel's attacker. This apparently occurred independent of Officer Frum and Sergeant Merchbaker—at least there is no allegation that either participated in the suggestive selection of the photographs.

Significantly, the Amended Complaint does not allege that Officer Frum misrepresented or failed to disclose any facts to the magisterial district judge when he applied for the arrest warrant.[7] An arrest warrant issued by a judicial officer "does not, in itself, shelter an officer from liability for false arrest." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997)). "Rather, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Id.* (quoting *Wilson*, 212 F.3d at 786-87); *Lippay v. Christos*, 996 F.2d 1490, 1500–01 (3d Cir.1993)) (holding that "[i]n order to prevail on [a § 1983] claim [for unlawful arrest], [a plaintiff] needed to satisfy the test enunciated in *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which requires a showing that the maker of the affidavit either stated a deliberate falsehood or acted with a reckless disregard for the truth; [p]roof of negligence or innocent mistake is insufficient[, a plaintiff must] ... demonstrate that [the police officer] acted with reckless disregard for the truth, [as well as] prove that [the officer] made the statements in his affidavits with a high degree of awareness of their

---

[7] During oral argument, the Court inquired specifically whether Pinkney is alleging that Officer Frum misrepresented to or concealed any information from the magisterial district judge when he applied for the arrest warrant. Pinkney's counsel acknowledged that he is making no such allegation.

probable falsity") (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)) (internal quotations omitted). In the present case, Pinkney does not identify any information that Officer Frum allegedly falsified in his affidavit to the magisterial district judge who issued the warrant. Likewise, Pinkney acknowledges that Officer Frum did not omit to disclose material information relevant to the issue of probable cause. As noted, he included the initial description of the assailant as having braided hair and included the photograph of Pinkney that disclosed that he did not. Thus, the facts alleged in the present case materially distinguish it from *Dempsey v. Bucknell Univ.*, 2012 WL 1569826 (M.D. Pa. May 3, 2012), where the District Court concluded that it could not resolve the issue of probable cause on the defendant campus security officers' motion to dismiss. In *Dempsey*, the exonerated plaintiff alleged that the campus security officers had "willfully and intentionally omitt[ed]material exculpatory information, and arrested Plaintiff Reed knowing that the information upon which they based the arrest was false…[,] that the officers knew about exculpatory and contradictory evidence, but ignored it…[and] that the officers interviewed a number of students, whose statements contradicted those of [the alleged victim of the assault], and that the officers ignored those statements when deciding to file criminal charges." *Id.* at *7.

Pinkney also appears to fault Officer Frum for failing to discover the exculpatory evidence that his counsel later produced. But "[o]nce probable cause is established, an officer has no duty to search for exculpatory evidence or to further investigate the circumstances surrounding the incident." *Anderson v. Goga*, 2013 WL 3242445, at *2 (W.D.Pa. June 25, 2013) (citing *Tavernaris v. City of Beaver Falls*, 2008 WL 2571469, at *2 (W.D.Pa. Jun. 25, 2008)); *see Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir.2006) ("But police officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness."). Likewise, an officer is not charged with conducting an independent investigation to verify statements made by a credible eyewitness if those statements

provide him with probable cause to arrest. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790–91 n. 8 (3d Cir.2000) (citing *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir.1986), cert. denied, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); *Morrison v. United States*, 491 F.2d 344, 346 (8th Cir.1974)) (officer "was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed."); *see also Potts v. City Of Philadelphia*, 224 F.Supp.2d 919, 934 (E.D.Pa.2002) ("A police officer, after all, is not obligated 'to conduct a mini-trial' before arresting a suspect.").

In sum, the facts alleged in the Amended Complaint demonstrate that, despite Pinkney's subsequent exoneration, Officer Frum had probable cause to charge and arrest Pinkney. Accordingly, Pinkney's Fourth Amendment claims against Officer Frum for false arrest (Count II), false imprisonment (Count III) and malicious prosecution (Count IV) must be dismissed with prejudice.

### iii.     Qualified Immunity

Officer Frum also argues that even if the Amended Complaint had stated a plausible Fourth Amendment claim against him, he nevertheless would be entitled to the protection of qualified immunity.  The Court agrees.

"The doctrine of qualified immunity protects police officers performing discretionary functions...." *Luthe v. City of Cape May*, 49 F. Supp. 2d 380, 389 (D.N.J. 1999) (citing *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).  Qualified immunity "shield[s officers] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir.1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  "[I]n § 1983 cases involving alleged violations of the Fourth Amendment, ... the inquiry

is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Sharrar*, 128 F.3d at 827 (citing *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). Police officers "who reasonably but mistakenly conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity." *Sharrar*, 128 F.3d at 826 (quoting *Hunter*, 502 U.S. at 227, 112 S.Ct. 534) (additional citations omitted). "In this way, the qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Sharrar*, 128 F.3d at 826 (quoting *Hunter*, 502 U.S. at 229, 112 S.Ct. 534 (quoting *Malley*, 475 U.S. at 341, 343, 106 S.Ct. 1092)). "Even where probable cause is not found to exist, a police officer sued for false arrest is immune from suit under the doctrine of qualified immunity where 'arguable probable cause' exists." *Rodriguez v. New York City Transit Auth.*, 2009 U.S. Dist. LEXIS 106464, 2009 WL 3817298 at *19 (S.D.N.Y. Nov. 10, 2009) (citing *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir.2004)); *Araujo v. City of New York*, 2010 WL 1049583, at *5 (E.D.N.Y. Mar. 19, 2010). In determining whether a police officer is entitled to qualified immunity, both the existence of a clearly established right and the objective reasonableness of the officer's actions are questions of law for the Court to decide. *Sharrar*, 128 F.3d at 828. "Only if the historical facts material to the latter issue are in dispute, ... will there be an issue for the jury." *Id.* at 828.

Where an arrest and the subsequent incarceration are made pursuant to a warrant, "[t]he Fourth Amendment requires that [the] arrest warrant[ ] be based upon probable cause, supported by [o]ath or affirmation...." *Kalina v. Fletcher*, 522 U.S. 118,118 S.Ct. 502, 509, 139 L.Ed.2d 471 (1997) (citations and internal quotations omitted). Whether a police officer who applied for an arrest warrant is protected by qualified immunity from liability under § 1983 depends upon whether "the warrant application is so lacking in indicia of probable cause as to render [the] offic[er's] belief in its

existence unreasonable[.]" *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271

(1986); *see also Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir.1995) (citing *Malley* and stating

that police officer is entitled to qualified immunity where grounds for probable cause stated in

warrant application were objectively reasonable). "[T]he standard for determining the reasonableness

of an official's belief in the existence of probable cause is whether a reasonably well-trained officer

would have known that his affidavit failed to establish probable cause and that he therefore should

not have applied for the warrant under the conditions." *Orsatti*, 71 F.3d at 483 (citing *Malley*, 475

U.S. at 345, 106 S.Ct. 1092); *but see Lippay*, 996 F.2d at 1500–01 (holding that a § 1983 claim for

unlawful arrest "requires a showing that the maker of the affidavit either stated a deliberate

falsehood or acted with a reckless disregard for the truth; [p]roof of negligence or innocent mistake

is insufficient[, a plaintiff must] ... demonstrate that [the police officer] acted with reckless disregard

for the truth, [as well as] prove that [the officer] made the statements in his affidavits with a high

degree of awareness of their probable falsity") (quoting *Garrison*, 379 U.S. at  85) (internal quotations

omitted). Thus, "[t]he essential inquiry in determining whether qualified immunity is available to an

officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that

probable cause existed." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir.2007). "Because the

qualified immunity doctrine provides the official with immunity from suit, not simply trial, the

district court should resolve any immunity question at the earliest possible stage of the litigation."

*Orsatti*, 71 F.3d at 483 (citations omitted); accord *Conn v. Gabbert*, 526 U.S. 286, 289, 119 S.Ct. 1292,

1295–96, 143 L.Ed.2d 399 (1999).

As discussed above, the allegations of the Amended Complaint fail to state a Fourth

Amendment claim against Officer Frum.  This likewise establishes his entitlement to qualified

immunity. *Larsen v. Senate of the Commonwealth of Pennsylvania*, 154 F.3d 82, 86 (3d Cir.1998) (holding

that "when a qualified immunity defense is raised a court first should determine whether the plaintiff

has asserted a violation of a constitutional right at all") (citing *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)).   At minimum, it cannot be said based upon the allegations of the Amended Complaint that a reasonably well-trained officer in the position of Officer Frum would have known that his affidavit failed to establish probable cause and that he therefore should not have applied for the warrant.   Accordingly, qualified immunity shields Officer Frum from suit on the Fourth Amendment claims asserted by Pinkney in this case.   *See Obilo v. City Univ. of City of New York*, 2003 WL 1809471, at *18 (E.D.N.Y. Apr. 7, 2003) (holding that even if the court assumed that probable did not exist for arrest of student, the defendant officers were still entitled to qualified immunity because their belief that probable cause existed was objectively reasonable).

B.   Municipal and Supervisory Claims Against Meadville and Chief Tautin (Count VI)

Pinkney asserts a municipal liability claim against Meadville under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and a supervisory liability claim against Chief Tautin.   Each claim is dependent on Pinkney's alleging a viable constitutional claim against Officer Frum. Because the Court has held that Pinkney has failed to do so, Pinkney's failure to supervise and train claims against Chief Tautin and Meadville are also subject to dismissal. *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996) (holding that *Monell* limits municipal liability to only those constitutional torts actually caused by the municipality).   Further, even if Pinkney had alleged a viable constitutional claim against Officer Frum, his *Monell* and supervisory liability claims would remain deficient.

While a municipality such as Meadville is a "person" amenable to suit pursuant to §1983, the statute does not allow municipal liability under a theory of respondeat superior.   *Monell*, 436 U.S. 658 at 689. *Id.*   In other words, a municipality is not liable under § 1983 merely for employing someone who violates a person's civil rights.   Rather, a municipality that does not directly violate a person's

civil rights is liable only where it has in place a policy or custom that led to the violation. *Bd. of Cty.*
*Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The
plaintiff bears the burden of identifying the policy or custom. *Id.* This rule ensures that a
municipality will only be liable where it is the "moving force" behind the plaintiff's injury. *Id.*
Additionally, if the policy or custom at issue relates to a failure to train or supervise municipal
employees, "liability under section 1983 requires a showing that the failure amounts to 'deliberate
indifference' to the rights of persons with whom those employees will come into contact." *Carter v.*
*City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109
S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

To state a claim of supervisory liability against Chief Tautin, Pinkney must plead facts to
show, among other things, that he " 'participated in violating the plaintiff's rights, directed others to
violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates'
violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)
(citing *Baker v. Monroe Township*, 50 F.3d 1186, 1190–91 (3d Cir. 1995)).

In the present case, Pinkney has not alleged any facts to support the existence of a policy or
custom of Meadville or any facts to support any basis for imposing supervisory liability upon Chief
Tautin. The Amended Complaint's conclusory allegations that Meadville and Tautin maintained
deliberately indifferent policies and customs regarding the actions of its police officers and failed to
properly train and supervise officers fall materially short of the factual allegations necessary to
support either theory of liability. *See Dunne v. Twp. of Springfield*, 2011 WL 2269963, at *12 (D.N.J.
Jan. 31, 2011) ("Although the Second Amended Complaint conclusorily alleges that the Township
utilized insufficient and improper hiring, supervisory, disciplinary, and training practices with its

police personnel, Plaintiff has failed to allege sufficient facts to state a plausible claim for municipal liability on these bases."), aff'd, 500 F. App'x 136 (3d Cir. 2012).

Accordingly, Pinkney has failed to state a claim upon which relief can be granted against Meadville or Chief Tautin.  Count VI of the Amended Complaint is therefore dismissed with prejudice as to these defendants.

### C.   Equal Protection/Racial Discrimination Claim Against Officer Frum (Count V)

Pinkney's Amended Complaint alleges that Officer Frum's actions were "racially motivated" and therefore deprived Pinkney of the equal protection and benefit of law in violation of his Fourteenth Amendment rights under the United States Constitution and 42 U.S.C. §1981.  ECF No. 50, ¶¶115-134.  The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV § 1.  To establish an equal protection claim, the plaintiff must show that the defendants' actions: "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002).  "To prove discriminatory effect, plaintiff must show that [he] is a member of a protected class and that [he] was treated differently from similarly situated individuals in an unprotected class." *Id.*  To prove discriminatory purpose, a plaintiff must show that "the decisionmaker...selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Laguda v. City of Rahway*, 2016 WL 1029789 at *8–9 (D. N.J. 2016) (citing *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)) (internal citations omitted).

42 U.S.C. §1981 (a) states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the

> security of persons and property as is enjoyed by white
> citizens, and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every kind, and to
> no other.

To state a prima facie case of discrimination, under §1981, a plaintiff must allege facts showing that: (1) the plaintiff is a racial minority; (2) the defendant discriminated against the plaintiff; (3) the defendant had an intent to discriminate on the basis of race; and (4) the discrimination concerned one or more of the activities enumerated in the statute. *Williams v. Penn. State Police Bureau of Liquor Control*, 108 F.Supp.2d 460, 472 (E.D.Pa.2000); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, 2011 WL 4549609, at *19 (E.D. Pa. Sept. 30, 2011), aff'd sub nom. *Osei v. Temple Univ.*, 518 F. App'x 86 (3d Cir. 2013). Here, the Amended Complaint fails to allege facts to support a plausible claim of racial discrimination in connection with Pinkney's arrest, including facts to make out the first prong of discriminatory effect—that Pinkney was treated differently from similarly situated individuals in an unprotected class. That Pinkney is African American and was arrested is insufficient, standing alone, to show discriminatory effect. To present a successful claim for denial of equal protection, a plaintiff must prove the existence of purposeful discrimination. *Keenan v. City of Phila*, 983 F.2d 459 (3d Cir. 1992).

The Amended Complaint acknowledges that the witness described Happel's attacker as an African American male, and the facts alleged do not support that Officer Frum or any other defendant considered race beyond it being one of the descriptive characteristics of the assailant. *Compare Hall v. Pennsylvania State Police*, 570 F.2d 86, 91 (3d Cir. 1978)(examining a surveillance

program that targeted exclusively African Americans entering a bank and did not present "a situation where suspects are being sought on the basis of descriptions which include race as well as other physical characteristics").  Further, the Amended Complaint acknowledges that Officer Frum did not arbitrarily identify Pinkney as a suspect in the assault based simply upon his race conforming to the description but, rather, based upon information that included an eyewitness's identification.

Pinkney's race discrimination claim appears to be premised upon the fact that the police arrested him, but did not arrest Shaw, a white male.  The facts alleged in the Amended Complaint, however, do not support that Shaw was "similarly situated" to Pinkney.  Although the Amended Complaint alleges that the police department's ongoing investigation ultimately revealed grounds to suspect that Shaw may have had some involvement in the assault upon Happel, it does not allege facts to support that this suspicion ever rose to probable cause to arrest Shaw.  The Amended Complaint does not allege that Happel or any witness identified Shaw as the attacker.  Given the foregoing, the Amended Complaint has failed to allege plausible disparate treatment of Pinkney relative to a similarly situated person outside of the protected class.  Because the Amended Complaint also fails to allege facts to support that Officer Frum acted with a discriminatory motive, Count V of the Amended Complaint must be dismissed against him.

   D.  Unlawful Stop and Detention Claim (Count I) and Equal Protection and §1981 Claims
       Against Sergeant Merchbaker (Count V)

Sergeant Merchbaker argues that Count I of the Amended Complaint should be dismissed on two grounds—first, he is not a state actor and therefore not amenable to suit under §1983, and second, the allegations of the Amended Complaint fail to support that he committed an unlawful stop and detention under the Fourth Amendment.  The Court finds that the Amended Complaint adequately alleges facts to support an inference that Sergeant Merchbaker acted under color of state law within the meaning of §1983 but agrees that the Amended Complaint is otherwise insufficient to state a Fourth Amendment claim.

A private, nongovernmental defendant may, in some circumstances, still act "under color of any statute, ordinance, regulation, custom, or usage, of any State" within the meaning of §1983. *Dempsey*, 2012 WL 1569826, at *6. The inquiry is whether the defendant's conduct is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). "A defendant's conduct satisfies the color of state law if the conduct has been 'traditionally the exclusive prerogative of the state.'" *Dempsey*, 2012 WL 1569826, at *6 (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (additional citations and quotation marks omitted)).

"In the context of campus police, the Third Circuit has held that 'the delegation of police powers, a government function, to the campus police buttresses the conclusion that the campus police act under color of state authority.'" *Id.* (quoting *Henderson v. Fisher*, 631 F.2d 1115, 1118 (3d Cir.1980)). Here, the Amended Complaint does not allege that Sergeant Merchbaker or other members of Allegheny's public safety force were appointed and sworn as officers under 22 Pa. Cons.Stat. § 501, which allows non-profit corporations to appoint their employees to exercise police powers "in and upon, and in the immediate and adjacent vicinity of" their property. Nevertheless, given the allegations regarding Sergeant Merchbaker's involvement in the witness interview that preceded Pinkney's arrest and his accompanying of Officer Frum to remove Pinkney from his classroom immediately prior to his arrest, the Court finds that the Amended Complaint supports a plausible inference that Sergeant Merchbaker acted under color of state law.

This conclusion, however, does not end the inquiry. Indeed, the Court's prior determination that Officer Frum had probable cause to arrest Pinkney establishes that the assistance Sergeant Merchbaker provided to Officer Frum in removing Pinkney from class also did not transgress constitutional boundaries. The Amended Complaint acknowledges that Officer Frum possessed a facially valid arrest warrant at the time Sergeant Merchbaker assisted him in removing Pinkney from

the classroom.  During oral argument, Pinkney's counsel argued that Sergeant Merchbaker and Officer Frum had options for taking Pinkney into custody without "perp walking" him out of his philosophy class.  Although the Court tends to agree with this observation, it cannot be said that the chosen course of action violated the Fourth Amendment.  Further, to the extent Sergeant Merchbaker acted under color of state law as alleged in the Amended Complaint, he is entitled to qualified immunity under the same principles discussed regarding Officer Frum. *See Obilo*, 2003 WL 1809471, at *18 (holding that even if probable did not exist for university security officers' arrest of student, they were still entitled to qualified immunity because their belief that probable cause existed was objectively reasonable).  Because Sergeant Merchbaker's alleged stop and brief detention of Pinkney prior to Officer Frum's execution of the arrest warrant did not violate the Fourth Amendment and, in any event, was objectively reasonable, Count I of the Amended Complaint must be dismissed with prejudice for failure to state a claim and, alternatively, based upon Sergeant Merchbaker's entitlement to qualified immunity.

As for Pinkney's equal protection and §1981 claims against Sergeant Merchbaker, these suffer from the same pleading and legal deficiencies as the claims against Officer Frum.  *See supra*, Section IV(B).  Because the Amended Complaint fails to allege plausible disparate treatment of Pinkney by Sergeant Merchbaker relative to a similarly situated person outside of the protected class or other facts to support an inference that he acted with a discriminatory motive, Count V of the Amended Complaint against him must be dismissed with prejudice.

E.  Supervisory Liability Claims Against Allegheny and Sergeant Merchbaker (Count VI)

Pinkney's supervisory and municipal liability claims against Allegheny and Merchbaker also fail based upon the same deficiencies previously identified in these claims against Meadville and Chief Tautin.  Pinkney has not alleged any facts to support the existence of a policy or custom of Allegheny that directly caused the violation of his rights under the Constitution or other federal law.

Likewise, the facts alleged do not support any basis for imposing supervisory liability upon Allegheny or Sergeant Merchbaker.  The Amended Complaint's conclusory allegations that they maintained deliberately indifferent policies and customs regarding the actions of campus security personnel and failed to properly train and supervise their personnel are inadequate to support either theory of liability.  *See Dunne*, 2011 WL 2269963, at *12.  Accordingly, Count VI of the Amended Complaint against Allegheny and Sergeant Merchbaker must also be dismissed with prejudice.

      F.   14th Amendment Deprivation of Personal Property Claim Against Meadville (Count XII, incorrectly designated as Count X)

At Count XII, Pinkney asserts a claim for conversion against Meadville based upon its refusal to return the ring seized from his dormitory room pursuant to a search warrant.  ECF No. 50, ¶ 183-189.  The Amended Complaint is unclear whether Pinkney asserts this claim pursuant to the 14th Amendment or as one of the state law claims his Amended Complaint presents pursuant to this Court's supplemental jurisdiction.  *Id.* at ¶ 1.  To the extent presented as a constitutional claim, it will be dismissed.[8]  To the extent presented as a claim under Pennsylvania state law, the Court will decline to exercise supplemental jurisdiction.

Any claim in this case alleging deprivation of property under the Fourteenth Amendment fails because Pinkney had an adequate remedy at state law.  *See e.g., Tate v. Neal*, 1996 WL 131943 (E.D. Pa. 1996) (dismissing the complaint on screening because the plaintiff had an adequate post-deprivation remedy to address his claim that the undercover officer seized his property and failed to return it).  The Supreme Court of the United States has held that neither negligent nor intentional deprivations of property violate the Due Process Clause if there is a meaningful post-deprivation

---

[8] Nor does this claim state a claim under § 1983 for a Fourth Amendment violation.  The retention of seized property may violate the Fourth Amendment only if the Government is unable to establish probable cause for the initial seizure. *See Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002), *cert. denied*, 539 U.S. 969 (2003).  However, in this case, the legality of the initial seizure of the ring is not at issue as it was based on a validly obtained search warrant.

remedy for the loss.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527,

530 (1981).  Here, Pinkney had an adequate remedy under state law.  Pennsylvania Rule of Criminal

Procedure 588 permits "a person aggrieved by a search and seizure" to file a motion for return of

property "in the court of common pleas for the judicial district in which the property was seized."

Pa. R Crim. P. 588.[9]  Federal courts have recognized this rule and similar rules as complying with

due process because they provide adequate post-deprivation remedies.  *See, e.g., Welsch v. Township Of*

*Upper Darby,* 2008 WL 3919354 (E.D. Pa. Aug. 26, 2008); *Potts v. City of Phila.*, 224 F.Supp.2d 919,

938 (E.D. Pa. 2002) (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("an unauthorized intentional

deprivation of property by a state employee does not constitute a violation of the procedural

requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-

deprivation remedy for the loss is available")); *Taylor v. Naylor*, 2006 WL 1134940, at * 3-4 (W.D. Pa.

Apr.26, 2006) (finding Pa. R. Crim. P. 588, replevin, and conversion statutes adequate post-

deprivation remedies for detained and eventually destroyed personal property).  While noting the

availability of state law remedies for the deprivation of Pinkney's personal property, the Court takes

no position regarding the merits of any claim Pinkney may pursue based upon those remedies.

Accordingly, Pinkney's 14th Amendment deprivation of personal property claim is dismissed with

prejudice.  His state law conversion and any related claims are dismissed without prejudice.

### G.  Remaining State Law Claims

Having dismissed all of Pinkney's federal claims, the Court declines to exercise supplemental

jurisdiction over his state law claims.  A district court may decline to exercise supplemental

jurisdiction over state law claims if "the district court has dismissed all claims over which it has

---

[9] The Rule is applicable to civil cases as well.  Rule 588's broad language addresses all "aggrieved by a seizure." It does not limit the recourse to only those involved in a criminal matter.  Further, Pennsylvania has recognized Rule 588 proceedings as civil in form, but "quasi-criminal in character."  *Commonwealth v. Howard*, 931 A.2d 129, 131 (Pa. Cmwlth. 2007).

original jurisdiction." 28 U.S.C. § 1367(c).  The Court of Appeals for the Third Circuit has instructed, however, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)) (emphasis in original).  No such considerations weigh in favor of this Court continuing to exercise supplemental jurisdiction in this case.

V.      Conclusion

For the foregoing reasons, it is hereby ORDERED that:

a.   The motion to dismiss [ECF No. 55] filed on behalf of Defendants Meadville, Pennsylvania, Michael J. Tautin and Jared Frum is GRANTED as to Counts II-VI of the Amended Complaint, and all federal law claims asserted under these Counts are hereby DISMISSED WITH PREJUDICE.  The claims asserted against Defendants Meadville, Pennsylvania, Tautin and Frum under Counts VIII and XI of the Amended Complaint are hereby DISMISSED WITHOUT PREJUDICE.  To the extent that Count XII (erroneously designated as a second Count X) of the Amended Complaint asserts a claim against Meadville, Pennsylvania based upon the Fourteenth Amendment to the United States Constitution, it is hereby DISMISSED WITH PREJUDICE.  To the extent Count XII asserts a claim under state law, it is hereby DISMISSED WITHOUT PREJUDICE;

b.   The motion to dismiss [ECF No. 59] filed on behalf of Defendants Allegheny College and William Merchbaker is GRANTED as to Counts I, V, and VI of the Amended Complaint, and all federal law claims asserted under these Counts are hereby

DISMISSED WITH PREJUDICE.  The claims asserted against Defendants Allegheny College and Merchbaker under Counts VIII and XI of the Amended Complaint are hereby DISMISSED WITHOUT PREJUDICE;

c.   The motion to dismiss [ECF No. 53] filed on behalf of Defendant Paula DiGiacomo is DISMISSED WITHOUT PREJUDICE, as are Counts VII, X and XI of the Amended Complaint against Defendant DiGiacomo, the Court having declined to exercise supplemental jurisdiction of such state law claims; and

d.   The motion to dismiss [ECF No. 57] filed on behalf of Defendants Meadville Tribune, Community Newspaper Holding, Inc. and Keith Gushard is DISMISSED WITHOUT PREJUDICE, as are Counts VIII, IX and XI of the Amended Complaint against Defendants Meadville Tribune, Community Newspaper Holding, Inc. and Gushard, the Court having declined to exercise supplemental jurisdiction of such state law claims.


It is so ordered.


RICHARD A. LANZILLO
UNITED STATES MAGISTRATE JUDGE


Entered this 3rd day of April, 2020