IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KOBE PINKNEY, | ) | Case No. 1:19-cv-00167 (Erie) |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | RICHARD A. LANZILLO |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| | ) | |
| MEADVILLE, PENNSYLVANIA, et al, | ) | |
| | ) | OPINION AND ORDER ON |
| Defendants | ) | DEFENDANTS THE CITY OF |
| | ) | MEADVILLE AND JARED FRUM'S |
| | ) | MOTION TO DISMISS (ECF NO. 86) |

Defendants The City of Meadville, Pennsylvania (Meadville) and Meadville Police Officer Jared Frum (Frum) have moved to dismiss Plaintiff Kobe Pinkney's Second Amended Complaint pursuant to Fed. R. Civ. Pro. 12(b)(6). ECF No. 86. For the reasons discussed below, the motion will be granted in part and denied in part.

I.     Procedural History

The pending motion follows a somewhat complicated procedural history. Pinkney commenced this action against Meadville, Frum, Meadville Police Chief Michael J. Tautin, Allegheny, Allegheny Police Sergeant William Merchbaker, Crawford County First Assistant District Attorney Paula DiGiacomo, the Meadville Tribune, Community Newspaper Holding, Inc., and Meadville Tribune reporter Keith Gushard. Pinkney's original Complaint and First Amended Complaint asserted federal constitutional claims and state law claims based upon allegations that Frum filed criminal assault and other charges against him without probable cause and that the other Defendants either had some role in his arrest or defamed him in their statements or reporting regarding the charges against him. *See* ECF Nos. 1, 49, 50.

By prior Opinion and Order, the Court dismissed Pinkney's federal law claims against all Defendants and declined to exercise supplemental jurisdiction over his state law claims. *Pinkney v. Meadville, Pennsylvania*, 2020 WL 1667241, at *15 (W.D. Pa. Apr. 3, 2020). Thereafter, Pinkney requested reconsideration of the Court's dismissal order on various grounds, including newly discovered evidence that contradicted his prior pleading admission that a witness had definitively identified him as the perpetrator of the assault upon which Frum based the charges against him. Based upon the newly discovered evidence, the Court granted reconsideration and vacated the order, but only to the extent it dismissed claims against Frum. In all other respects the Court reaffirmed its dismissal of Pinkney's federal law claims against the Defendants. *Pinkney v. Meadville, Pennsylvania*, 2020 WL 1984721 (W.D. Pa. Apr. 27, 2020). The Court granted Pinkney leave to file a Second Amended Complaint based upon his newly discovered evidence.[1] *Id.*

Pinkney filed his Second Amended Complaint (ECF No. 83) on May 6, 2020.[2] Pinkney characterizes this pleading as "a two tiered civil rights complaint brought under 42 U.S.C. Section 1983 and Title VI, 42 U.S.C, Section 2000 et seq.," against Frum and Meadville. ECF No. 83, p.1. Meadville and Frum moved to dismiss all claims against them pursuant to Fed. R. Civ. Pro. 12(b)(6) on May 20, 2020. ECF No. 86. The motion has been fully briefed and is ready for disposition.

---

[1] The reinstatement of Pinkney's federal law claims against Frum also restored the Court's supplemental jurisdiction over his state law claims. In a subsequent Opinion and Order, the Court dismissed those claims on the merits. *Pinkney v. Meadville, Pennsylvania*, 2020 WL 1985037 (W.D. Pa. Apr. 27, 2020).

[2] In addition to asserting claims against Frum, Meadville and Allegheny, three of the original Defendants in this action, the Second Amended Complaint also names two additional Defendants, Duncan Freeland and Joe Hall. On September 15, 2020, Allegheny, Freeland and Hall filed a separate motion to dismiss the claims against them. ECF No. 102. The Court will address that motion in a separate Opinion and Order.

II.     Material Facts

The following facts derive from Pinkney's Second Amended Complaint and the exhibits thereto and are considered as true for purposes of the pending motions.

On April 7, 2019, at approximately 1:30 am, Frum, while on routine patrol in the area of the Meadville Academy Theatre, observed four males walking near an establishment known as Julian's Bar.  ECF No. 83, ¶24.  Two of the men were carrying a third male, later identified as Rhett Happel. Frum observed that the left side of Happel's face was severely swollen and that he had sustained serious injuries to his face.  *Id.*, ¶¶25, 28.  Frum summoned an ambulance to the scene.  While the group waited for the ambulance to arrive, one of the men volunteered that he believed that Happel had been assaulted and speculated that the attack had been motivated by a report that Happel had drugged a female who the police had found unconscious in the bathroom of Julian's Bar the previous night.  *Id.*, ¶¶26-27.

Three days later, on April 10, 2019, Frum interviewed Defendant Duncan Freeland, a Residential Advisor and student at Allegheny.  *Id.*, ¶29.  Frum conducted the interview at Allegheny's Public Safety Building with the assistance of Sergeant Merchbaker, Allegheny's Interim Director of Public Safety, and in the presence of Defendant Joe Hall, Allegheny's Director of Student Conduct. *Id.*  Freeland told Frum and Sergeant Merchbaker that the assailant was an African American male, approximately six feet tall, with braided hair, who walked up to Happel when he was in the bathroom of Julian's Bar, tapped Happel's shoulder from behind and then punched Happel on the left side of his face as Happel turned around.  *Id.*, ¶30.  According to Freeland, the assailant walked to another area of Julian's Bar and eventually exited the establishment.  *Id.*, ¶31.  After the assault, Freeland was contacted by Happel's friend, Evan Haines, who sent Freeland a Facebook photo of Jared Shaw, a white male who had been observed at Julian's Bar with the assailant on the evening of

the assault, and an African-American male, later identified as Pinkney.  *Id.*, ¶32.  Both Shaw and

Pinkney are football players at Allegheny.  *Id.*, ¶35.  Freeland told Frum that the black male

(Pinkney) depicted in the photograph "looked a lot like the person that punched Happel."  *Id.*, ¶33.

Haines showed Freeland two additional photographs of Shaw and Pinkney together, and "both

times the witness described the Pinkey (sic) as having shorter hair than the assailant."  *Id.*, ¶34.  In

contrast to the description provided by Freeland, Pinkney has never worn his hair in braids and is

not six feet tall.[3]  *Id.*, ¶¶ 54, 64, 92.

Frum also "interviewed the victim, Rhett Happel, who told him that on the evening he was

assaulted, he did not recall being struck, but did remember that he had been threatened by both

Jared Shaw and Joe Hayes, with Shaw threatening to hit him, and that Shaw had to be pushed away

from him."  *Id.*, ¶36.  Frum's incident report also included a statement from Kristen Ferguson, a

bartender employed by Julian's, who initially reported that she was working in the bar when she

thought she observed a female punch Rhett Happel.  Ferguson later equivocated and stated that she

could not be sure that the assailant was a female but did recall Happel being pointed out and

accused by a female.  *Id.*, ¶37.  Happel later recalled "that, moments prior to the assault, Jared Shaw

and his girlfriend, who has a first name of 'Chloe,' confronted him inside the bar, accusing him of

drugging Chloe the night before, causing her to fall unconscious."  *Id.*, ¶38.  Shaw and Chloe

followed Happel to the men's bathroom where Happel was attacked.  *Id.*, ¶39.  Based upon this

information, the Meadville Police deemed Shaw "a person of interest, for possibly conspiring with

the assailant out of retaliation for Shaw drugging Chloe."[4]  *Id.*, ¶40.  "Consequently, the police

---

[3] The Second Amended Complaint does not identify Pinkney's actual height.

[4] The Court assumes that the latter reference to Shaw in this sentence is an error and that the intended reference was to Happel.

offered Shaw immunity from prosecution, in exchange for Happel identifying the assailant." *Id.*,

¶41.[5]  Shaw declined this offer of immunity and instead hired a local attorney.  *Id.*, ¶42.

On April 11, 2019, Frum filed a criminal complaint and affidavit of probable cause against

Pinkney charging him with aggravated assault in violation of 18 Pa.C.S.A. § 2702(a)(1), simple assault

in violation of 18 Pa.C.S.A. § 2701 (a)(1), harassment in violation of 18 Pa.C.S.A. § 2709(a)(1), and

disorderly conduct in violation of 18 Pa.C.S.A. § 5503(a)(1).  Frum's affidavit of probable cause

stated that a witness had described Happel's attacker as "an African American male approximately

six feet tall with braided hair" and that an eyewitness had specifically identified Pinkney as the

assailant:

> On April 10, 2019, at approximately 16:30 hours, I interviewed a witness [now known to be Freeland] at the Allegheny College Public Safety building. The witness provided an audio recorded statement and stated that they were standing in line for the bathroom. They stated that an African American male *approximately six feet tall with braided hair* walked up to Happel. They stated that he then tapped Happel on the shoulder and when Happel looked around the male punched him once in the left side of the face. They stated that the male then walked to the town tavern side of the establishment. They stated a short time later they walked into that area and did not see the male anymore.
>
> The witness stated that they were contacted by Happle's (sic) friend, Evan Haines, and was sent picture of a white male and a black male. they recognized the white male as Jared Shaw and the black male as Kobe Pinkney. *they recognized Pinkney as the black male that punched Happel.* They stated that Haines sent two more pictures and they were both pictures of Pinkney.

ECF No. 55-1, p. 6 (emphasis added).[6]

---

[5] Again, this allegation's identification of persons involved events is unclear.  Based upon the prior allegation that the police suspected Shaw of having conspired with the assailant, it appears that Pinkney intended to allege that Shaw was offered immunity in exchange for his (Shaw's) identification of the assailant.

[6] Frum's affidavit of probable cause is comprised of two pages, the second of which includes the quoted information. Pinkney's original Complaint, First Amended Complaint and Second Amended Complaint have all attached the first page of the affidavit as an exhibit but not the second page.  Frum previously produced the entire affidavit of probable cause at ECF No. 55-1.  At oral argument, Pinkney's counsel acknowledged that the foregoing quoted excerpt was

Pursuant to the criminal complaint and affidavit of probable cause, a warrant for Pinkney's arrest was issued on April 11, 2019.  That same day, Sergeant Merchbaker removed Pinkney from a philosophy lecture at Allegheny, and Frum placed him under arrest.  *Id.*, ¶44.  Pinkney was taken before Crawford County Magisterial District Judge Samuel V. Pendolino and arraigned on the charges of aggravated assault, simple assault, harassment, and disorderly conduct.  *Id.*, ¶46.  Judge Pendolino set bail at $5,000.00.  *Id.*, ¶47. Pinkney's preliminary hearing was scheduled for April 25, 2019 and then continued to May 22, 2019.  *Id.*, ¶48.

Immediately after Pinkney's arrest, several witnesses came forward proclaiming his innocence and non-involvement in the assault upon Happel.  *Id.*, ¶¶45, 49-56.  At least one such witness stated that he was present in Julian's Bar on the night of the assault and that he did not observe Pinkney in the bar.  This witness went on to identify another individual, Josiah Williams, as the likely assailant.  *Id.*, ¶50.  Williams is a black male who, unlike Pinkney, wore his hair in braids. *Id.*  This information and other exculpatory evidence were relayed to Michael Stefanucci, Meadville Assistant Chief of Police.  *Id.*, ¶¶51-56.

Shortly before Pinkney's preliminary hearing, another witness provided an affidavit to Pinkney's criminal defense lawyer stating that he was present outside of Julian's Bar during the early morning hours of April 7, 2019.  He further attested that he saw Josiah Williams approach the men carrying Rhett Happel from the bar and heard him tell the men that he was the person who beat up Happel.  According to the witness, Williams then threatened to fight the entire group.  *Id.*, ¶57.

---

included in the affidavit of probable cause.  Because the entire affidavit of probable cause is indisputably authentic and Pinkney relies upon it in support of certain of his claims, this Court may consider it without converting Frum's motion to dismiss to a motion for summary judgment.  *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Before Pinkney's defense counsel could provide the exculpatory evidence to the Meadville Police Department, the Commonwealth withdrew all charges against Pinkney on May 15, 2019. Pinkney believes this decision was based upon the Commonwealth's own further investigation. *Id.*, ¶59. "Apparently, Defendant Freeland got cold feet and recanted his allegation that [Pinkney] looked like the assailant that assaulted Rhett Happel." *Id.*, ¶60. The investigation that exonerated Pinkney also included forensic testing results from a ring that police had confiscated from Pinkney based upon suspicion it was "a foreign object utilized in the assault against Happel." *Id.*, ¶61. The test results were negative for any evidence implicating Pinkney. *Id.* The exculpatory evidence also included a videotape obtained from Julian's Bar, which showed the presence of Happel and Williams, but not Pinkney, within the establishment on the night of the assault. *Id.*, ¶62.

### III.   Pinkney's Legal Claims

Pinkney's Second Amended Complaint asserts the following seven counts[7]:

| | |
|---|---|
| Count I | False Arrest against Frum; |
| Count III | False Imprisonment against Frum; |
| Count IV | Malicious Prosecution against Frum; |
| Count IV | Violation of Title VI of the Civil Rights Act of 1964, 1972, 42 U.S.C. §2000d, and the Equal Protection Clause of the Fourteenth Amendment against Frum, Allegheny, Freeland, and Hall; |
| Count V | Negligent Hiring, Supervision and Retention under Pennsylvania State Law against Allegheny; |
| Count VI | Intentional Infliction of Emotional Distress under Pennsylvania State Law against Frum, Allegheny, Freeland, and Hall; and |
| Count VII | Conversion under Pennsylvania State Law against Meadville. |

---

[7] The Amended Complaint does not include a Count II. It does include two counts label as "Count IV." To avoid confusion, the Court will refer to the count for malicious prosecution as "Count IV-A" and the Title VI/equal protection count as "Count IV-B."

IV.    Standard of Review: Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed.2d 929 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955 (rejecting the traditional Rule 12 (b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed.2d 80 (1957)). In making this determination, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed.2d 209 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions disguised as factual allegations. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. *See also*

*McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the

following three-step approach when evaluating a complaint under Rule 12(b)(6):

> First, the court must "tak[e] note of the elements a plaintiff
> must plead to state a claim." Second, the court should
> identify allegations that, "because they are no more than
> conclusions, are not entitled to the assumption of truth."
> Finally, "where there are well-pleaded factual allegations, a
> court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629

F.3d 121, 130 (3d Cir. 2010)). This determination is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.

Ct. 1937.

V.      Analysis

   A.      Pinkney's false arrest, false imprisonment and malicious prosecution claims
           against Frum

Frum argues that Pinkney's false arrest, false imprisonment and malicious prosecution claims

must be dismissed because Pinkney's arrest and prosecution were supported by probable cause. In

the alternative, Frum asserts that qualified immunity shields him from these claims.

   i.      Probable Cause

"False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v.

Kato*, 549 U.S. 384, 388, 127 S. Ct. 1091, 1095, 166 L. Ed. 2d 973 (2007). "To bring a claim for false

arrest, a plaintiff must establish '(1) that there was an arrest; and (2) that the arrest was made without

probable cause.'" *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020) (quoting *James v. City of Wilkes-*

*Barre*, 700 F.3d 675, 680 (3d Cir. 2012)).  Similarly, to state a claim for false imprisonment, a plaintiff must establish: (1) that he was detained; and (2) that the detention was unlawful.  *James v. City of Wilkes-Barre*, 700 F.3d 675, 682 (3d Cir. 2012) (citing *Wallace*, 549 U.S. at 389, 127 S. Ct. 1091).  "[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest."  *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995).  Conversely, "[f]alse arrest and false imprisonment claims will 'necessarily fail if probable cause existed for any one of the crimes charged against the arrestee.'"  *Harvard*, 973 F.3d at 199 (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 477 (3d Cir. 2016)).

"To prevail on a malicious prosecution claim, a plaintiff must demonstrate that: '(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.'"  *Harvard*, 973 F.3d at 206 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).  *See also Stafford v. Morris*, 816 F. App'x 712, 715 (3d Cir. 2020) (citing *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005)).  Thus, the absence of probable cause is an essential element of each of the foregoing claims.

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  *Dempsey*, 834 F.3d at 467 (citation omitted).  Probable cause is assessed based upon the "totality-of-the-circumstances" available to the arresting officer.  *Harvard*, 973 F.3d at 200 (citing *Dempsey*, 834 F.3d at 467-68).  In the current procedural posture of this case, this assessment accepts all well-pled factual allegations in

the complaint as true and views those facts in the light most favorable to Pinkney. *Id.*; *Higgins*, 281 F.3d at 388. As part of this assessment, the Court "must determine whether the plainly exculpatory evidence available to the arresting officer 'outweighs the probable cause otherwise established' through inculpatory evidence." *Harvard*, 973 F.3d at 200 (citing *Dempsey*, 834 F.3d at 478, 490). Because this totality-of-the-circumstances inquiry is "necessarily fact-intensive," whether probable cause existed is normally a question for the jury. *Id.* (citing *Dempsey*, 834 F.3d at 468; *Merkle*, 211 F.3d at 788) ("Generally, the question of probable cause in a section 1983 damage suit is one for the jury." (internal quotation marks and citation omitted)). The analysis of probable cause is to be undertaken on a crime-by-crime basis. *Harvard*, 973 F.3d at 200.

As noted, the criminal complaint and affidavit of probable cause charged Pinkney with aggravated assault, simple assault and disorderly conduct. Under Pennsylvania law "[a] person is guilty of aggravated assault if he; (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life...." 18 Pa.C.S.A. § 2702(a)(1). A person is guilty of simple assault "if he: (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." 18 Pa.C.S.A. § 2701(a)(1). "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly created a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 42 Pa. C.S.A. § 5503.

As the foregoing elements demonstrate, the legality of Frum's arrest of Pinkney for the offenses charged turns on whether probable cause existed to believe he committed the assault upon Happel. Pinkney was not accused of any conduct that could have implicated any of the three

charges against him other than the actual assault.  Viewing its factual allegations in the light most favorable to Pinkney, the Second Amended Complaint states a plausible claim that probable cause did not exist for his arrest or the charges against him.

The primary, if not sole, inculpatory evidence against Pinkney was Freeland's statement to Frum that Pinkney's appearance in a Facebook photograph "looked a lot like the person that punched Happel."  ECF No. 83, ¶33.  "An eyewitness identification is generally sufficient to establish probable cause for an arrest, unless 'there is an apparent reason for the officer to believe that the eyewitness was lying' or was otherwise mistaken."  *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 874 (6th Cir. 2012) (quoting *United States v. Lanier*, 636 F.3d 228, 233 (6th Cir. 2011)); *Hargroves v. City of New York*, 411 Fed.Appx. 378, 383 (2d Cir. 2011) ("Ordinarily, the identification, by an eyewitness, of a suspect will likely be sufficient to establish probable cause for an arrest."); *Miloslavsky v. AES Engineering Soc, Inc.*, 808 F.Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth").  Similarly, "[a] positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest."  *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) (citing *Bail v. Ramirez*, 2007 WL 959045, at *8 (S.D.N.Y. Mar. 29, 2007)).

Here, however, Freeland's identification of Pinkney was equivocal as evidenced by his qualifying language that Pinkney "looked a lot like" the assailant.[8]  Indeed, Freeland acknowledged

---

[8] In contrast to Pinkney's Second Amended Complaint, his initial and First Amended Complaints alleged that Freeland definitively identified him as the assailant, not once but twice.  And, during oral argument on the Defendants' initial motions to dismiss the Amended Complaint, Pinkney's counsel acknowledged the definitive nature of this eyewitness identification and disclaimed any inaccuracy in or omission from Frum's affidavit of probable cause in support of the warrant for Pinkney's arrest.  The alleged definitive nature of Freeland's identification was a material factor in the Court's earlier decision to grant Frum's motion to dismiss the claims of the first Amended Complaint against him.  *See*

that Pinkney had shorter hair than the assailant and that, unlike the assailant, Pinkney did not wear his hair in braids. These discrepancies and the equivocal nature of Freeland's identification are particularly significant given that Freeland's identification appears to have been the only evidence linking Pinkney to the offenses charged. No other witness placed Pinkney at Julian's Bar on the evening of April 6 or early morning hours of April 7, 2019. No physical evidence or video surveillance tied Pinkney to the assault. The Court also notes that Freeland's equivocal identification came only after Happel's friend, Evan Haines, showed Freeland photographs that included Pinkney as the only black male. Frum was apparently aware of the suggestive nature of this identification. These facts distinguish this case from *Stafford v. Morris, supra*, where the Court of Appeals affirmed the entry of summary judgment for a state trooper based upon probable cause despite the inability of certain victims to identify the plaintiff as the perpetrator of the crime. In *Stafford*, the totality of the circumstances known to the trooper at the time of the arrest fully supported probable cause even accounting for the fact that two out of three minor victims did not identify the plaintiff in a photographic line up. 816 F. App'x at 714.

In the present case, the warrant for Pinkney's arrest was issued by a Magisterial District Judge of the Pennsylvania minor judiciary. An arrest warrant issued by a judicial officer "does not, in itself, shelter an officer from liability for false arrest." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). "Rather, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in

---

*Pinkney v. Meadville, Pennsylvania*, 2020 WL 1667241, at *7 (W.D. Pa. Apr. 3, 2020), *vacated in part*, 2020 WL 1984721 (W.D. Pa. Apr. 27, 2020). Pinkney's subsequent presentation of evidence demonstrating that his prior allegations were misinformed and that Freeland's identification was equivocal prompted the Court to reconsider its dismissal of the claims against Frum and allow Pinkney to file a Second Amended Complaint based upon newly discovered evidence. *See Pinkney v. Meadville, Pennsylvania*, 2020 WL 1984721, at *1 (W.D. Pa. Apr. 27, 2020).

applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Wilson*, 212 F.3d at 786-87.   Thus, when an arrest is based on a valid warrant, courts conduct a two-pronged analysis to determine whether probable cause existed.   *See Andrews v. Sculli*, 853 F.3d 690, 697 (3d Cir. 2017).   They ask, "first, whether the officers, with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for the warrant, and second, whether those assertions or omissions were material, or necessary, to the finding of probable cause." *Id.* (citing *Wilson*, 212 F.3d at 786–87 (internal quotation marks and alteration omitted)).

Regarding the first element, an assertion is made with reckless disregard for the truth when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information reported." *Id.* at 698 (quoting *Wilson*, 212 F.3d at 788).   To determine whether information was recklessly omitted, the inquiry is whether the officer withheld "a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Dempsey*, 834 F.3d at 470 (citing *Wilson v.*, 212 F.3d at 786–87 (internal quotation marks and alteration omitted)).   If the court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless disregard for the truth, the second element requires that the Court "perform a word-by-word reconstruction of the affidavit" and determine whether the reconstructed affidavit would establish probable cause.   *Dempsey*, 834 F.3d at 470.

Whether Frum acted recklessly when he failed to accurately and completely convey the nature of Freeland's "identification" of Pinkney as the assailant presents a factual issue that cannot be determined on a motion to dismiss.   In his internal Meadville police incident report, Frum accurately recorded Freeland's statement that Pinkney "looked a lot like" the assailant and noted the

14

discrepancies in how Pinkney and the assailant wore their hair. ECF No. 83-1, pp. 2-3. In contrast, Frum's affidavit of probable cause presented Freeland's identification of Pinkney as definitive and omitted the discrepancies in hair style. *Id.*, pp 5; ECF No. 55-1. These facts indicate that Frum was conscious of his misstatement and omissions when he submitted his affidavit. Therefore, a jury may reasonably find that Frum was reckless in his presentation of the facts in his affidavit of probable cause. Thus, the Second Amended Complaint pleads enough facts to state a plausible claim on this issue and allow it to proceed to discovery.

Having found that the Second Amended Complaint satisfies the first element under *Wilson* and its progeny, the Court must conduct a word-by-word reconstruction of Frum's affidavit and determine whether the reconstructed affidavit would establish probable cause. *Dempsey*, 834 F.3d at 470. As noted, this reconstruction focuses on Frum's presentation of the facts concerning Freeland's identification of Pinkney as Happel's attacker. The first page of Frum's affidavit recites primarily the evidence gathered on the night of the assault and does not speak to the identification of the attacker. The material portion of the affidavit is page 2, where Frum attested that Freeland described the attacker as an "African American male approximately six feet tall with braided hair" and twice attested that "they [Freeland and Haines] recognized Pinkney as the black male that punched Happel." Accurately reconstructed to convey the facts known to Frum, the affidavit would have included words conveying that Freeland stated that Pinkney "looked a lot like" the black male who punched Happel, except that Pinkney had shorter hair than the attacker and, unlike the attacker, did not wear his hair in braids. So reconstructed, it cannot be said as a matter of law that the affidavit supported probable cause to arrest and charge Pinkney. With no other evidence to link Pinkney to the crime, a jury may find that the facts set forth in the reconstructed affidavit, including the equivocal identification and discrepancies in appearance between Pinkney and the attacker, did not support a reasonable belief that Pinkney committed the offenses charged. Therefore, the

Second Amended Complaint states viable claims for false arrest, false imprisonment, and malicious prosecution against Frum.

In reaching this conclusion, the Court has not considered the exculpatory evidence that Pinkney's criminal defense counsel gathered after Pinkney's arrest. This evidence was not known to Frum when he presented his affidavit of probable cause. While "[t]he police must not ignore exculpatory evidence that would void probable cause if taken into account," "once the evidence establishes probable cause, an officer is not required to continue investigating, sifting and weighing information, nor is an officer obligated to investigate the suspect's plausible claims of innocence." *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) (citing *Panetta v. Crowley*, 460 F.3d 388, 396–98 (2d Cir. 2006) (internal citation omitted). Nevertheless, a reasonable jury may find that probable cause was lacking in this case even without consideration of the post-arrest exculpatory evidence.

ii.    Qualified Immunity

Frum argues that even if he lacked probable cause to arrest Pinkney, qualified immunity shields him from suit under §1983 because "his belief that probable cause existed was reasonable." ECF No. 87, p.10. The Court disagrees.

Qualified immunity "shield[s officers] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982)). The qualified immunity defense is traditionally analyzed in two steps. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, make out the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001). Next, the court must examine

whether the right at issue was "clearly established" at the time of the challenged conduct. To be "clearly established," a right must be sufficiently clear such that a reasonable official in the position of the defendant would have known that his conduct was unlawful. *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012). While a case directly on point is not required to show that a right was "clearly established," "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Taylor v. Barkes*, 575 U.S. 822, 135 S. Ct. 2042, 2044, 192 L. Ed.2d 78 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed.2d 1149 (2011)). The two prongs to the qualified immunity inquiry need not be analyzed in sequential order; courts have discretion to decide which of the two prongs to tackle first. *al-Kidd*, 131 S.Ct. at 2080; *Pearson*, 555 U.S. at 236, 129 S.Ct. 808.

Regarding the first step in the qualified immunity analysis, the Court has already determined that the facts alleged in the Second Amended Complaint support a violation of Pinkney's Fourth Amendment rights. Regarding the second step in the analysis, in the context of a § 1983 action alleging a violation of the Fourth Amendment, "the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Sharrar*, 128 F.3d at 827 (citing *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed.2d 589 (1991) (per curiam)). Police officers "who reasonably but mistakenly conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity." *Id.* at 826 (citations omitted). "In this way, the qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations omitted). "Even where probable cause is not found to exist, a police officer sued for false arrest is immune from suit under the doctrine of qualified immunity where 'arguable probable cause' exists." *Rodriguez v. New York City Transit Auth.*, 2009 U.S. Dist. LEXIS 106464, 2009 WL 3817298 at *19 (S.D.N.Y. Nov. 10, 2009) (citing *Escalera v.*

*Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)); *Araujo v. City of New York*, 2010 WL 1049583, at *5 (E.D.N.Y. Mar. 19, 2010).

The Fourth Amendment requires that an arrest warrant be based upon probable cause and supported by oath or affirmation. *Kalina v. Fletcher*, 522 U.S. 118, 118 S. Ct. 502, 509, 139 L. Ed.2d 471 (1997) (citations omitted). The issuance of the warrant by a judicial officer and the police officer's subjective belief in the truth of the facts stated in the affidavit do not per se establish the objective reasonableness of the police officer's actions and his right to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 345, 106 S. Ct. 1092, 1098, 89 L. Ed. 2d 271 (1986). In this context, qualified immunity will not shield a police officer who applied for an arrest warrant where "the warrant application is so lacking in indicia of probable cause as to render [the] offic[er's] belief in its existence unreasonable[.]" *Id.* at 344–45, 106 S.Ct. 1092; *see also Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citing *Malley* and stating that police officer is entitled to qualified immunity where grounds for probable cause stated in warrant application were objectively reasonable). "[T]he standard for determining the reasonableness of an official's belief in the existence of probable cause is whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he therefore should not have applied for the warrant under the conditions." *Orsatti*, 71 F.3d at 483 (citing *Malley*, 475 U.S. at 345, 106 S.Ct. 1092).

Frum argues that he is entitled to qualified immunity because he reasonably believed that his affidavit and the resulting warrant supported probable cause to arrest and charge Pinkney. This argument fails, however, because it ignores the misstatements and omissions in his affidavit. Qualified immunity under *Malley* and its progeny is premised upon an officer's reasonable belief in the accuracy of the facts stated in his affidavit and the existence of probable cause based on those facts. This premise is negated "where a police officer causes an arrest to be made pursuant to a

warrant that he obtained on the basis of statements he knew to be false or on the basis of statements he makes in reckless disregard of the truth…." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993). In such a case, the "plaintiff may recover damages under section 1983 for 'unreasonable seizure' of his person in violation of the Fourth Amendment." *Id.* (citations omitted). These principles and the Fourth Amendment rights upon which they are based were clearly established at the time of Frum's actions in this case. *See United States v. Leon,* 468 U.S. 897, 923, 104 S. Ct. 3405, 82 L. Ed .2d 677 (1984); *cf. Franks v. Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *Wilson,* 212 F.3d at 787.

Finally, the Third Circuit Court of Appeals has noted that "qualified immunity exists, in part, to protect police officers in situations where they are forced to make difficult, split-second decisions." *Reedy v. Evanson*, 615 F.3d 197, 224 n. 37 (3d Cir. 2010) (citing *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir.2005) ("Under qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field [because they] must make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." (internal quotations omitted)). In this case, Frum was not called upon to make any "split-second" decisions. He had time to deliberate over the content of his affidavit of probable cause and its legal sufficiency. Given his inaccurate statements and omissions in that affidavit, the Court cannot hold as a matter of law that he had a reasonable belief that probable cause existed for Pinkney's arrest. Accordingly, his request for dismissal of this action based upon qualified immunity must be denied.

B.    Equal Protection/Racial Discrimination Claim Against Frum

Count IV-B of the Second Amended Complaint bears the heading "Violation of Title VI of the Civil Rights Act of 1964, 1972, 42 U.S.C. Section 2000d)(seq. (sic) and the Equal Protection Clause to the Fourteenth Amendment." ECF No. 83, p.23. Because of the confusing nature of this

heading and inconsistencies between it and the allegations that follow, the Court must first ascertain what claims Pinkney is asserting against Frum in this count.  Pinkney lists Frum, Allegheny, Freeland and Hall as the Defendants to this count.  His liability allegations against Allegheny, Freeland and Hall (ECF No. 83, ¶¶128-132) are distinct from those against Frum (*id.*, ¶¶135-139).[9]  It also appears that Pinkney relies upon Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause as the legal authority for his discrimination claims against Allegheny, Freeland and Hall (*id*, ¶128), and upon 42 U.S.C. §1981 and the Equal Protection Clause for his discrimination claims against Frum, although Pinkney does not include a reference to §1981 in the heading of Count IV-B.[10]  After reviewing the facts alleged in support of Pinkney's claims against Frum, the Court will analyze those claims under the Equal Protection Clause and §1981.

In support of his discrimination claims against Frum, Pinkney alleges that his "race was a motivating factor" in Frum's decision to "detain him without reasonable suspicion, arrest him without probable cause and maliciously prosecute him with false charges, where he was detained and arrested merely because prior to the incident he took some facebook (sic) photos with a white male that was observed with the assailant at the scene."  ECF No. 83, ¶138.  Pinkney further alleges that he "was only arrested because like the assailant [he] is African American."  *Id.*  He then goes on to allege that Frum's "one sided investigation demonstrated pervasive racial bias against [him] and in favor of Jared Shaw, a white male accused by Happel of making threats of violence against him, who was not even arrested."  *Id.*, ¶139.

---

[9] The Court will address the allegations and claims against Allegheny, Freeland and Hall in a separate Opinion and Order on their motion to dismiss.

[10] It is unclear whether Pinkney's reference to "1972" in the heading is a typographical error or a reference to Title IX of the Education Amendments Act of 1972.  If the latter, Title IX has no application here as it prohibits discrimination "*on the basis of sex*" in "any education program or activity receiving Federal financial assistance."  20 U.S.C. §1681-§1688 (emphasis added).  No allegations of sex discrimination appear in the Second Amended Complaint.

The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "To state a claim for an equal protection clause violation, a plaintiff must show that (1) compared with others similarly situated he was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Cash v. Wetzel*, 8 F. Supp. 3d 644, 664 (E.D. Pa. 2014) (citing *Sabatini v. Reinstein*, 1999 WL 636667 (E.D.Pa. August 20, 1999)). The Second Amended Complaint mostly asserts conclusory allegations of racial bias against Frum. Such allegations do not support a plausible claim. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. The Second Amended Complaint does, however, include one factual matter—Frum's alleged disparate treatment of Jared Shaw, a white male—as a potential basis for his discrimination claims. Disparate treatment such as Pinkney alleges here presents a selective enforcement claim.

To establish a selective enforcement claim under the Equal Protection Clause, "a plaintiff must demonstrate that he was (1) treated differently from other, similarly situated persons and (2) 'that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a fundamental right.'" *Harvard*, 973 F.3d at 205 (quoting *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) (alteration, internal quotation marks, and citation omitted)). The reference to "similarly situated" in the first element of the claim does not mean "identically situated." *Id.* (citing *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir. 1991), abrogated on other grounds by *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)). Rather, persons are similarly situated "when they are alike 'in all relevant respects.'" *Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed.2d 1 (1992)). This "inquiry 'should not demand exact

correlation, but should instead seek relevant similarity.'" *Id.* (quoting *Stimmel v. Sessions*, 879 F.3d 198, 212 (6th Cir. 2018)) (additional citation omitted).

Pinkney is black and therefore a member of a protected class. Thus, the question here is whether Shaw, a white male, and Pinkney were alike in all other respects relevant to Frum's actions such that it can be inferred that Frum's disparate treatment of Shaw and Pinkney was due to Pinkney's race. Shaw and Pinkney occupied similar positions in one material respect—each was suspected of having some involvement in the attack upon Happel. This, however, is where the similarities in position end. The Second Amended Complaint and its exhibits do not support that Frum had a reasonable basis to believe that Shaw was the individual who physically attacked Happel. Indeed, whatever flaws existed in Freeland's identification of Pinkney, the evidence consistently identified the assailant as a black male, which excluded Shaw as the attacker. Pinkney appears to posit that Frum nevertheless should have arrested Shaw on suspicion of conspiring with the assailant in the attack upon Happel. This position is based upon the fact that Frum was aware of evidence that Shaw and another individual, Joe Hayes, had threatened to hit Happel on the night of the attack. ECF No. 83, ¶36. Based upon this evidence, Meadville Police deemed Shaw "a person of interest, for possibly conspiring with the assailant out of retaliation for [Happel] drugging Chloe." *Id.*, ¶40. "Consequently, the police offered Shaw immunity from prosecution, in exchange for [his] identifying the assailant." *Id.*, ¶41.

The flaw in Pinkney's argument is that neither the Second Amended Complaint nor its exhibits support a conclusion that Frum had any evidence approaching what would have been necessary to establish probable cause to arrest Shaw for conspiracy to assault Happel. Pennsylvania law defines the offense of criminal conspiracy as follows:

> (a) A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> > (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
> >
> > (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903.

Frum is not alleged to have known any facts supporting a reasonable belief that Shaw agreed with the assailant to participate in the assault or aid the assailant in planning or committing the assault—elements essential to support a criminal conspiracy charge under Pennsylvania law. Probable cause "requires more than mere suspicion[.]" *Reedy*, 615 F.3d 197, 211 (3d Cir. 2010) (quoting *Orsatti*, 71 F.3d at 482). Therefore, Frum's decision to charge Pinkney while not also charging Shaw does not evidence a racial bias against Pinkney.

Further, Pinkney's contention that Frum also lacked probable cause to arrest him does not make him similarly situated to Shaw. The conduct alleged against each materially differed as did the elements of the charges that were filed or potentially could have been filed against each. These dissimilarities are too great to find them to have been similarly situated at the time of the events at issue. The facts of this case do not support an inference that no rational basis existed for Frum's decision to charge Pinkney but not Shaw except upon the basis of Pinkney's race. *See Harvard*, 973 F.3d at 206. This case also lacks any allegations of racist statements or other direct evidence to support an inference of racial animus. *See id.* The Second Amended Complaint therefore fails to state an equal protection claim against Frum.

For similar reasons, the Second Amended Complaint also fails to state a claim pursuant to §1 of the Civil Rights Act of 1866, which provides as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

To state a prima facie case of discrimination under § 1981, a plaintiff must allege facts showing that: (1) the plaintiff is a racial minority; (2) the defendant discriminated against the plaintiff; (3) the defendant had an intent to discriminate on the basis of race; and (4) the discrimination concerned one or more of the activities enumerated in the statute. *Williams v. Penn. State Police Bureau of Liquor Control*, 108 F.Supp.2d 460, 472 (E.D. Pa. 2000); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).

Here, the Amended Complaint fails to allege facts to support a plausible claim of racial discrimination in connection with Pinkney's arrest, including facts to infer that Pinkney was treated differently from a similarly situated person not in the protected class. That Pinkney is black and was arrested is insufficient, standing alone, to show a discriminatory intent or effect. The Second Amended Complaint acknowledges that Freeland described Happel's attacker as a black male, and the facts alleged do not support that Frum considered race beyond it being one of the descriptive characteristics of the assailant. *Compare Hall v. Pennsylvania State Police*, 570 F.2d 86, 91 (3d Cir. 1978) (examining a surveillance program that targeted exclusively African Americans entering a bank and did not present "a situation where suspects are being sought on the basis of descriptions which include race as well as other physical characteristics"). Because the Second Amended Complaint

fails to allege facts to support that Frum acted with a discriminatory motive, Count IV-B of the Amended Complaint must be dismissed against him.[11]

### C. Intentional Infliction of Emotional Distress

Count VI of the Second Amended Complaint asserts a claim for intentional infliction of emotional distress against Frum and other Defendants.  To prevail on an intentional infliction of emotional distress claim under Pennsylvania law, a plaintiff must show: "(1) the conduct of defendant was intentional or reckless; (2) the conduct of defendant was extreme and outrageous; (3) defendant's conduct caused emotional distress; and (4) the distress was severe." *Sabo v. UPMC Altoona*, 386 F. Supp.3d 530, 556 (W.D. Pa. 2019) (citing *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000)).  "Outrageous" and "extreme" conduct is defined as "conduct that is 'so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarding as atrocious, and utterly intolerable in civilized society.'" *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 n.5 (Pa. Super. Ct. 2004) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998)).  Liability under this cause of action is "reserved by the courts for only the most clearly desperate and ultra extreme conduct." *Hoy*, 720 A.2d at 754.  Whether the alleged conduct may reasonably be regarded as so extreme as to permit recovery is left to the court in the first instance. *See Salerno v. Phila. Newspapers, Inc.*, 546 A.2d 1168, 1172 (Pa. Super. Ct 1988).  In addition, the weight of authority holds that "in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiffs must allege physical injury." *Clark v. Conahan*, 737 F. Supp. 2d 239, 273 (M.D. Pa. 2010); *Minarsky v. Susquehanna Cty. & Thomas Yadlosky*, 2016 WL 183280, at *4 (M.D. Pa. Jan. 13, 2016) (holding that "a plaintiff must demonstrate physical

---

[11] Frum also argues that Pinkney's Fourth Amendment equal protection claim against him is barred by collateral estoppel based upon the Court's prior Opinion and Order dismissing that claim. ECF No. 87, p. 13. Given the Court's dismissal of this claim on its merits, it need not reach this issue.

injury or harm to sustain a cause of action for intentional infliction of emotional distress); *Rudas v. Nationwide Mut. Ins. Co.*, 1997 WL 11302, at *6 (E.D. Pa. Jan.10, 1997) (dismissing claim for intentional infliction of emotional distress where the plaintiff had not alleged physical injury); *Hart v. O'Malley*, 436 Pa. Super. 151, 647 A.2d 542 (Pa.Super.1994) ("it is clear that in Pennsylvania, in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiff must allege a physical injury"); *Fewell v. Besner*, 444 Pa. Super. 559, 664 A.2d 577 (Pa.Super.1995) (affirming the grant of preliminary objections as to plaintiff's claim of intentional infliction of emotional distress where plaintiff failed to allege physical injury); *Hart v. O'Malley*, 436 Pa.Super. 151, 647 A.2d 542, 553–54 (Pa. Super.1994), affirmed, 544 Pa. 315, 676 A.2d 222 (Pa.1995); *Johnson v. Caparelli*, 425 Pa. Super. 404, 625 A.2d 668 (Pa. Super.1993), appeal denied, 538 Pa. 635, 647 A.2d 511 (Pa.1992); *Kelly v. Resource Housing of Am.*, 419 Pa. Super. 393, 615 A.2d 423 (Pa. Super.1992); *Love v. Cramer*, 414 Pa. Super. 231, 606 A.2d 1175 (Pa. Super.1992). *See also Buttermore v. Loans*, 2016 WL 308875, at *7 (W.D. Pa. Jan. 25, 2016) (noting that courts in Pennsylvania consistently require that a plaintiff suffer some physical manifestation of his alleged emotional distress).

In the present case, Pinkney's intentional infliction of emotional distress claim against Frum fails on multiple grounds. First, although Pinkney's allegations state viable claims for false arrest, false imprisonment and malicious prosecution, they do not rise to the level of extreme and outrageous conduct necessary to sustain an intentional infliction of emotional distress claim. *See Mason v. City of Philadelphia*, 2014 WL 4375671, at *6 (E.D. Pa. Sept. 4, 2014). Furthermore, Pinkney has not alleged the physical injury or manifestation that Pennsylvania law holds is necessary to state such a claim. Accordingly, Pinkney's intentional infliction of emotional distress claim against Frum will be dismissed.

D.  Conversion Claim against Meadville

Pinkney's only claim against Meadville is a conversion claim under Pennsylvania law.  He alleges that Meadville police officers executed a search warrant after he was arrested and seized a ring from him pursuant to the warrant.  ECF No. 83, ¶¶156-157.  After forensic testing determined that the ring was not used in the assault of upon Happel, Pinkney requested that it be returned to him.  *Id.*, ¶¶158-159.  The Commonwealth refused to do so.  *Id.*, ¶¶160.  Thus, Pinkney alleges that Meadville has converted the ring to its own use (*id*, ¶160), although it is not entirely clear whether Meadville or the Commonwealth of Pennsylvania remains in possession of the ring.

Frum's motion treats this claim as a procedural due process claim under the Fourteenth Amendment.  As such, Frum argues it must be dismissed because Pennsylvania law provides an adequate post-deprivation remedy when police seize property pursuant to an investigation.  Frum is correct that Pennsylvania state law provides a remedy in this situation.  Pennsylvania Rule of Criminal Procedure 588 states:

> A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

Pa. R. Crim. P. 588.

Frum is also correct that the adequacy of this post-deprivation remedy precludes a procedural due process claim under the Fourteenth Amendment.  *See McKenna v. Portman*, 538 F. App'x 221, 224–25 (3d Cir.2013); *Taylor v. Naylor*, 2006 WL 1134940, at *4 (W.D.Pa. Apr.26, 2006). Nevertheless, Frum's argument misses the mark because Pinkney is not asserting a Fourteenth Amendment due process claim.  Instead, he presents this claim as a conversion claim under Pennsylvania state law.  The Court has primary jurisdiction over this claim pursuant to 28 U.S.C.

§1332 based upon complete diversity of citizenship between Pinkney and all Defendants. Further, although Rule 588 provides that a proceeding to recover property pursuant to that rule shall be "filed in the court of common pleas for the judicial district in which the property was seized," the Court has found no authority indicating that Rule 588 is the exclusive remedy to recover seized property. Indeed, this Court and others have identified conversion actions among the remedies available to recover property seized pursuant to a subpoena. *See Taylor v. Naylor*, 2006 WL 1134940, at * 3-4 (W.D. Pa. Apr.26, 2006) (recognizing conversion, replevin and Pa. R.Crim. P. 588 as post-deprivation remedies for seized property); *Marsh v. Ladd*, 2004 WL 2441088, at * 6-7 (E.D.Pa. Oct.27, 2004) (same).

Thus, Frum has not offered a valid ground for dismissal of Pinkney's conversion claim. His motion to dismiss that claim will be denied.

### E. Pinkney's demands for specific compensatory and punitive damages

The Second Amended Complaint concludes with Pinkney's request for relief, which includes demands for $5,000,000.00 in compensatory damages and $50,000,000.00 in punitive damages. ECF No. 83, p. 30. Frum and Meadville have moved to strike these amounts from the Second Amended Complaint as violations of Rule 8 of the Local Rules of the United States District Court for the Western District of Pennsylvania. Rule 8 provides:

> No party shall set forth in a pleading originally filed with this Court a specific dollar amount of unliquidated damages in a pleading except as may be necessary to invoke the diversity jurisdiction of the Court or to otherwise comply with any rule, statute, or regulation which requires that a specific amount in controversy be pled in order to state a claim for relief or to invoke the jurisdiction of the Court.

LCvR 8.

Pinkney's demands for specific amounts of compensatory and punitive damages violate Rule 8.  To invoke this Court's subject matter jurisdiction based upon diversity of citizenship between him and the Defendants, Pinkney needed only to have alleged that the amount in controversy exceeded the sum or value of $75,000.00, exclusive of interest and costs.  28 U.S.C. 1332(a).  Therefore, the Court will grant Frum and Meadville's motion to strike the specific amounts demanded for compensatory and punitive damages in the Second Amended Complaint.

VI.    Conclusion

For the reasons discussed above, the allegations of Pinkney's Second Amended Complaint do not state legally viable claims against Frum and Meadville for violation of 42 U.S.C. §1981, equal protection, or intentional infliction of emotional distress.  Therefore, Frum and Meadville's motion to dismiss will be granted as to Counts IV-B and VI of the Second Amended Complaint.  Pinkney's §1981, equal protection, and intentional infliction of emotional distress claims against Frum and Meadville will be dismissed with prejudice.  Frum and Meadville's motion will be denied as to Counts I, II, IV-A, and VII of the Second Amended Complaint.  Finally, the specific amounts demanded for compensatory and punitive damages in the Second Amended Complaint will be stricken.

ORDER

AND NOW, this 28th day of December, 2020, it is hereby ORDERED that Defendants

Meadville and Frum's Motion to Dismiss pursuant to Fed. R. Civ. Pro 12(b)(6) (ECF No. 86) is

GRANTED in part and DENIED in part.  The motion is GRANTED as to Count IV-B and VI of

the Second Amended Complaint, and Plaintiff Pinkney's §1981, equal protection, and intentional

infliction of emotional distress claims against Frum and Meadville are DISMISSED with prejudice.

The motion is DENIED as to Counts I, II, IV-A and VII of the Second Amended Complaint.  The

specific amounts demanded for compensatory and punitive damages in the Second Amended

Complaint are hereby STRICKEN.

RICHARD A. LANZILLO
United States Magistrate Judge