IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KOBE PINKNEY, | ) Case No. 1:19-cv-00167 (Erie) |
| Plaintiff | ) |
| v. | ) RICHARD A. LANZILLO |
| | ) UNITED STATES MAGISTRATE JUDGE |
| MEADVILLE, PENNSYLVANIA, et al, | ) |
| | ) OPINION AND ORDER ON |
| Defendants | ) DEFENDANTS ALLEGHENY |
| | ) COLLEGE, DUNCAN FREELAND AND |
| | ) JOE HALL'S MOTION TO DISMISS |
| | ) (ECF NO. 102) |

Defendants Allegheny College ("Allegheny"), Duncan Freeland ("Freeland") and Joe Hall ("Hall") (collectively, "Allegheny Defendants") have moved to dismiss Plaintiff Kobe Pinkney's Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 102. For the reasons discussed below, the motion will be granted.[1]

I.   Procedural History

Pinkney filed his Second Amended Complaint ("SAC") on May 6, 2020. ECF No. 83. The SAC is Pinkney's operative pleading and the subject of the pending motion. The procedural history leading to the filing of the SAC is detailed in the Court's Opinion and Order entered on December 28, 2020 (ECF No. 106) and will not be repeated here.[2]  In addition to the Allegheny

---

[1] The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331 (federal question) and §1332 (complete diversity of citizenship). The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636. *See* ECF Nos. 39, 40, 45, 48, 51, 52.

[2] This information is also reported at *Pinkney v. Meadville, Pennsylvania*, 2020 WL 7695832, at *1 (W.D. Pa. Dec. 28, 2020).

1

Defendants, the SAC also names The City of Meadville, Pennsylvania ("Meadville") and Meadville Police Officer Jared Frum ("Frum") as Defendants.

The SAC includes a claim that the Allegheny Defendants violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000 *et seq.*, and Pinkney's Fourteenth Amendment rights because they undertook various actions against him with "racial animus and bias." ECF No. 83, ¶¶128-134. The SAC also asserts a state law intentional infliction of emotional distress claim against the Allegheny Defendants, *id.*, ¶¶152-54, and a state law negligent hiring claim against Allegheny alone. *Id.*, ¶¶144-150. On September 15, 2020, the Allegheny Defendants filed a motion to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 102. The motion has been fully briefed and is ready for disposition.

II.     Factual Allegations

The following facts derive from the SAC and the exhibits thereto and are considered as true for purposes of the pending motion.

On April 7, 2019, at approximately 1:30 am, Frum, while on routine patrol in the area of the Meadville Academy Theatre, observed four males walking near an establishment known as Julian's Bar. ECF No. 83, ¶24. Two of the men were carrying a third male, later identified as Rhett Happel. Frum observed that the left side of Happel's face was severely swollen and that he had sustained serious injuries to his face. *Id.*, ¶¶25, 28. Frum summoned an ambulance to the scene. While the group waited for the ambulance to arrive, one of the men volunteered that he believed that Happel had been assaulted and speculated that the attack had been motivated by a report that Happel had drugged a female who the police had found unconscious in the bathroom of Julian's Bar the previous night. *Id.*, ¶¶26-27.

2

Three days later, on April 10, 2019, Frum, interviewed Freeland, a Residential Advisor and student at Allegheny. *Id.*, ¶29. Frum conducted the interview at Allegheny's Public Safety Building with the assistance of Sergeant Merchbaker, Allegheny's Interim Director of Public Safety, and in the presence of Hall, Allegheny's Director of Student Conduct. *Id.* Freeland told Frum and Sergeant Merchbaker that the assailant was an African American male, approximately six feet tall, with braided hair, who walked up to Happel when he was in the bathroom of Julian's Bar, tapped Happel's shoulder from behind and then punched Happel on the left side of his face as Happel turned around. *Id.*, ¶30. According to Freeland, the assailant walked to another area of Julian's Bar and eventually exited the establishment. *Id.*, ¶31. After the assault, Freeland was contacted by Happel's friend, Evan Haines, who sent Freeland a Facebook photo of Jared Shaw, a white male who had been observed at Julian's Bar with the assailant on the evening of the assault, and black male, later identified as Pinkney. *Id.*, ¶32. Both Shaw and Pinkney are football players at Allegheny. *Id.*, ¶35. Freeland told Frum that the black male (Pinkney) depicted in the photograph "looked a lot like the person that punched Happel." *Id.*, ¶33. Haines showed Freeland two additional photographs of Shaw and Pinkney together, and "both times the witness described Pinkey (sic) as having shorter hair than the assailant." *Id.*, ¶34. In contrast to the description provided by Freeland, Pinkney has never worn his hair in braids and is not six feet tall.[3] *Id.*, ¶¶ 54, 64, 92.

Frum also "interviewed the victim, Rhett Happel, who told him that on the evening he was assaulted, he did not recall being struck, but did remember that he had been threatened by both Jared Shaw and Joe Hayes, with Shaw threatening to hit him, and that Shaw had to be pushed away from him." *Id.*, ¶36. Frum's incident report also included a statement from Kristen Ferguson, a bartender employed by Julian's, who initially reported that she was working in the bar when she

---

[3] The SAC does not identify Pinkney's actual height.

thought she observed a female punch Rhett Happel. Ferguson later equivocated and stated that she could not be sure that the assailant was a female but did recall Happel being pointed out and accused by a female. *Id.*, ¶37. Happel later recalled "that, moments prior to the assault, Jared Shaw and his girlfriend, who has a first name of 'Chloe,' confronted him inside the bar, accusing him of drugging Chloe the night before, causing her to fall unconscious." *Id.*, ¶38. Shaw and Chloe followed Happel to the men's bathroom where Happel was attacked. *Id.*, ¶39. Based upon this information, the Meadville Police deemed Shaw "a person of interest, for possibly conspiring with the assailant out of retaliation for Shaw drugging Chloe."[4] *Id.*, ¶40. "Consequently, the police offered Shaw immunity from prosecution, in exchange for Happel identifying the assailant." *Id.*, ¶41.[5] Shaw declined this offer of immunity and instead hired a local attorney. *Id.*, ¶42.

On April 11, 2019, Frum filed a criminal complaint and affidavit of probable cause against Pinkney charging him with aggravated assault in violation of 18 Pa.C.S.A. § 2702(a)(1), simple assault in violation of 18 Pa.C.S.A. § 2701 (a)(1), harassment in violation of 18 Pa.C.S.A. § 2709(a)(1), and disorderly conduct in violation of 18 Pa.C.S.A. § 5503(a)(1). Frum's affidavit of probable cause stated that a witness had described Happel's attacker as "an African American male approximately six feet tall with braided hair" and that an eyewitness had specifically identified Pinkney as the assailant:

> On April 10, 2019, at approximately 16:30 hours, I interviewed a witness [now known to be Freeland] at the Allegheny College Public Safety building. The witness provided an audio recorded statement and stated that they were standing in line for the bathroom. They stated that an African American male *approximately six feet tall with*

---

[4] The Court assumes that the latter reference to Shaw in this sentence is an error and that the intended reference was to Happel.

[5] Again, this allegation's identification of persons involved events is unclear. Based upon the prior allegation that the police suspected Shaw of having conspired with the assailant, it appears that Pinkney intended to allege that Shaw was offered immunity in exchange for his (Shaw's) identification of the assailant.

4

>   *braided hair* walked up to Happel. They stated that he then tapped Happel on the shoulder and when Happel looked around the male punched him once in the left side of the face. They stated that the male then walked to the town tavern side of the establishment. They stated a short time later they walked into that area and did not see the male anymore.
>
>   The witness stated that they were contacted by Happle's (sic) friend, Evan Haines, and was sent picture of a white male and a black male. they recognized the white male as Jared Shaw and the black male as Kobe Pinkney. *they recognized Pinkney as the black male that punched Happel.* They stated that Haines sent two more pictures and they were both pictures of Pinkney.

ECF No. 55-1, p. 6 (emphasis added).

Pursuant to the criminal complaint and affidavit of probable cause, a warrant for Pinkney's arrest was issued on April 11, 2019. That same day, Sergeant Merchbaker removed Pinkney from a philosophy lecture at Allegheny, and Frum placed him under arrest. *Id.*, ¶44. Pinkney was taken before Crawford County Magisterial District Judge Samuel V. Pendolino and arraigned on the charges of aggravated assault, simple assault, harassment, and disorderly conduct. *Id.*, ¶46. Judge Pendolino set bail at $5,000.00. *Id.*, ¶47. Pinkney's preliminary hearing was scheduled for April 25, 2019 and then continued to May 22, 2019. *Id.*, ¶48.

Immediately after Pinkney's arrest, several witnesses came forward proclaiming his innocence and non-involvement in the assault upon Happel. *Id.*, ¶¶45, 49-56. At least one such witness stated that he was present in Julian's Bar on the night of the assault and that he did not observe Pinkney in the bar. This witness went on to identify another individual, Josiah Williams, as the likely assailant. *Id.*, ¶50. Williams is a black male who, unlike Pinkney, wore his hair in braids. *Id.* This information and other exculpatory evidence were relayed to Michael Stefanucci, Meadville Assistant Chief of Police. *Id.*, ¶¶51-56.

Shortly before Pinkney's preliminary hearing, another witness provided an affidavit to Pinkney's criminal defense lawyer stating that he was present outside of Julian's Bar during the early

morning hours of April 7, 2019. He further attested that he saw Josiah Williams approach the men carrying Rhett Happel from the bar and heard him tell the men that he was the person who beat up Happel. According to the witness, Williams then threatened to fight the entire group. *Id.*, ¶57.

Before Pinkney's defense counsel could provide the exculpatory evidence to the Meadville Police Department, the Commonwealth withdrew all charges against Pinkney on May 15, 2019. Pinkney believes this decision was based upon the Commonwealth's own further investigation. *Id.*, ¶59. "Apparently, Defendant Freeland got cold feet and recanted his allegation that [Pinkney] looked like the assailant that assaulted Rhett Happel." *Id.*, ¶60. The investigation that exonerated Pinkney also included forensic testing results from a ring that police had confiscated from Pinkney based upon suspicion it was "a foreign object utilized in the assault against Happel." *Id.*, ¶61. The test results were negative for any evidence implicating Pinkney. *Id.* The exculpatory evidence also included a videotape obtained from Julian's Bar, which showed the presence of Happel and Williams, but not Pinkney, within the establishment on the night of the assault. *Id.*, ¶62.

Pinkney's Second Amended Complaint also infers that Freeland and Hall acted carelessly or with an improper motive when they provided information regarding Pinkney in connection with the police investigation. It alleges that Freeland, a Resident Advisor at Allegheny, "had been part of an ongoing investigation [by] Defendant Hall of [Pinkney], which commenced little more than a week prior to [Pinkney] being falsely accused of assaulting Rhett Happel." *Id.*, ¶63. The Second Amended Complaint alleges that because Freeland had participated in a "myriad" of investigations of Pinkney, he would have recognized that he did not fit the description of the assailant and was not the person who assaulted Happel. *Id.*, ¶64. On April 2, 2019, prior to the events at Julian's Bar, Pinkney's mother sent Hall an email complaining about investigations of Pinkney for various incidents of misconduct that occurred at Allegheny. *Id.*, ¶65. As part of these investigations,

6

Freeland, in his capacity as a Resident Assistant, and another Resident Assistant surveilled Pinkney in his dorm room by opening the door and listening outside in the hallway. *Id.*, ¶¶66-67. The email from Pinkney's mother complained that Pinkney was "being targeted and or profiled." *Id.*, ¶68. Responding to Pinkney's mother in his own email the next day, Hall acknowledged that Resident Assistant staff and Public Safety had twice investigated the smell of marijuana in Pinkney's dorm and that multiple members of the Resident Life staff were part of the investigation. *Id.*, ¶69. Pinkney alleges that Freeland's erroneous identification of him as the perpetrator of the assault upon Happel "was part and parcel of a pattern and practice of racially discriminatory harassment that was orchestrated by Defendant Joe Hall against [Pinkney]. *Id.*, ¶72.

The Second Amended Complaint also includes allegations regarding a civil rights lawsuit filed by a male Allegheny student against Allegheny asserting that it had conducted a flawed and gender-biased investigation of a female student's campus rape complaint against him in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. ECF No. 83, ¶¶77-79 (citing *John Doe v. Allegheny College*, 1:17-CV-31 (W.D. Pa.), ECF No. 1). Pinkney alleges that flaws in Hall's investigation of the Doe matter are similar to those involved in his investigation of Pinkney. *Id.*, ¶¶ 80-81.

III. Pinkney's Legal Claims

Pinkney's Second Amended Complaint asserts the following seven counts[6]:

Count I      False Arrest against Frum;

Count III     False Imprisonment against Frum;

---

[6] The SAC does not include a Count II. It does include two counts label as "Count IV." To avoid confusion, the Court will refer to the count for malicious prosecution, which is not the subject of the pending motion, as "Count IV-A" and the Title VI/equal protection count as "Count IV-B."

7

| | |
|---|---|
| Count IV | Malicious Prosecution against Frum; |
| Count IV | Violation of Title VI of the Civil Rights Act of 1964, 1972, 42 U.S.C. §2000d, and the Equal Protection Clause of the Fourteenth Amendment against the Allegheny Defendants and Frum; |
| Count V | Negligent Hiring, Supervision and Retention under Pennsylvania State Law against Allegheny; |
| Count VI | Intentional Infliction of Emotional Distress under Pennsylvania State Law against the Allegheny Defendants and Frum; and |
| Count VII | Conversion under Pennsylvania State Law against Meadville. |

IV.   Standard of Review: Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed.2d 929 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955 (rejecting the traditional Rule 12 (b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed.2d 80 (1957)). In making this determination, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555, 127 S. Ct.

1955. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed.2d 209 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions disguised as factual allegations. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. *See also McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the following three-step approach when evaluating a complaint under Rule 12(b)(6):

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

V.   Analysis

   A.   Race Discrimination Claims

Pinkney asserts that the Allegheny Defendants discriminated against him based upon his race in violation of the Title VI of the Civil Rights Act of 1964 ("Title VI") and the Equal Protection Clause of the Fourteenth Amendment. His allegations fail to state a claim under either.

9

Title VI provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To establish a right to relief under Title VI, a plaintiff must demonstrate that he or she is (1) a member of a protected class; (2) qualified for the educational benefit or program at issue; (3) suffered an adverse action; (4) which occurred under circumstances giving rise to an inference of intentional discrimination. *Saravanan v. Drexel Univ.*, 2017 WL 4532243, *8 (E.D. Pa. Oct. 10, 2017).

Although the Allegheny Defendants do not raise the issue, the Court is compelled to note that Pinkney's Title VI claim against Freeland and Hall fails as a matter of law because "[i]ndividual liability may not be asserted under Title VI." *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011) (citing *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1170 n. 12 (11th Cir.2003); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir.1996). The Allegheny Defendants appear to argue that this claim fails as to all three of them because they are "not state actors." ECF No. 103, pp. 7-8. To the extent they do so, they conflate a discrimination claim under Title VI with a Fourteenth Amendment equal protection claim. While "state action" is required to support the latter claim, *Hennis v. Tedrow*, 2011 WL 6780692 (W.D. Pa. Dec. 27, 2011), Title VI requires only that the defendant's program or activity receive "Federal financial assistance." 42 U.S.C. § 2000d. The SAC includes allegations to satisfy this requirement as to Allegheny. ECF No. 83, ¶17.

Nevertheless, Pinkney's Title VI claim against Allegheny also fails because the facts alleged in the SAC do not support a finding that Allegheny directly, or through its alleged agents, Freeland and Hall, engaged in race-based discrimination. While Pinkney is a member of a protected class, the SAC does not allege facts to support the conclusion that any of the Allegheny Defendants treated him differently from similarly situated individuals or otherwise acted with a racial animus or bias.

Instead, Pinkney offers a factually unsupported theory that Hall and Freeland's actions in responding to complaints of the smell of marijuana in the hall outside Pinkney's dorm room, a pulled fire alarm in Pinkney's dorm, and an unauthorized air conditioner were part of a scheme that culminated in an effort to frame Pinkney for the assault upon Happel and Frum's subsequent filing of criminal charges against him. *See id.*, ¶¶ 60-71. The SAC does not offer any plausible connection between the college investigations and the filing of criminal charges against Pinkney. Even if the Court were to infer that Hall and Freeland's prior investigations and Freeland's misidentification of Pinkney as Happel's attacker show that the Allegheny Defendants' were unfairly targeting Pinkney, the facts alleged still show no indicia that their actions were racially motivated. Accordingly, the SAC fails to state a Title VI claim against any of the Allegheny Defendants.

Pinkney's equal protection claim also fails. The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. To establish an Equal Protection Clause violation, a "plaintiff must show that: (1) he was a member of a protected class; (2) he was treated differently from similarly situated persons outside of his protected class; and (3) the discrimination was purposeful or intentional rather than incidental." *Heim v. Dauphin Cty. Prison*, 2011 WL 3875998, at *6 (M.D. Pa. Aug. 31, 2011) (citing *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009)). Further, an Equal Protection Clause claim, and claims pursuant to 42 U.S.C. §1983 in general, are viable only where the challenged conduct constitutes "state action." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 930, 148 L. Ed. 2d 807 (2001); *Brownley v. Gettysburg College*, 338 F. Supp. 725, 726 (M.D. Pa. 1972) (holding that it is "fundamental that [§1983] proscribes state action only and private action, however wrongful, cannot form the basis for relief"); *Hennis v. Tedrow*, 2011 WL 6780692 (W.D. Pa. Dec. 27, 2011) ("The Equal

Protection Clause of the Fourteenth Amendment exists to protect similarly situated individuals from disparate treatment under the law or by some other state action.").

Allegheny is a private college. Freeland was a student and residential assistant at Allegheny. Hall was an Allegheny employee. The circumstances under which the actions of private entities and individuals can be considered state action are limited. "[A] challenged activity may be state action when it results from the State's exercise of 'coercive power,' when the State provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity with the State or its agents." *Brentwood Acad.* 531 U.S. at 296, 121 S. Ct. at 930 (internal citations and quotation marks omitted). A nominally private entity also may be treated "as a state actor when it is controlled by an 'agency of the State,' when it has been delegated a public function by the State[7], when it is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control.'" *Id.* (internal citations omitted).

No such nexus exists between the actions of the Allegheny Defendants and the state in this case. Freeland's sole involvement in Pinkney's criminal prosecution was as a witness who provided information to the police. Freeland misidentified Pinkney as Happel's attacker.[8] Although the SAC alleges that this misidentification was negligent or reckless, "[p]roviding false information to the police—even deliberately—does not transform a private party into a state actor." *Yoast v. Pottstown Borough*, 437 F. Supp. 3d 403, 420–21 (E.D. Pa. 2020) (citing *Boyer v. Mohring*, 994 F. Supp. 2d 649, 658 (E.D. Pa. 2014) (additional citations omitted)). "'However, providing false information to the

---

[7] Under certain circumstances, such delegation of state authority may be found to have been made to a college or university's private police department. *See Dempsey v. Bucknell Univ.*, 2012 WL 1569826, at *6 (M.D. Pa. May 3, 2012). While delegation of police authority may have occurred relative to Sgt. Merchbaker and Allegheny's campus police department, the facts do not support such a finding relative to Freeland and Hall.

[8] Freeland's statements to Frum regarding the appearance of Happel's attacker and Pinkney were both subjective and objective. He described Pinkney as looking "a lot like" the person who struck Happel while specifically acknowledging their differences in hair style. While the language Freeland used to compare Pinkney and the attacker connotes a troubling generalization regarding the appearance of black men, it does not rise to the level of intentional discrimination.

police, coupled with a conspiracy to violate constitutional rights, can transform a private actor into a state actor.'" *Id.* (quoting *Simmer v. Kehler*, 2015 WL 6737017, at *3–4 (D.N.J. Nov. 2, 2015)). To properly allege an unconstitutional conspiracy, the plaintiff must assert facts from which a conspiratorial agreement can be inferred. *Id.* Conclusory allegations of conspiracy, collusion or agreement are not enough. *Id.* Here, the facts alleged do not support a finding that any of the Allegheny Defendants conspired with Frum or any other state actor to violate Pinkney's constitutional rights. The fact that Freeland and Hall cooperated in the criminal investigation of Pinkney and that Freeland provided information as a witness do not lead to an inference that they conspired with Frum or any other state actor. Pinkney's conclusory claim that Freeland and Hall somehow were working "in concert" with Frum to "frame Plaintiff" (ECF No. 83, ¶ 130) is unsupported by the factual allegations of the SAC. Accordingly, Pinkney's equal protection claim against the Allegheny Defendants fails because their challenged conduct was not state action. In addition, as discussed in the context of Pinkney's Title VI claim, the facts alleged in the SAC do not support an inference that the Allegheny Defendants' actions relative to Pinkney were racially motivated.

      B.      Intentional Infliction of Emotional Distress

Count VI of the SAC asserts a claim for intentional infliction of emotional distress against Allegheny, Freeland, Hall, and Frum.[9] To prevail on an intentional infliction of emotional distress claim under Pennsylvania law, a plaintiff must show: "(1) the conduct of defendant was intentional or reckless; (2) the conduct of defendant was extreme and outrageous; (3) defendant's conduct caused emotional distress; and (4) the distress was severe." *Sabo v. UPMC Altoona*, 386 F. Supp.3d 530, 556 (W.D. Pa. 2019) (citing *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000)).

---

[9] The Court addressed the claim against Frum in a separate opinion and order on his motion to dismiss. *See* ECF No. 106.

"Outrageous" and "extreme" conduct is defined as "conduct that is 'so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarding as atrocious, and utterly intolerable in civilized society.'" *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 n.5 (Pa. Super. Ct. 2004) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998)). Liability under this cause of action is "reserved by the courts for only the most clearly desperate and ultra extreme conduct." *Hoy*, 720 A.2d at 754. Whether the alleged conduct may reasonably be regarded as so extreme as to permit recovery is left to the court in the first instance. *See Salerno v. Phila. Newspapers, Inc.*, 546 A.2d 1168, 1172 (Pa. Super. Ct 1988).

In addition, the weight of authority holds that the plaintiff must also allege that he suffered "some type of resulting physical harm due to the defendant's outrageous conduct" in order to state claim for intentional infliction of emotional distress under Pennsylvania law. *Reedy v. Evanson*, 615 F.3d 197, 232 (3d Cir. 2010) (holding that resulting physical harm is an essential element of the claim) (citing *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005); *Clark v. Conahan*, 737 F. Supp. 2d 239, 273 (M.D. Pa. 2010) (holding that "in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiffs must allege physical injury"); *Rudas v. Nationwide Mut. Ins. Co.*, 1997 WL 11302, at *6 (E.D. Pa. Jan.10, 1997) (dismissing claim for intentional infliction of emotional distress where the plaintiff had not alleged physical injury); *Hart v. O'Malley*, 436 Pa. Super. 151, 647 A.2d 542 (Pa.Super.1994) ("it is clear that in Pennsylvania, in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiff must allege a physical injury"); *Fewell v. Besner*, 444 Pa. Super. 559, 664 A.2d 577 (Pa. Super.1995) (affirming the grant of preliminary objections as to plaintiff's claim of intentional infliction of emotional distress where plaintiff failed to allege physical injury). *See also Buttermore v. Loans*, 2016 WL 308875, at *7 (W.D. Pa. Jan. 25, 2016) (noting that

courts in Pennsylvania consistently require that a plaintiff suffer some physical manifestation of his alleged emotional distress).

In the present case, the Court need not determine whether Pinkney's allegations against the Allegheny Defendants rise to the level of extreme and outrageous conduct because Pinkney has not alleged any "resulting physical harm" due to their conduct. *Reedy*, 615 F.3d at 232. Absent allegations of such harm, Pinkney's intentional infliction of emotional distress claim fails as a matter of law and must be dismissed. *Clark*, 737 F. Supp. 2d at 273.

        C.      Negligent Hiring Claim against Allegheny

In Count V of the SAC, Pinkney asserts a claim for "negligent hiring, supervision, and retention" against Allegheny. Pinkney bases this claim on Hall's role in the handling of a prior campus rape complaint against a different student. After a campus disciplinary committee found that student responsible for sexual misconduct, he filed a civil rights lawsuit against Allegheny asserting that Hall and other Allegheny employees had conducted a flawed and gender-biased investigation against him in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. ECF No. 83, ¶¶77-79 (citing *John Doe v. Allegheny College*, 1:17-CV-31 (W.D. Pa.), ECF No. 1). The SAC alleges that flaws in Hall's investigation of the campus rape complaint are similar to those in his investigation of Pinkney. *Id.*, ¶¶ 80-81.

The *Doe v. Allegheny* litigation was settled in early mediation. *See John Doe v. Allegheny College*, 1:17-CV-31 (W.D. Pa.), ECF No. 21. The record is silent regarding the terms of settlement, but there is no allegation or indication that Allegheny admitted liability in that case. Nevertheless, Pinkney asserts that that Doe's claims of gender bias in Allegheny's policies at issue in the 2017 case somehow provided Allegheny with "advanced knowledge" that Hall personally "subjected . . . students to racially discriminatory harassment." ECF No. 83, ¶ 146.

15

A negligent supervision action "requires the four elements of common law negligence, i.e., duty, breach, causation, and damages." *Belmont v. MB Inc. Partners, Inc.*, 708 F.3d 470, 488 (3d Cir. 2013). Specifically, the plaintiff must allege a loss that resulted from "(1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee." *Smith v. RB Distribution, Inc.*, 2020 WL 6321579, at *14 (E.D. Pa. Oct. 28, 2020) (quoting *Belmont*, 708 F.3d at 487-488) (internal citation omitted). In addition, the plaintiff must "satisfy two foreseeability requirements": first, that the employer "knew or should have known of the necessity for exercising control of its employee"; and second, that "the harm…the improperly supervised employee caused to the third party" was "reasonably foreseeable." *Id.* (quoting *Belmont*, 708 F.3d at 491(internal citations omitted)).

At the outset, the Court questions whether Pinkney has alleged a legally cognizable harm or loss as a result of Hall's conduct and for which Allegheny can be liable based on the theory asserted. In prior decisions, the Court determined that Allegheny and related parties are not liable for Pinkney's arrest, allegedly without probable cause, or on various other theories of liability. *Pinkney v. Meadville, Pennsylvania*, 2020 WL 1667241, at *15 (W.D. Pa. Apr. 3, 2020); *Pinkney v. Meadville, Pennsylvania*, 2020 WL 1985037 (W.D. Pa. Apr. 27, 2020). In this Opinion, the Court has determined that the SAC fails to state a race discrimination claim or intentional infliction of emotional distress claim against the Allegheny Defendants, including Hall. This begs the question of what loss or damage would have been prevented by Allegheny's exercise of greater care in its hiring and supervision of Hall. Pinkney alleges that Hall subjected him to unfair campus investigations while he was a student, but he does not allege that he was subjected to any discipline or other loss as a result of these investigations or reasonably relate them to the subsequent filing of criminal charges against him. While being unfairly targeted in campus disciplinary investigations is certainly

16

objectionable, the allegations here have not raised it to the level of actionable. Accordingly, the Court finds that Pinkney has not alleged a legally cognizable loss caused by Hall's conduct and concerning which Allegheny can be responsible due to its alleged negligent hiring and supervision of Hall.

Further, the facts alleged do not support an inference that Allegheny failed to exercise reasonable care in the hiring or supervision of Hall. First, Pinkney cannot rely on any deficiencies in Hall's handling of the *Doe* sexual assault complaint to support his negligent hiring claim because those deficiencies did not manifest until after Allegheny hired Hall and therefore could not have put Allegheny on notice when it hired him that he presented a risk to Pinkney or any other student. Second, the deficiencies in Hall's handling of the *Doe* complaint are not sufficiently related or similar to the alleged unfairness in his treatment of Pinkney to support a finding that Hall's handling of the *Doe* complaint made it foreseeable that he would mishandle investigations of Pinkney. *Doe* involved an alleged gender-biased investigation of a college rape complaint. Pinkney asserts that he was targeted for investigations of campus misconduct based on his race. Pinkney cannot use allegations as to one protected class to support his allegations as to another. *Cf, Elhanafy v. Shinseki*, 2012 WL 2122178 (E.D.N.Y. June 12, 2012) (even where plaintiff had alleged various incidents of racial, sex, and national origin discrimination, he could not establish "continual harassment on any particular discriminatory ground"); *Patoski v. Jackson*, 477 F. Supp. 2d 361, 364 (D. Mass. 2007) ("there are plainly significant differences between allegations of age and/or gender discrimination and racial discrimination. Initially, the three are so different as to be specific enumerated categories of protected classes"). Here, the SAC does not support Pinkney's claim of race discrimination against the Allegheny Defendants. Pinkney cannot properly rely upon another person's unproven claim of gender discrimination to cure that deficiency or to support his negligent hiring and supervision claim.

For the foregoing reasons, the Court will dismiss Pinkney's negligent hiring and supervision claim against Allegheny.

VI.   Conclusion

For the reasons discussed above, the allegations of Pinkney's SAC do not state claims upon relief can be granted against the Allegheny Defendants. Accordingly, the Court enters the following Order:

ORDER

AND NOW, this 5th day of January, 2021, it is hereby ORDERED that Defendants Allegheny College, Duncan Freeland, and Joe Hall's Motion to Dismiss pursuant to Fed. R. Civ. Pro 12(b)(6) (ECF No. 102) is GRANTED. The claims against Defendants Allegheny College, Duncan Freeland, and Joe Hall are hereby DISMISSED, with prejudice.

RICHARD A. LANZILLO
United States Magistrate Judge