IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KOBE PINKNEY

       Plaintiff

v.

MEADVILLE, PENNSYLVANIA;
PATROLMAN JARED FRUM;

       Defendants

CIVIL ACTION

NO. 1:19-cv-00167-RAL

JURY TRIAL DEMANDED

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF RULE 12 MOTION TO DISMISS SECOND AMENDED COMPLAINT

AND NOW, come the Defendants, Meadville, Pennsylvania and Patrolman Jared Frum, and in further support of their Motion to Dismiss Plaintiff's Second Amended Complaint [*ECF 86*] state as follows.

### REMAND FROM UNITED STATES COURT OF APPEALS

The United States Court of Appeals for the Third Circuit entered an Opinion and Order on June 14, 2022, remanding the instant matter to the trial court for two reasons: (1) the Court of Appeals stated that, if authentic, the audio recording of the interview of Duncan Freeland should be considered by the trial court in deciding the Motion to Dismiss; and (2) the trial court was directed to determine whether the Plaintiff had forfeited the issue of whether the audio recording was authentic. The second part of the remand Order was based upon the fact that the first time Plaintiff challenged the authenticity of the audio recording of Freeland's interview occurred at time of oral argument before the Court of Appeals on April 26, 2022, nearly two years after it was filed of record.

Therefore, the scope of remand from the Court of Appeals was quite narrow.

Incredibly, the Plaintiff never objected to nor raised any challenge to the recording's authenticity after it was docketed of record on May 28, 2020, as an exhibit in support of Defendants' Motion to Dismiss Second Amended Complaint. Perhaps even more incredible is the fact that Plaintiff never requested a copy of nor listened to the recording of the Freeland interview for more than two years after it was made available to him[1].

## EVIDENTIARY HEARING OF JULY 15, 2022

This Honorable Court presided over an evidentiary hearing that occurred on July 15, 2022. (A copy of the transcript of the evidentiary hearing is attached as an exhibit.)

Prior to the July 15, 2022, evidentiary hearing, this Court issued an Order dated June 15, 2022, directing the parties to file a list of witnesses and/or exhibits each intended to use at the evidentiary hearing. The parties were also permitted to file a brief in support of their respective positions. On July 8, 2022, the Plaintiff filed a Brief in Support of Oral Argument for Evidentiary Hearing *[ECF 115]* which did nothing more than rehash the procedural history of the case, the claims raised by Plaintiff, the defenses raised by the various Defendants, and the various rulings made by the Court throughout. Plaintiff on page 8 of his Brief admitted that he never raised any challenge to the authenticity of the audio tape. Plaintiff then argued that he should not be precluded from challenging the authenticity of the audio tape. (Id., Pages 9 – 13.)

Despite the Plaintiff's "on again, off again" challenge as to the authenticity of the audio recording, Plaintiff's attorney stated at the evidentiary hearing that he was ***not*** challenging the authenticity of the audio tape. Plaintiff was merely challenging whether the audio tape provided probable cause for the Plaintiff's arrest. (See Transcript, Pages 14 – 17, 21.)

---

[1] Defendants contend that a copy of the audio recording was sent to Plaintiff contemporaneously with the filing of the Motion to Dismiss Second Amended Complaint on or about May 20, 2020.

The Court then steered the focus of the evidentiary hearing as to the "completeness" of the audio recording of Freeland. There is a difference of opinion as to whether the issue of "completeness" has to do with the complete investigation conducted by Officer Frum as opposed to the completeness of the audio recorded statement of Duncan Freeland that was submitted as an exhibit. The Defendants believed then and aver now that the issue before the regarding authentication (and, arguably completeness) was whether the audio statement was authentic, unaltered, unedited, and a complete/full copy of the recorded statement. (Transcript, Pages 21-22, 49-50, 61-69.)

Through direct testimony, Officer Frum provided testimony showing that the audio recorded statement that was submitted as an exhibit was complete, was unaltered, was unedited and had been preserved at the Meadville Police Department since it was downloaded there after Freeland's interview. (See Transcript 7/15/22, Pages 23 – 34.) Respectfully, from that point going forward, the evidentiary hearing turned into a quasi-discovery proceeding by which the Plaintiff's attorney and then the Court elicited information from Officer Frum that went well beyond the purpose of the hearing itself. (Transcript 7/15/22, Pages 34 – 49.) In fact, the Court engaged in extensive questioning of Officer Frum as to information that he possessed before the interview began, about the nature and extent of an interview he conducted with Freeland before the recording began, about the manner by which he posed questions to Freeland, about the pictures that were shown to the witness by the victim's friend, about the interviewing of other witnesses, about the participation of other officers in the investigation, etc. (Transcript 7/15/22, Pages 41 – 49.) It appeared to Defendants that the Court was critical of the way Frum asked questions, the lack of detail in questions asked, and the "completeness" of the investigation undertaken.

3

Out of deference to the Court, and based upon the apparent difference of opinion as to the correct context of the issue of "completeness," undersigned counsel did not interrupt the Court or object to the questioning of Frum until after the Court finished its inquiry. (Transcript, Pages 21-22, 49-50, 61-69.)

From the Defendants' perspective, once the audio recording was shown to be authentic and complete, the inquiry should have stopped. At that point, the audio recording *is what it is* and should be considered as much for purposes of deciding the Motion to Dismiss. What other investigation that was conducted, that was not conducted or that should have been conducted was not relevant to the determination of whether probable cause existed *at that moment based upon the totality of the circumstances* and/or whether Officer Frum is entitled to qualified immunity.

Because the Plaintiff's attorney and the Court essentially deposed Officer Frum about matters far beyond the authenticity and completeness of the audio recording, undersigned counsel questioned Officer Frum about additional information known by him that also supports his determination that probable cause existed to file charges against Kobe Pinkney. This information also establishes that there was no material misstatement in Officer Frum's Affidavit of Probable Cause that was presented to the Magistrate. (See Transcript 7/15/22, Pages 50 – 67.) At that point, because of objections raised by the Plaintiff and by the Court, the questioning of Officer Frum stopped and argument as to whether this information was relevant and admissible occurred. (Transcript 7/15/22, Pages 67 – 73.)

The testimony provided by Officer Frum at the evidentiary hearing supports the position taken by the Defendants in their Rule 12 Motion to Dismiss Second Amended Complaint and Brief in Support [*ECF 86 and 87*] that the Defendants are entitled to dismissal of all claims, with prejudice because probable cause existed for Mr. Pinkney's arrest and/or that Officer Frum is

4

entitled to Qualified Immunity from liability and suit itself because a reasonable officer in his position with the information known to him *at that time* would have concluded *under the totality of the circumstances* that probable cause existed for the arrest of the Plaintiff.

## FACTS GLEANED FROM OFFICER FRUM'S TESTIMONY

Officer Frum was directed by Chief Tautin of the City of Meadville Police Department to talk to Duncan Freeland. Chief Tautin told Frum that Freeland had received photographs from Rhett Happel's friend, Evan Haines. (Transcript 7/15/22, Pages 37, 42.) In the first photograph, Freeland recognized Jared Shaw and Kobe Pinkney as the individuals depicted. (Id., Page 37 – 38, 51.) Freeland told Officer Frum that *from the photograph,* Freeland "recognized Kobe as looking an awful lot like who I saw throw the punch at the bar." (Id., Pages 38, 52.)

In the interview of Freeland, Officer Frum learned that Freeland was shown two additional photographs which included Pinkney. Therefore, Freeland was shown a total of three photographs by Rhett Happel's friends. Freeland told Frum that in two of the photographs the person depicted had shorter hair but that Freeland did not know when those photographs had been taken. However, the individual depicted in all three photographs had the "same facial features." (Transcript 7/15/22, Pages 43 – 44, 52 – 55.) Officer Frum then asked Freeland "And all three of them," referring to the photographs shown to Freeland by Evan Haines, "looked like the gentleman who was at the bar Saturday night." In response, Freeland responded "matched the hair in the last two [photographs], but yeah." (Transcript 7/15/22, Page 54.)

Officer Frum also testified that Freeland knew Kobe Pinkney for years before the interview from going to college with him and being his resident advisor (RA) in the same hall. (Id., Page 45.)

Based upon Freeland's prior knowledge and familiarity with Kobe Pinkney, his identification of Pinkney from the photographs that he was shown by Evan Haines and the

statement by Freeland that the person shown in the photographs "looked an awful lot like" the person who struck Rhett Happel, Officer Frum asked Freeland "You seen (sic) Kobe throw the punch." In response, Freeland responded "Yeah." (Id., Page 40, 55.)

When Officer Frum was asked if Duncan Freeland's identification of Pinkney as the assailant was unsure or equivocal in any way, Officer Frum testified "**There wasn't a doubt**." (Id., Page 57.)

At this point in the evidentiary hearing, because the questioning of Officer Frum had gone way beyond the purpose of the hearing itself, undersigned counsel questioned Officer Frum as to other facts and circumstances of which he was aware at the time that Kobe Pinkney was arrested. This was referred to at the evidentiary hearing as the "back story."

The day before Rhett Happel was assaulted, Jared Shaw's girlfriend alleged that she was slipped a date rape drug at a college party where both Jared Shaw and Kobe Pinkney were present. The description Jared Shaw's girlfriend gave to the police of the person she thought was responsible matched Rhett Happel. Further, prior to Rhett Happel's assault, there was an incident at a frat party between Jared Shaw, Kobe Pinkney and another person. (Id., Pages 58 – 60.)

This "back story" along with the statement given by Duncan Freeland provided the connection between Kobe Pinkney and Rhett Happel. Kobe Pinkney and Jared Shaw went to college together and were known to Freeland because he was their RA. Pinkney and Shaw are shown together in at least 1 photograph. Therefore, they were at least acquainted with each other and, arguably, friends. When Shaw's girlfriend allegedly had a substance slipped into her drink (the day before Happel was assaulted), she gave police a description of the person she felt was responsible. The person she described resembled Rhett Happel. Further, prior to Happel's

assault, an incident or confrontation occurred between Shaw, Pinkney and Happel.  Therefore, when Pinkney was identified by Freeland as Happel's assailant, not only did Frum have a positive identification, he had a motive for the assault.  **All** of this information formed Frum's determination that probable cause existed for charges against Kobe Pinkney.

In fact, Freeland said in his recorded statement said: "*It looked like it was random to me at first but – yeah. But after hearing there was some back story, it kind of made more sense.*" Therefore, Freeland himself "connected the dots" between Pinkney and Happel based upon all of the information he had heard.

As shown in the following section of this Brief, information elicited at the evidentiary hearing of July 15, 2022, was consistent with the information that was already before the Court when considering the Defendant's Motion to Dismiss Second Amended Complaint and exhibits attached to it.  The actual recording of the statement of Duncan Freeland was filed with the Court in support of Defendant's Rule 12 Motion.  ***Further, Officer Frum's incident report was attached as an exhibit to the Plaintiff's Second Amended Complaint***.  Therefore, none of the testimony from Officer Frum at the evidentiary hearing should be considered new information or a surprise to any involved party.  Further, nothing in Frum's report should be considered beyond consideration in deciding the Motion to Dismiss since the report was integral to Pinkney's claims.

The main and only relevant fact gleaned from the evidentiary hearing is that ***<u>Duncan Freeland's identification of Kobe Pinkney as the assailant of Rhett Happel was unequivocal, sure, and without a doubt</u>***.  Defendants aver that this fact is also bourn out by the actual audio recording itself.

**DOCUMENTS SUPPORTIVE OF THE MOTION TO DISMISS SECOND AMENDED COMPLAINT**

When Plaintiff filed his Second Amended Complaint [*ECF 83*], he attached to it a number of exhibits identified as Exhibits A through K. **Exhibit A was the two-page Incident Report of Patrolman Jared Frum. [*ECF 83-1, Pages 2 and 3*]** Officer Frum's Incident Report recorded his initial contact with Rhett Happel when he was found by his friends outside of the bathroom of the bar after being assaulted. Happel's friends told Patrolman Frum that the assault could have stemmed from an incident occurring the night before in which a female claimed to have been drugged by a man in a blue shirt. This is the incident testified to by Officer Frum at the evidentiary hearing.

Officer Frum's incident report also discussed his recorded interview of Duncan Freeland at the Allegheny College Public Safety Building. Freeland told Officer Frum that while he was standing in line for the bathroom [at the bar] an "African American boy about 6' tall" with "some kind of braided hairstyle" tapped Rhett on the shoulder and then punched him. Freeland told Officer Frum that Evan Haines, a friend of Rhett Happel, sent him a picture with Jared Shaw and Kobe Pinkney depicted. Freeland recognized Pinkney [from the photograph] as looking an "awful lot like" the person who punched Rhett Happel. Haines sent Freeland two other photographs of Pinkney and all of the photographs looked like the person who punched Rhett Happel. In two of the photographs, Pinkney had shorter hair; however, Freeland did not know when those photographs were taken. Frum's report states that the interview with Freeland was tape recorded.

Despite the fact that the Plaintiff's attorney claimed to be surprised to hear some of the testimony elicited from Officer Frum at the evidentiary hearing, he clearly had that information

8

in his possession for more than two years. **Further, Plaintiff attached Officer Frum's report to the Second Amended Complaint as his *first* Exhibit!**

Furthermore, there is no basis for the Court to not consider the information in Officer Frum's report based upon hearsay or other grounds. The report was integral to the Plaintiff's Second Amended Complaint and was previously reviewed, considered and relied upon by the Court in granting Plaintiff's Rule 60 Motion and/or in denying summary judgment to Officer Frum on both probable cause and qualified immunity grounds. Now, the Court has heard Officer Frum's testimony in addition to reading his Incident Report and Affidavit of Probable Cause. There are no material differences between the report and testimony of Frum.

All of the facts set forth above were laid out in detail in the Defendants' Motion to Dismiss Second Amended Complaint. [*ECF 86, Pages 6 – 8.*] Those facts clearly establish that Officer Frum possessed probable cause to arrest Kobe Pinkney in relation to the assault of Rhett Happel. Alternatively, Officer Frum is entitled to qualified immunity because any reasonable police officer in Frum's position, who possessed those facts and who had an eyewitness positively identify Kobe Pinkney as the assailant of Rhett Happel, would have also concluded that probable cause existed for the arrest.

Finally, as stated in Officer Frum's report and as he testified to at the evidentiary hearing, the actual decision to file charges against Kobe Pinkney was made by District Attorney Francis Schultz. (Transcript 7/15/22, Page 72; *ECF 83-1, Page 3*.) While this fact does not remove Officer Frum's determination that probable cause existed, it does establish that there was an additional, independent basis for Officer Frum's conclusion that probable cause existed: that being that the District Attorney of Crawford County determined that probable cause existed for

the filing of criminal charges. At a minimum, this fact further supports Frum's entitlement to

qualified immunity.

## ADDITIONAL LEGAL AUTHORITY AND ARGUMENT

The Pennsylvania Supreme Court has defined probable cause as follows:

> "Probable cause is made out when the facts and circumstances
> which are within the knowledge of the officer at the time of the
> [stop], and of which he has reasonably trustworthy information, are
> sufficient to warrant a man of reasonable caution in the belief that
> the suspect has committed or is committing a crime. The question
> we ask is not whether the officer's belief was correct or more
> likely true than false. Rather, we require only a *probability*, and
> not a *prima facie* showing, of criminal activity. In determining
> whether probable cause exists, we apply a totality of the
> circumstances test."

*Commonwealth v. Byrd*, 2018 Pa. Super. 102, 185 A.3d 1015, 1023-24 (2018); quoting
*Commonwealth v. Martin*, 627 Pa. 623, 101 A.3d 706, 721 (2014) (citation omitted) (emphasis in
original), cert. denied 577 U.S. 886, 136 S. Ct. 201 (2015).

The Pennsylvania Supreme Court's definition of probable cause is wholly consistent with

the federal legal authority cited in the Defendants' Brief in Support of Motion to Dismiss Second

Amended Complaint. (See *ECF 87*.)

Additionally, police have no obligation to obtain exculpatory evidence prior to initiating

a criminal proceeding where the arresting officer was unaware of it at the time of charging.

*Waters v. Cheltenham Township*, 700 F. Appx. 149, 153 (3d Cir. 2017). Stated another way, an

arresting officer is not required to undertake an exhaustive investigation in order to validate the

probable cause that, in his mind, already exists. See *Merkle v. Upper Dublin School District*,

211 F.3d 782 (3d Cir. 2000). Once a police officer has discovered sufficient facts to establish

probable cause, the officer has no constitutional duty to further investigate in hopes of finding

exculpatory evidence. *Patterson v. School District of Philadelphia*, 2000 WL 1020332 (E.D. Pa.

2000).

10

For all of the reasons stated herein as well as for the reasons stated in the Motion to Dismiss Second Amended Complaint, Defendants are entitled to dismissal of all claims raised because Officer Frum possessed probable cause for the arrest of Kobe Pinkney.

With respect to qualified immunity, Officer Frum is entitled to dismissal based upon qualified immunity because he possessed probable cause to arrest Mr. Pinkney. Alternatively, since Officer Frum did not engage in any type of deliberate, intentional, or wrongful manipulation of the identification of Kobe Pinkney and because he relied upon an eyewitness who was unequivocal, certain and without doubt when Duncan Freeland identified Pinkney as the assailant, Officer Frum acted like every other reasonable official would have in concluding that probable cause existed. There are no factual discrepancies or issues of material fact regarding how the identification of Kobe Pinkney occurred that would defeat qualified immunity at this stage and therefore, Officer Frum is entitled to dismissal as a matter of law at this time.

Additionally, in light of the fact that Officer Frum was directed by the Crawford County District Attorney to file criminal charges against Kobe Pinkney, Officer Frum is entitled to dismissal of all claims against him based upon qualified immunity. In addition to Frum's determination that probable cause existed, Frum relied upon the District Attorney's independent determination that probable cause existed for the filing of criminal charges against Pinkney.

The Court of Appeals for the Third Circuit has held that defendants are "presumptively entitled to qualified immunity from claims…premised on a lack of probable cause," where they "relie[d] in good faith on a prosecutor's legal opinion" or the approval of a neutral magistrate. *Handy v Palmiero*, 836 F. Appx. 116, 118-119 (3d Cir. 2020); citing *Kelly v. Borough of Carlisle*, 622 F. 3d 248, 253 (3d Cir. 2010); *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132

S. Ct. 1235 (2012).  See also *Smith v. Township of Clinton,* 791 Fed.Appx. 363 (2019); *Snyder v. Daugherty*, 899 F.Supp.2d 391 (W.D. Pa. 2012).

Based upon the foregoing, Officer Frum is entitled to qualified immunity from liability and suit itself.  Therefore, all claims filed against him must be dismissed.

WHEREFORE, for the reasons stated herein and based upon the additional reasons cited in the Defendants' Motion to Dismiss Second Amended Complaint and Brief in Support, the Defendants, City of Meadville and Officer Frum, request dismissal of all claims against them, as a matter of law, with prejudice.

Respectfully submitted,

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN

By _____
Patrick M. Carey, Esquire
717 State Street, Suite 701
Erie, PA  16501
(814) 480-7800

LEGAL/148550499.v1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KOBE PINKNEY | CIVIL ACTION |
| Plaintiff | NO. 1:19-cv-00167-RAL |
| v. | |
| MEADVILLE, PENNSYLVANIA;<br>PATROLMAN JARED FRUM; | |
| Defendants | JURY TRIAL DEMANDED |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the within Defendants' Supplemental Brief

in Support of Motion to Dismiss was duly served on all counsel of record and unrepresented

parties on the _16th_ day of September, 2022, electronically or by mailing same to them at their

designated offices by first class United States mail, postage prepaid, or by personal service at

their respective offices.

Earl Raynor, Esquire
1800 JFK Boulevard
Philadelphia, PA 19103
*Counsel for Plaintiff*

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

By _____
Patrick M. Carey