1              IN THE UNITED STATES DISTRICT COURT
2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3   KOBE PINKNEY,                    :
          Plaintiff                  :
4                                    :
      v.                             :       No. 1:19-CV-167-RAL
5                                    :
MEADVILLE, PENNSYLVANIA              :
6   and PATROLMAN JARED FRUM,        :
          Defendants                 :
7

8

9

10      Transcript of the proceedings on July 15, 2022,
        United States District Court, Erie, Pennsylvania,
11      before Magistrate Judge Richard A. Lanzillo.

12

13

14   APPEARANCES:

15      For the Plaintiff:        Earl Dubois Raynor, Jr., Esquire
                                  Law Office of Atty. Earl Raynor
16                                1800 JFK Boulevard, 3rd Floor
                                  Box 103
17                                Philadelphia, PA 19103

18      For the Defendant:        Patrick M. Carey, Esquire
                                  Marshall Dennehey
19                                717 State Street, Suite 701
                                  Erie, PA 16501
20

21      Court Reporter:           Janis L. Ferguson, RPR, CRR
                                  17 South Park Row
22                                Room A340
                                  Erie, PA 16501
23

24      Proceedings recorded by mechanical stenography;
25   transcript produced by computer-aided transcription.



1               P R O C E E D I N G S

2                     9:58 a.m.

3          (All parties present in open court.)

4          THE COURT:  All right.  We are here in the matter of

5     Kobe Pinkney versus Meadville, Pennsylvania and Patrolman

6     Jared Frum, at Docket No. 19-cv-167 on the Erie Division

7     docket.

8               Pursuant to the remand instructions and mandate

9     of the U.S. Court of Appeals of the Third Circuit, I scheduled

10    this hearing and argument to determine whether the Plaintiff,

11    Kobe Pinkney, has waived or forfeited his right to challenge

12    the authenticity and completeness of the recording of the

13    witness interview of Duncan Freeland, which has been filed of

14    record at Docket No. 93.

15               If I were to determine that the Plaintiff has

16    not waived or forfeited his right to challenge the recording's

17    authenticity for completeness, then the hearing will proceed

18    immediately to determine whether the recording is, in fact,

19    authentic and complete.

20               Before I proceed further, for the record, let's

21    have the appearances of counsel.

22               Attorney Raynor, as I introduced myself to you

23    earlier before we convened —

24          MR. RAYNOR:  Good morning, Your Honor.  Earl Raynor

25    on behalf of Kobe Pinkney.

1          THE COURT:  All right.  And, Attorney Carey, good
2     morning again.
3          MR. CAREY:  Good morning, Your Honor.  Patrick Carey
4     on behalf of Jared Frum and the City of Meadville.
5          THE COURT:  All right.  Very well.
6               Now, prior to this proceeding, I issued a
7     scheduling order which directed the parties to file a list of
8     witnesses, if any, each intended to call, as well as lists of
9     any exhibits each party wished to offer at this hearing.
10              I received the Defendant's exhibit and witness
11    list, but I take it from the brief and response submitted on
12    behalf of Mr. Pinkney, that, Attorney Raynor, your primary
13    approach today will be by way of argument.
14              Is that correct?
15         MR. RAYNOR:  Yes, Your Honor.  Yes.
16         THE COURT:  All right.  Very well.  I understand.
17              All right.  To expedite things, there are just
18    a couple of record matters that I thought would be useful to
19    confirm with counsel before I turn to Attorney Carey for his
20    presentation.
21              Attorney Raynor, I just -- I want to confirm,
22    you agree that your Second Amended Complaint which was filed
23    at ECF No. 83 on May 6th of 2020, in fact, refers to and
24    quotes from Officer Frum's April 10, 2019 incident report
25    concerning the assault on Mr. Happel.  That's -- and, in fact,

1    it's specifically Paragraph 33 of the Second Amended

2    Complaint?

3          MR. RAYNOR:  Yes, Your Honor.

4          THE COURT:  All right.  And the incident report was

5    attached to the Second Amended Complaint as Exhibit A.  Is

6    that right?

7          MR. RAYNOR:  Yes, Your Honor.

8          THE COURT:  All right.  And that incident report

9    states that Officer Frum met with Duncan Freeland on April 10,

10   2019, and that, quote, "Freeland agreed to give an

11   audio-recorded statement about what he saw," close quote.

12   That's — you can check, but that's what's recited in

13   Paragraph 33 of the Second Amended Complaint.

14         MR. RAYNOR:  Yes, Your Honor.

15         THE COURT:  All right.  So just to confirm, at the

16   time you filed the Second Amended Complaint at least, you knew

17   that there was an audio-recorded statement.  You knew that

18   that existed at that time, or at least that is what Officer

19   Frum's incident reported stated.

20         MR. RAYNOR:  That is correct.  I asked if he filled

21   out a full detailed incident report.  I thought the incident

22   report simply -- that it represented the totality of what was

23   stated on the audio tape.  That was my impression.  And so

24   that's why I thought that by attaching the summary -- by

25   attaching the incident report itself, that I covered the audio

1    tape, since that interview was recorded by Officer Frum.

2           THE COURT:  All right.  I understand.  Let me ask

3    you, when did you first receive an actual copy of the

4    recording of the audio tape?

5           MR. RAYNOR:  I never received a copy of the

6    recording of the audio tape.

7           THE COURT:  All right.

8           MR. RAYNOR:  I assume that it's verbatim with the

9    incident report.

10          THE COURT:  So at this point -- have you received a

11   copy of the audio tape at this point or a copy of the

12   transcript of it?

13          MR. RAYNOR:  Well, I received the -- a brief of

14   Officer Frum and Meadville, Pennsylvania, which included the

15   transcript of the audio tape.

16          THE COURT:  Right.  All right.

17          MR. RAYNOR:  So I have that, yes.

18          THE COURT:  All right.  So is that the first time

19   that you saw either a transcript of the recording or the

20   actual disk or recording itself?

21          MR. RAYNOR:  Yes.

22          THE COURT:  I mean, it was filed of record on

23   May 28th, 2021 at ECF 93, right?

24          MR. RAYNOR:  Yes, it was filed of record.  I should

25   have got it.  I did not actually get it.  I had the incident

1    report, and it recorded verbatim the audio tape.  I thought

2    the audio tape was just —

3           THE COURT:  I understand.  All right.  I want to

4    give equal treatment to Attorney Carey at this point, though,

5    and ask a couple questions, confirm a few things on the record

6    as well.

7           Attorney Carey — and I don't mean to walk you

8    through the docket if you don't have a copy handy.  We have

9    one.  But here's what I pieced together, and I want to see if

10   you agree with me:

11          Mr. Pinkney's original Complaint was filed back

12   on June 9 of 1990 [sic].  You don't actually have to agree

13   with that.  I mean, obviously, it's a matter of record.  And I

14   noted that Officer Frum and City of Meadville moved to dismiss

15   that Complaint or, in the alternative, for summary judgment on

16   August 20 of 2019.  That's at ECF Nos. 16 and 17.

17          It appeared to me, though, that in connection

18   with that initial motion, there was no mention of the audio

19   recording.

20          MR. CAREY:  I don't know if it was mentioned, but it

21   certainly was not produced as an exhibit.

22          THE COURT:  Okay, thank you.

23          Now, then in response to that Motion to

24   Dismiss, Mr. Pinkney filed a Motion for Leave to File an

25   Amended Complaint, which I granted.  And Mr. Pinkney filed his

1 Amended Complaint on October 10 -- it's either October 10 or

2 October 13.  There is some duplicate entries on the docket for

3 the Amended Complaint.  But in or around the 10th or 13th of

4 2019 we have an Amended Complaint at Docket No. 49 or 50.

5         That prompted the Motion to Dismiss the Amended

6 Complaint on October 14, 2019.  And that motion -- in the body

7 of the motion itself, it included a list of, quote,

8 "indisputably authentic documents", but did not reference or

9 include as an exhibit the audio recording.

10         Is that correct, Attorney Carey?

11         MR. CAREY:  The point that I think you're getting to

12 is did we attach the audio recording to that Motion to

13 Dismiss.  I do not think that we did.

14         THE COURT:  Okay.  And putting aside the reference

15 to the audio in the -- putting the fact that the Attorney Frum

16 [sic] stated in his investigation report -- and I believe also

17 in his Affidavit of Probable Cause that there was an

18 audio-recording of a witness.  There was no -- the Defendants

19 did not at that time invoke the audio recording as a basis for

20 disputing Mr. Pinkney's claim, I guess is my question.

21         MR. CAREY:  Fair enough.

22         THE COURT:  All right.  And then on April 16th,

23 2020, Officer Frum, through counsel, filed a Response in

24 Opposition to Pinkly's Motion for Relief from Judgment at

25 Docket No. 76.  That's where, Attorney Raynor, as you will

1   recall, I originally dismissed the claims against Officer Frum

2   based upon certain language in your Complaint which had

3   indicated that Mr. Freeland had specifically and definitively

4   identified Mr. Pinkney as the person who attacked Mr. Happel.

5           You then moved for relief from judgment, and

6   the record was then supplemented by way of Amended Complaint

7   to include -- or it was a proposed Amended Complaint to

8   include more specific information concerning what was said or

9   allegedly said by Mr. Freeland.  The Defendants opposed your

10  motion for me to open that part of the judgment.

11          And, Attorney Carey, I'm correct, am I not,

12  that in opposing that motion, the Defendant still didn't raise

13  this audio recording?

14          MR. CAREY:  Yes.  The first time we -- the first

15  time we -- I don't know what you mean by "raised".  But the

16  first time we produced a copy of the actual recording was in

17  response to the Second Amended Complaint.

18          THE COURT:  Okay.  Right.  And I guess my point

19  is -- or maybe not my point, but my question is:  At any time

20  prior to the Motion to Dismiss the Second Amended Complaint

21  did the Defendants ever raise the existence of an audio

22  recording as a basis for seeking the dismissal of the

23  Plaintiff's claims against Officer Frum?

24          MR. CAREY:  At no time before we filed the Motion to

25  Dismiss Second Amended Complaint did we rely upon the actual

1    recording, the actual audio recording as a basis to seek

2    dismissal.

3            THE COURT:  Okay.

4            MR. CAREY:  Prior to that, if you want to know

5    why —

6            THE COURT:  Sure.

7            MR. CAREY:  —— it was more streamlined and less

8    complicated to go with what the Plaintiff had filed in terms

9    of the allegations in the Plaintiff's Complaint and the

10   attachments, which was the Affidavit of Probable Cause itself.

11   I think —— I don't think that he produced a complete copy, and

12   we did, but ——

13           THE COURT:  You did, yeah.  And that was —— I don't

14   mean to interrupt you, but that —— I must admit, Attorney

15   Raynor, that has been a source of some annoyance on my part,

16   because, you know, I —— in my first decision on this, I

17   pointed out that you were missing Page 2 of the Affidavit of

18   Probable Cause.  And then the next incarnation of the

19   Complaint, it was missing again, and the next incarnation of

20   the Complaint it was missing again.  And the Defendants

21   provided that second part of the Affidavit of Probable Cause

22   or Complaint against —— Criminal Complaint, which actually is

23   the meat, it's the substance of what we're talking about here.

24           I don't mean to digress there, but ——

25           MR. RAYNOR:  My apologies, Judge.

1        THE COURT:  Yeah, I understand.  But, you know, that
2   attention to detail in a case like this is important.
3        MR. RAYNOR:  Yes, sir.
4        THE COURT:  All right.  Enough said about that.
5   Attorney Carey, I interrupted you.  Go ahead.
6        MR. CAREY:  So we felt that there was a sufficient
7   legal basis based upon what was pled by the Plaintiff and the
8   documents that they attached, although we supplemented to
9   provide complete copies, that it justified dismissal of all
10  claims against the City and against Officer Frum.
11        Believe me, Judge, I understand that when a
12  Defendant files a Motion to Dismiss and attaches extraneous
13  materials, it gets murky at that point as to what the Court
14  should do.  I understand that.  And that's why -- he produced
15  these documents.  I had no -- I felt no problem in producing a
16  complete version and saying, okay, here's a complete version;
17  as a matter of law, it should be dismissed.
18        So there was no reason, I guess, at that point
19  for us to attach the actual recording.
20        THE COURT:  I understand.  And the reason I'm asking
21  these questions in assessing whether there has been a knowing
22  waiver or forfeiture of the right to dispute the authenticity,
23  accuracy, or completeness of this audio, I'm trying to
24  understand exactly when Attorney Raynor and his client,
25  Mr. Pinkney, were clearly on notice that this formed a

1    material aspect of the Defendant's position that the -- that

2    the claim should be dismissed.  And then I have to look at how

3    much opportunity did you have to review it.

4              You know, the Circuit is clear -- I mean, the

5    opinion is crystal clear that the reference to the -- to an

6    audio recording by a witness for Mr. Freeland in an exhibit to

7    the Complaint is enough of a nexus -- it's enough to make it

8    integral to the Complaint.  So I'm going to consider it.  I

9    mean, there's -- that's the mandate.  I'm going to consider

10   it.  It is now part of the record.

11             But as to whether there's going to be a

12   forfeiture or a waiver of the right to dispute, you know, any

13   aspect of that recording, you know, it's kind of I need to

14   know what you knew and when, and then what opportunity did you

15   have to conduct discovery or any -- or otherwise investigate

16   the completeness or accuracy of the recording.

17             So that's the point of my questions.  I

18   think -- I think I've got the background now.  And I guess the

19   one part I didn't know from the docket is that you didn't

20   actually see a transcript of this, Mr. Raynor, until you

21   received one from the Defendants in connection with my

22   scheduling order.  I'm going to scratch my head a little bit

23   about that.  This was -- you know, it was featured pretty

24   prominently.  And I don't review appellate submissions, but I

25   have received materials from the Defendants, and, you know, it

1    clearly was relied upon at the appellate level.

2                    So I think I have those -- those facts down.

3            MR. CAREY:  Can I address something?

4            THE COURT:  You may.

5            MR. CAREY:  So Mr. Raynor says he never got a copy

6    of the recording.  And I have -- I don't know if you're

7    willing to see this, but I have a letter from my office to the

8    Clerk of Court, May 20, 2020, saying, "Enclosed please find a

9    disk marked as Exhibit 4 to our Motion to Dismiss --" this is

10   the Second Amended Complaint "-- Motion to Dismiss which was

11   filed this date with regards to the above-referenced matter."

12           THE COURT:  It's filed of record.  I mean, it's on

13   the docket.

14           MR. CAREY:  It's cc'd to Mr. Raynor.

15           THE COURT:  Yeah, I understand.  And also, Mr.

16   Raynor, you're on our CM/ECF system, so you would have

17   received notice.

18                    So, yeah, I don't -- there's no way I could

19   find other than --

20           (Discussion held off the record.)

21           MR. CAREY:  I will -- I will tell you, I've made

22   copies of the recorded statement itself.  I have it today.

23   Overkill, perhaps.  I intended to introduce this as an

24   exhibit, even though it's already been filed.

25                    But you know what, Judge, I would like the

1    record to reflect, I'm handing a copy to Mr. Raynor.

2            THE COURT:  Let's make the letter here Exhibit —

3    Defendant's Exhibit A.  I can't remember whether you

4    pre-numbered these or not.  Did you?

5            MR. CAREY:  I didn't pre-number anything.

6            THE COURT:  I mean, you don't have a problem with

7    that letter, do you?

8            MR. RAYNOR:  Not at all, Judge.

9            THE COURT:  Yeah.  The point is, you know, upon the

10   filing of that disk, it was a matter of record.  Now, it was

11   filed -- if I'm recalling correctly, the actual Motion to

12   Dismiss at Docket No. 86 was filed on May 20.

13           MR. CAREY:  Right.

14           THE COURT:  And --

15           MR. CAREY:  That was docketed -- the actual

16   statement was docketed May 28th.

17           THE COURT:  Right.  Yeah, I see that.  And the

18   motion was filed and docketed on the 20th, and it included an

19   affidavit from Officer Frum identifying the audio recording I

20   believe as Exhibit 4.  And then subsequently on May 28th, the

21   disk was received in the clerk's office and docketed at ECF

22   93.

23               All right.  Does anyone dispute that chronology

24   as far as when things were filed?

25           MR. RAYNOR:  No, Your Honor.

1        MR. CAREY:  The only thing I would say is I don't

2   know when it was received in the clerk's office.  We would

3   have had it hand-delivered on the 20th, and I know it wasn't

4   docketed until the 28th.  And I don't know --

5        THE COURT:  Oh, okay.  I mean, that's -- I don't

6   dispute that.  That may be the case.

7             I can tell you that I looked at the docket this

8   morning, and there is a received stamp May 28th.  But is it

9   possible that it, you know, came in and sat in an, you know,

10  in basket?  I don't know.  I don't think -- I don't think that

11  the eight days is material.

12       MR. CAREY:  It's really not.  But to the point that

13  we were perhaps not on top of things by not delivering that

14  for eight days, I don't -- it's not my practice, and I don't

15  know that that's the case.  That's the only reason I brought

16  it up.

17       THE COURT:  All right.

18             Attorney Raynor -- actually, let me ask each of

19  you.  Who has the burden of proof here on this first issue of

20  waiver of forfeiture?  It's not addressed in the papers.  I

21  have some thoughts on it, but I want to hear from counsel.

22       MR. RAYNOR:  Well, Your Honor, I think that the

23  burden would be on Plaintiff in this case to establish whether

24  or not I've abandoned the argument altogether or I

25  inadvertently did not argue it on time.

1          And so I can testify unequivocally that I have

2    not abandoned any challenge to the audio tape.  It was an

3    inadvertent —

4          (Attorney Raynor asked for clarification.)

5          MR. RAYNOR:  It was an inadvertent omission.

6          As Your Honor indicated, the audio tape wasn't

7    filed until after I filed my Second Amended Complaint and they

8    filed their response to it.  So that for well over a year and

9    a half the audio tape wasn't even a part of the case.

10         But my focus is that, okay, I'm not going to

11   say that there was no interview.  Clearly, Officer Frum did

12   interview Mr. Freeland.  That tape is —

13         (Attorney Raynor asked for clarification.)

14         MR. RAYNOR:  That tape is a memorialization of the

15   conversation.

16         My argument is that even with the audio tape,

17   it doesn't rise to probable cause.  That's my argument.

18   Because everything on this audio tape is consistent with what

19   was written in the incident report.  He didn't say that Duncan

20   Freeland recognized my client as the person who did it.  He

21   said he looks an awful lot like him.  That's —

22         (Attorney Raynor asked for clarification.)

23         THE COURT:  He looks an awful lot like him.

24         MR. RAYNOR:  Right.

25         THE COURT:  Slow down just a little bit for our

1    court reporter, if you would.

2              MR. RAYNOR:  Yes.

3                   So I feel the crux of the argument isn't the

4    authenticity of the tape.  I'm not going to sit here and say

5    that there's no conversation, that he's lying.  I'm not going

6    to say that.  Okay.  The tape, there is a tape.  But it does

7    not rise to probable cause.  It doesn't change anything.

8              THE COURT:  All right.

9              MR. RAYNOR:  I'm not saying that there is --

10             THE COURT:  I understand -- I understand your

11   argument.  And I appreciate it, because at some point I would

12   be obliged to ask you, Attorney Raynor, you know, are you

13   aware of any basis to believe that what is recorded on that

14   audio is anything other than the voices of Officer Frum and

15   Mr. Freeland.  And I assume the answer to that question, based

16   on your argument, is that, no, you don't dispute — those are

17   their voices.

18             MR. RAYNOR:  Correct.

19             THE COURT:  All right.  And, you know, I now -- I

20   got a transcript of that recording.  You do now as well.

21             MR. RAYNOR:  Yes.

22             THE COURT:  All right.  So I think that that --

23   we've jumped ahead to the second part of this, but it's

24   productive.  I mean, we're not going to have any dispute

25   regarding authenticity.

1          MR. RAYNOR:  Right.

2          THE COURT:  Or accuracy of the words stated.  Is

3     that right?

4          MR. RAYNOR:  Right.  I briefed the issue for the

5     record, but, no, here today, I'm not going to --

6          THE COURT:  All right.  All right.  So whether you

7     waived the right to challenge that or not, at least as to that

8     portion of the recording, you don't dispute its accuracy or

9     authenticity.

10         MR. RAYNOR:  Right.

11         THE COURT:  All right.  Well, that narrows the scope

12    of our inquiry considerably.

13              Now, what that -- I don't think that -- what

14    that acknowledgment or concession on the record completely

15    eliminates, though, is the issue is completeness.  All right?

16    And that's something if I get to that issue -- there's been no

17    waiver of that -- then we'll talk about that later.

18              Attorney Carey, I think Attorney Raynor and I

19    have done a lot of your work on this first issue, but what

20    else should I know in -- regarding the first issue of

21    forfeiture or waiver?

22         MR. CAREY:  Can I ask something first?  Because I'm

23    confused about something.  And I apologize; it's embarrassing

24    for me.  Both Mr. Raynor and you have indicated that we've

25    submitted a transcript.  Did we submit the transcript of the

1   audio?

2          THE COURT:  Oh, maybe it's my transcript.  I thought

3   you indicated you had one.

4          MR. CAREY:  I have one, but I don't know that I -- I

5   don't know.

6          THE COURT:  Oh, I apologize.  I -- this is from my

7   superb, on-top-of-it court reporter, Ms. Ferguson.

8          MR. CAREY:  Oh, so she transcribed it.

9          THE COURT:  She transcribed it.  It's not of record.

10   It's just one for -- so I wouldn't have to continue to listen

11   to it during the hearing.

12          MR. CAREY:  Okay.  And I've known Janis a long time.

13   I'm willing to go with her transcript, but I have a -- we had

14   Sonya Hoffman, who is an Erie County court reporter, she

15   transcribed it.  And I'm sitting here thinking to myself,

16   going, I don't think I produced that.

17          THE COURT:  You referenced it, and I assumed that

18   that was the one I was looking at.  I see that this is

19   transcribed by Ms. Ferguson.

20               I know both of these court reporters, and I

21   suspect that perhaps, you know, a different dash or comma in

22   places, but it should be substantially the same.

23               Attorney Carey, we can work from yours.  I

24   mean, that's -- I'm fine with that.  Or I can make

25   copies of --

1            MR. CAREY:  I made copies for -- to act as an

2   exhibit today.

3            THE COURT:  Great.

4            MR. CAREY:  Which if the Court has no objection, I

5   was just going to hand it up.

6            THE COURT:  Attorney Raynor, if you have any -- take

7   a minute to review it.  It's a little hard for you to verify

8   the accuracy because you haven't listened to the audio yet.

9   But I'm going to take a look at it, and if it appears

10  consistent with Ms. Ferguson's transcription, I'm going to

11  admit it.

12           MR. CAREY:  I note that there -- we said in our

13  brief that we would submit an affidavit of Sonya Hoffman, but

14  we didn't.  There is a certification, however, attached.

15           THE COURT:  I -- I accept her certification.  It

16  covers any hearsay or other objection.

17           MR. CAREY:  So you -- I'll let you review it.  I'm

18  sorry.  That's what you said you were going to do.

19           THE COURT:  Yeah, this is verbatim, precisely what

20  Ms. Ferguson transcribed for me, except perhaps, you know, a

21  dash here or a comma there.  I'm not even seeing those.

22           MR. CAREY:  I will tell you, I have found a couple

23  things in Sonya Hoffman's transcript that I disagree with, but

24  they don't go to the substance of any issue.

25                I mean, for example, on -- and, actually,

1    Officer Frum told me he found one as well.

2              But on Page 4, Line 8 is the answer, "Yeah."

3    And then Line 9 is a question.  But, actually, from Line 9

4    through 11, that's a continuation of the answer.

5              So that's one thing that I found.  What I

6    think, when you listen to the recording with the transcript in

7    front of you, you'll agree with me that Lines 9 through 11 on

8    Page 4 are a continuation of the answer and not a question.

9              And the other thing I found, too, is at the

10   very top of Page 5 —

11             THE COURT:  Hold on a second.  Let me just compare

12   that real quick.

13             All right.  So your Line 9 starts with, "Okay."

14   Ms. Ferguson transcribed this exchange as follows:  At Line 8

15   of her transcript, "Answer:  Yeah."  Line 9.  "Okay," as a

16   question.  Line 9 says, "Question:  Okay."  Line 10, "Answer:

17   Because he sent — like, Evan also sent two other pictures,

18   which looked like they were — he had shorter hair in those,

19   but I have no idea when they were taken, so —" end of answer.

20             And then Line 13.  "Question:  Okay.  So how

21   many pictures did Evan actually send you," question mark.

22             MR. CAREY:  Right.  And I think that's substantially

23   similar.  The thing is, is that in Sonya Hoffman's transcript,

24   Lines 9 through 11, she has that as being a question, and it

25   was actually a continuation of Duncan Freeland's answer.  So

1  it's a matter of the "Q", indicating question, should be "A"

2  indicating the continuation of the answer.  And then there

3  were a couple of words that were different.

4          THE COURT:  Just slightly.  Well, at any rate, just

5  so that everyone has the benefit of both transcriptions, I

6  will have a copy of Ms. Ferguson's transcription made.

7          (Discussion held off the record.)

8          THE COURT:  All right.  I'll make a copy of that

9  transcript.  I don't believe that there's any material

10  difference in the substance.  And I'm going to admit

11  Defendant's Exhibit B.

12          Is there any objection, Attorney Raynor?

13          MR. RAYNOR:  No, Your Honor.

14          THE COURT:  Then I'm going to admit it as

15  Defendant's Exhibit B.  And I'm going to mark Miss Ferguson's

16  transcription, which she prepared at my request, as Court

17  Exhibit 1.  And I'll get copies to counsel.

18          Attorney Carey, I guess where the colloquy kind

19  of leads us, whether Mr. Raynor or Mr. Pinkney waived the

20  challenge to authenticity -- a challenge to authenticity or

21  accuracy of the words that appear on the audio tape, it

22  strikes me that that issue is now moot because counsel has

23  conceded that he has no basis on which to dispute those.

24          But I don't -- I find that that is not the

25  conclusion of the question, though, because there is the issue

1   of completeness.

2           And I think you guys all know, I don't try to

3   hide the ball.  When something is on my mind -- when I read

4   this transcript, it appeared to me to include -- the interview

5   included quite a lot of declaratory statements -- in other

6   words, statements not in the form of a question -- which

7   raised the issue in my mind which I'd like to hear from the

8   Defendants, including Officer Frum specifically, as to whether

9   there was a discussion that preceded the actual recorded

10  interview.

11          I mean, just by way of example, there's a

12  question in Ms. Ferguson's transcript on Page 3 at Line 9 --

13  or, actually, let me -- you don't have that, so let me use the

14  transcript that's been marked as Exhibit B on behalf of the

15  Defendants.

16          All right.  Early in the transcript we have an

17  interview of an individual identified as Evan Haines.  And the

18  question at Page 16 of Exhibit B is, "Okay.  So Evan, you had

19  stated earlier that Evan sent you a picture."  I don't know

20  that that was stated earlier in the recorded interview.

21      MR. CAREY:  I'm prepared to address that, because I

22  had the same question this morning to Officer Frum, in talking

23  to him about did you conduct a pre-interview interview.

24      THE COURT:  Okay.

25      MR. CAREY:  And so if you want me to get into it,

1    I'll ask him.  We can put him --

2            THE COURT:  Why don't you -- I don't want to -- you

3    can approach your presentations however you see fit and call

4    whomever.  But I do have those questions, and if Officer Frum

5    is prepared to address them, I think that's appropriate.

6            MR. CAREY:  He is.

7            THE COURT:  All right, very well.

8              Officer Frum, could you come forward to be

9    *sworn.*

10       JARED MICHAEL FRUM, a witness herein, having been first

11   duly sworn, was examined and testified as follows:

12                       DIRECT EXAMINATION

13   BY MR. CAREY:

14       Q.   Please state your name and occupation for the

15   record.

16       A.   Jared Michael Frum.  I am a patrol officer from

17   Meadville City Police Department.

18       Q.   *How long have you been employed in that capacity?*

19       A.   I'm in my fourteenth year, I believe.

20       Q.   All right.  I want to take your attention back to

21   April of 2019.  Were you employed in the capacity as a police

22   officer for the City of Meadville at that time?

23       A.   Yes.

24       Q.   Did you become involved in the investigation of the

25   assault of Rhett Happel that occurred on April 7th of 2019?

1      A.   Yes.

2           MR. CAREY:   If I can lead him for just one second.

3           THE COURT:   Sure.

4    BY MR. CAREY:

5      Q.   You came across Mr. Happel as he was walking down

6    the street after he was assaulted; is that correct?

7      A.   Yes.

8      Q.   That was, what, during third shift?

9      A.   It would have been the night, yes.   We have two

10   shifts.   We work 12-hour shifts.

11     Q.   Okay.

12     A.   The night shift.

13     Q.   And you took the initial information -- actually,

14   probably not from Happel, but from the guys he was with as to

15   what happened.

16     A.   Yes, that's correct.

17     Q.   When you got done taking that initial information,

18   did you investigate it, or did you turn that in to the

19   department to be assigned to someone?

20     A.   I did my initial report, and it went from there.

21     Q.   Would you typically have been assigned that that's

22   your case; you do all the follow-up investigation and make the

23   charging decisions?

24     A.   Not necessarily, because of where -- Mr. Happel got

25   sent to Erie for treatment.   Most cases, we turn that over to

1  a detective because our victim is no longer in the City of

2  Meadville.

3      Q.   And was that what you thought was going to happen

4  with this particular investigation?

5      A.   Yes.

6      Q.   Now, a couple of days after that, were you asked by

7  any of your superiors to do any follow-up investigation?

8      A.   Yes.

9      Q.   Can you tell me who gave you the assignment and what

10  the assignment was.

11      A.   The -- Chief Tautin gave me the assignment to

12  interview a witness.

13      Q.   Okay.  Tautin is T-A-U-T-I-N.  Is that the correct

14  spelling, sir?

15      A.   Yes.

16      Q.   All right.  So Chief Tautin asked you to go and

17  interview a witness.

18      A.   That's correct.

19      Q.   Is that something you normally would do?

20      A.   Yeah.  I mean, I interview people.

21      Q.   All right.  Where was -- who was the witness?  Did

22  you know at that time?

23      A.   They told me it was -- his name was Duncan Freeland.

24      Q.   Okay.  And how was it that you were to meet him?

25      A.   I was to meet him at the Allegheny College security

1    office.

2        Q.    Okay.  Was it through the Allegheny County -- or,

3    excuse me -- Allegheny College security office that your

4    Department learned of the existence of this witness?

5        A.    I honestly don't know.

6        Q.    All right.  But you learned of it through your

7    chief.

8        A.    Yes.

9        Q.    So I assumed there was a date and time when you were

10   supposed to meet him there.

11       A.    Yes.

12       Q.    When you got to the campus security office, was

13   Mr. Freeland there?

14       A.    No.

15       Q.    Did he arrive shortly after?

16       A.    Yes.

17       Q.    And did you introduce yourself?

18       A.    Yes.

19       Q.    Were you in uniform?

20       A.    Yes.

21       Q.    Did you tell him the purpose of you -- your meeting

22   with him?

23       A.    Yes.

24       Q.    What did you say to him?

25       A.    That's when I asked him and talked to him about the

1   interview, basically.  Keep everything chronological, be

2   specific, say specific things if they were said.  And he

3   brought up --

4        Q.   Let's stop for a second.  So when you first met him,

5   you introduced yourself.  Correct?

6        A.   Yes.

7        Q.   Did you tell him that you had been asked to come

8   there to meet with him because he had information?

9        A.   Yes.

10        Q.   Was anybody else present?

11        A.   In the lobby of the area, it was Sergeant Merchbaker

12   and the secretary or dispatcher for their security office

13   there.

14        Q.   So they were present during the introductions?

15        A.   Yes.

16        Q.   When you introduced yourself to Freeland and he

17   introduced himself to you.

18        A.   Yes.

19        Q.   Did you then go to a different location to conduct

20   the interview?

21        A.   Yes.

22        Q.   Was anybody with you during the interview?

23        A.   No.

24        Q.   When you sat down with Mr. Freeland, did you have a

25   recording device with you?

1      A.    Yes.

2      Q.    Was it a cassette or digital recording device?

3      A.    Digital recording device.

4      Q.    Had you ever operated that before?

5      A.    Yes.

6      Q.    You were familiar with it?

7      A.    Yes.

8      Q.    When you sat down with Mr. Freeland, did you

9  immediately turn on the recording device?

10      A.    Not immediately, no.

11      Q.    Did you conduct an interview of Mr. Freeland at that

12  time without being recorded of the information that he had to

13  give you?

14      A.    No.

15      Q.    In other words, did you do a question-and-answer;

16  what did you see, what did you do, what was said, what

17  information do you have, before it was recorded?

18      A.    No.

19      Q.    You told us a second ago that in this introductory

20  meeting, pre recorded interview, that you said some things to

21  Mr. Freeland such as:  If there was something that was said,

22  tell me exactly what was said.  Correct?

23      A.    Yeah, that's correct.

24      Q.    I think you told me -- you might not have said it

25  here -- that if there were swear words or bad language used,

1    it's okay to say those?

2         A.   Yes.

3         Q.   Because you wanted to know exactly what was said.

4    Right?

5         A.   Yes.

6         Q.   You asked him, I believe you said a minute ago, to

7    keep it chronological?

8         A.   Yes.

9         Q.   Because it flows better.

10        A.   Yes.

11        Q.   Makes more sense that way, right?

12        A.   Yes.

13        Q.   Okay.  And what else did you say to him about how

14   you wanted the interview process to go?

15        A.   Be authentic, really.

16        Q.   Can't think of anything more?

17        A.   No.  Other than, like I said, the topic did come up

18   of how he got the pictures.  So I stopped him at that point.

19   I don't -- this is for the recording.  I don't want to do

20   anything like that.  That's not -- I don't want to talk about

21   that right now.

22        Q.   Tell me how the topic of photographs came up.

23        A.   He brought it up.

24        Q.   What did he say?

25        A.   Let's --

1              MR. RAYNOR:  I want to object.  That's hearsay.

2  That's not part of the report -- part of the report.  What

3  Duncan Freeland said is not on the record and cannot be

4  discovered through regular course.

5              THE COURT:  All right.  Your response?

6              MR. CAREY:  Your Honor, it goes to how he proceeded,

7  why he proceeded the way he did.  It's not being offered for

8  the truth of the matter.

9              THE COURT:  Yeah, I tend to agree with Attorney

10  Carey on that.  It's being offered for a non-hearsay reason

11  and will be only considered only for that *reason and not for*

12  the truth of the matter asserted.

13              Go ahead.

14  BY MR. CAREY:

15      Q.   So I forget what the question exactly was, but how

16  did the issue of the existence of photographs that he had

17  seen, how did that come up?  He offered it to you?

18      A.   Yeah.  I mean, my -- my whole first spiel about

19  chronological and all that stuff, it -- it stems from, like,

20  that.  And then he brought up that the reason why he's here is

21  he saw pictures.  He was given one by this Evan Haines.

22      Q.   Okay.

23      A.   And then that's when I said -- at that point I

24  don't -- I don't want to talk about anything other than being

25  chronological, make sure you be very, very specific,

1  everything that you can remember, because, obviously, it

2  happened how many days after the fact.  Just reiterate those

3  types of things so that the interview itself is authentic and

4  genuine.

5      Q.   So when you told him you didn't want to hear

6  anything more about what he actually saw, did he stop?

7      A.   Yes.

8      Q.   Did you ask him anything more about the information

9  that he had?

10     A.   No.

11     Q.   All right.  At that point you start the interview?

12     A.   Yes.

13     Q.   Do you turn the recording on first?

14     A.   Yes.

15     Q.   Okay.  And the recording that -- that we've offered

16  as an exhibit in this proceeding, did you listen to that?

17     A.   Yes.

18     Q.   When was the last time you listened to that?

19     A.   This morning.

20     Q.   Is that a complete recording of the interview from

21  start to finish?

22     A.   Yes.

23     Q.   Has it been edited in any way?

24     A.   No.

25     Q.   When you got done with that -- making that

1    recording, that interview, where did you go?

2         A.   Back to the station.

3         Q.   And do you take the recording device with you?

4         A.   Yes.

5         Q.   What do you do with it?

6         A.   Plugged it into the computer and downloaded the --

7    the file to our police server.

8         Q.   Okay.

9         A.   Inside the incident folder that belongs to that

10   incident number.

11        Q.   Okay. *So that recording is downloaded to that*

12   *incident?*

13        A.   Yes.

14        Q.   On the department's computer system.

15        A.   That's correct.

16        Q.   When we had -- when we obtained -- me, when I

17   obtained a copy of that recorded statement, was that a mere

18   drag and dump that was put onto a disk by somebody at the

19   department?

20        A.   Yes.

21        Q.   Do you know who did that?

22        A.   Assistant Chief Stefanucci.

23        Q.   Okay.  And, again, you listened to the recording

24   today.

25        A.   Yes.

1        Q.   And it's a complete recording.

2        A.   Yes.

3        Q.   Have you reviewed the transcript that we submitted

4    today?

5        A.   Yes.

6        Q.   Is that complete -- or is that an accurate depiction

7    of that audio recording?

8        A.   Yes.

9        Q.   And I think we pointed out one of the discrepancies

10   that we found in the transcription when we were on the record

11   a minute ago.  Correct?

12       A.   That's correct.

13       Q.   And there was also -- there was a second -- there

14   was something that you saw in that transcript.  Correct?

15       A.   Yes.

16       Q.   What was that?

17       A.   I believe the -- they used "Right" as Rhett's name.

18       Q.   Okay.  So there's a reference -- or there's a --

19   there's something in the transcript that uses the word

20   R-I-G-H-T, and it's really a reference to Rhett, R-H-E-T-T?

21       A.   Yes, that's correct.

22       Q.   Other than that, did you see any other

23   discrepancies?

24       A.   No.

25       Q.   Okay.

```
 1          MR. CAREY:  Your Honor, I mean, I don't know if you
 2    want questioning about the statement itself.  I think I
 3    addressed the issue that you raised.
 4          THE COURT:  I'll give you an opportunity if it comes
 5    up to do -- to redirect.  Does that make sense to you?
 6          MR. CAREY:  Yes.
 7          THE COURT:  Yeah.  Why don't we do that.  That
 8    way -- it may very well.  So there may be some substantive
 9    comments, but you might as well hear Attorney Raynor and --
10          MR. RAYNOR:  Yes, Your Honor.
11          THE COURT:  You may proceed.
12                          CROSS-EXAMINATION
13    BY MR. RAYNOR:
14        Q.   Good morning --
15        A.   Good morning.
16        Q.   -- Trooper Frum.
17          Trooper Frum, you indicated that at some point you
18    were alone with Duncan Freeland, correct?
19        A.   That's correct.
20        Q.   And that was after you had left Sergeant Merchbaker
21    and, I guess, the secretary at Allegheny College.  Is that
22    correct?
23        A.   That's correct.
24        Q.   Okay.  So you went to the back.  And you did speak
25    with Mr. Freeland about the incident prior to doing the
```

1    recording; isn't that true?

2        A.   I mean, not -- not the incident itself, really, no.

3    Just, like I said, when he said about receiving a picture from

4    Evan Haines, and then, like I said, I stopped him there.  I

5    don't -- it's not --

6        Q.   Okay.  So you're saying that he told you he received

7    a picture from Evan Haines, but he didn't say who was in the

8    picture or what the person in the picture looked like.  He

9    just said there was a picture, correct?

10       A.   Not before the recording.

11       Q.   Not before the recording.  Okay.  So I'm going to

12   direct your attention to Page 3.

13            THE COURT:  This is Exhibit B, Attorney Raynor?

14            MR. RAYNOR:  Yes, it is.

15            MR. CAREY:  May I give him the copy --

16            THE COURT:  Yes.

17            MR. CAREY:  -- just to follow?

18            THE COURT:  Yes, of course.

19            MR. CAREY:  What page are we on, Mr. Raynor?

20            THE COURT:  Page 3, I believe.

21            MR. RAYNOR:  Page 3.

22   BY MR. RAYNOR:

23       Q.   So I'm going to start with Line 8.  "Question:

24   Okay.  And you spoke with friends of Rhett --"

25            (Attorney Raynor asked for clarification.)

1        THE COURT:  Line 8 reads, "Question:  Okay.  And you

2   spoke with friends of Rhett," question mark.  And the answer

3   was, "Yeah."

4        MR. RAYNOR:  Yeah.

5   BY MR. RAYNOR:

6        Q.   Line 10, "Question:  Who was that?"  Line 11, your

7   answer, "Evan Haines."  Line 12 -- or, "Question," rather,

8   "And."  Line 13, Mr. Freeland's answer, "And his mother."

9   Line 14, "Question:  And Rhett's mother?"  Line 15, "Answer:

10  Yeah.  Yeah."

11        So you got into the entire circumstances surrounding

12  Mr. Freeland's review of the photographs presented by Evans

13  Haines on behalf of his mother.  You discussed that with

14  Mr. Freeland before the tape began recording, correct?

15        A.   Yes.  With Evan Haines, yes.

16        THE COURT:  I'm confused.  And it's probably me.

17  The question in Line 8, "Okay.  And you spoke with friends of

18  Rhett," that appears to be in the form of a declarative

19  statement, as opposed to a question.  Or it's a question

20  seeking confirmation of information already known.

21            And I'm looking back earlier in the transcript,

22  and I may have missed it, but I don't see where Mr. Freeland

23  previously stated that he had spoken with friends of Rhett's,

24  so the implication is that that was information he shared

25  prior to the recording device being turned on.

```
 1              THE WITNESS:  That was —— okay.  Now I understand.
 2              THE COURT:  That was your —— is that your question?
 3              MR. RAYNOR:  Yes, Your Honor.
 4              THE COURT:  All right.
 5              THE WITNESS:  When I was directed by Chief Tautin to
 6    go talk to him, he told me that Duncan Freeland had received
 7    photos from Rhett's friends.  So the declarative statement is
 8    from Chief Tautin basically telling me why I was going to
 9    interview this Duncan Freeland.
10              THE COURT:  I think —— I do have to ask you, though,
11    rather than repeating information to the witness, wouldn't
12    standard procedure be to ask a question, how did you first,
13    you know, learn of the investigation or the incident or
14    something, then, that —— rather than providing information to
15    the witness, allows the witness to tell his or her story and
16    understanding?
17              THE WITNESS:  I agree with you, yes.
18              THE COURT:  All right.  Go ahead.
19              MR. RAYNOR:  Thank you, Your Honor.
20    BY MR. RAYNOR:
21       Q.   Okay.  I'm going to ask you to go further down the
22    page, and I'm going to begin with Line 19, your question.
23    "And in this picture, who was all in it?"  Your answer:
24    "Jared Shaw and Kobe Pinkney."
25              Do you recall that?
```

1          A.    That's his answer of my question.

2          Q.    Right, right.  His answer, right.

3          A.    Yes.

4          Q.    So Mr. Freeland told you that he recognized Kobe

5     Pinkney from the photograph.

6          A.    Yes.

7          Q.    And he recognized Jared Shaw from the photograph.

8     Correct?

9          A.    Yes.

10         Q.    Okay.  But at this point he had not told you that

11    Kobe Pinkney was the person that punched Rhett Happel, had he?

12         A.    Not at this time.

13         Q.    And then go further.  I'm going to Line 4, Page 1,

14    his answer.  "I recognized Kobe as looking an awful lot like

15    who I saw —"

16               (Attorney Raynor asked for clarification.)

17               THE COURT:  It states, "Answer:  I recognized Kobe

18    as looking an awful lot like who I saw throw the punch at the

19    bar."

20    BY MR. RAYNOR:

21         Q.    Okay.  That was Mr. Freeland's answer to your

22    question, correct?

23         A.    That's correct.

24         Q.    So Mr. Freeland knew Kobe Pinkney, told you he

25    recognized Kobe Pinkney from the photograph, but despite all

```
 1   that, he then says Kobe looked like the assailant.  Correct?

 2       A.   At this time, correct.

 3            THE COURT:  I'm sorry; Attorney Raynor, where does

 4   it say that Duncan Freeland -- where does it say in this

 5   statement prior to that sentence that Mr. Freeland knew Kobe

 6   Pinkney?  Maybe it does, but I --

 7            MR. RAYNOR:  Well, on Page 3 he says -- he's asked

 8   who is in the picture, and he says Kobe Pinkney and Jared

 9   Shaw.

10            MR. CAREY:  Lines 19 and 20.

11            THE COURT:  I see.  All right.  Who is in the

12   picture.  All right.  All right.

13   BY MR. RAYNOR:

14       Q.   So, once again, Mr. Freeland knew Kobe Pinkney, and

15   he tells you later that Kobe looked like the guy.  Correct?

16       A.   That's correct.

17       Q.   Now, I'm going to go to Page 8 -- oh, I'm sorry,

18   Page 5.  You asked a question beginning on Page 4 at Line 25.

19   Your question is, "Okay.  And -- but you said you just seen

20   him tap right on his shoulder, looked around, you seen Kobe

21   throw the punch."  And Mr. Freeland's answer is "yeah",

22   correct?

23       A.   That's correct.

24            THE COURT:  Stop there, because you lost me in the

25   transcript.  What page and what line did you read from?
```

1                MR. RAYNOR:  Page 5, Line 1.

2                MR. CAREY:  Page 4, Line 25.

3                MR. RAYNOR:  Page 4, Line 25.

4                THE COURT:  I was going to say, I was looking, and

5      that's not what it says on my transcript.  So I just -- all

6      right.

7                MR. RAYNOR:  I'll ask him again.

8      BY MR. RAYNOR:

9           Q.   On Page 4, Line 25, you begin, "Question:  Okay.

10     And -- but you said you just seen him tap right on the

11     shoulder, looked around.  You seen Kobe throw the punch."

12     Mr. Freeland's answer, Line 3 on Page 5, is, "Yeah."

13               Do you recall that?

14          A.   That's correct.

15          Q.   So you declare that your question is Kobe Pinkney,

16     and Mr. -- all Mr. Freeland says is, "Yeah," correct?

17          A.   That's correct.

18          Q.   To repeat, he never said in this transcript or this

19     recording, I saw Kobe Pinkney throw the punch.  He never says

20     it.

21          A.   He agrees to my answer.

22          Q.   Well, he says, "Yeah."

23               How is how old is Duncan Freeland at this time?  He

24     was in college, right?

25               (Attorney Raynor asked for clarification.)

40

1          THE COURT:  How old --

2      Q.    How old is Duncan Freeland at this time?  He was in

3   college.  Did you get his age?

4      A.    I mean, his date of birth is at the beginning of the

5   transcript.  So he was born in '96.  I'm not quick at math.

6      Q.    So he's about 22, 23 years old?  You would agree?

7      A.    However, yeah.

8      Q.    Okay.  So you declared Kobe the one who did it, he

9   says yeah.  But prior to that he told you Kobe just looked

10  like the person, correct?

11     A.    That's correct.

12          MR. RAYNOR:  Based on that, Your Honor, I have no

13  further questions.

14          THE COURT:  Before that, before Attorney Carey

15  redirects, I have a couple of questions based on my -- what I

16  just heard.

17              I'm reading through this, and I see the

18  references to hair and braids.  At any time during the

19  recorded interview or the discussion with Mr. Freeland that

20  preceded that interview, did he tell you any more information

21  about the attacker's hair?  Its length, anything about the

22  braids, anything at all?

23          THE WITNESS:  No, Your Honor.

24          THE COURT:  All right.  Did you ask?

25          THE WITNESS:  No, Your Honor.

1          THE COURT:  I think I already asked you about -- or

2     I raised with Attorney Carey the sentence, "And you spoke with

3     friends of Rhett," and he examined you and he explained that

4     the reason why you knew that was -- was based upon information

5     you had received from your Chief?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  All right.  I understand.

8               You then go on to state at Line 16 as a

9     question:  "Okay.  So Evan, you had stated earlier that Evan

10    sent you a picture."  That sounds like you're attributing that

11    information as being supplied by Mr. Freeland, as opposed to

12    your chief.  Did he tell you earlier in the interview?  Did I

13    miss it?  Or did he tell you --

14         THE WITNESS:  No, that preceded.  Like I said, when

15    he started talking about Evan Haines sending him a picture,

16    that's when I stopped him.

17         THE COURT:  All right.  And that's what you're

18    referring to there.

19         THE WITNESS:  Yes.

20         THE COURT:  All right.  I understand.

21              Regarding the braids, did Kobe Pinkney have

22    braids when you arrested him?

23         THE WITNESS:  I did not -- I wasn't there when he

24    was placed under arrest.

25         THE COURT:  You don't know?

1       THE WITNESS:  I really don't know.

2       MR. RAYNOR:  I know he didn't have braids.  From

3   what I've discovered.

4       THE COURT:  On Page 4, in response to -- if you look

5   on Page 4, Line 9, this may be one of the areas, Attorney

6   Carey, you wanted to correct.  I'm not sure.

7       "Question:  Okay.  He sent like -- Evan also

8   sent two other pictures which looked like they were -- he had

9   *shorter hair in those, but I have no idea when they were*

10  taken, so."  That -- that sounds like an answer.  Is that --

11      THE WITNESS:  That's correct.  "Okay" is -- is me.

12      THE COURT:  Okay.

13      THE WITNESS:  And then he starts back --

14      THE COURT:  All right.

15      THE WITNESS:  "He sent --" so where it says, "He

16  sent," like, that is actually Mr. Freeland.

17      THE COURT:  All right.  Did Mr. Freeland disclose

18  *during the interview when any of the pictures that he was*

19  basing his identification on were taken?

20      THE WITNESS:  I -- I believe he says somewhere that

21  he doesn't remember when they -- doesn't -- has no idea when

22  they were taken, in the same line.

23      THE COURT:  Yeah.  Well, he said, "I think there

24  were a total of three pictures," and as to two of them, it

25  says that he had shorter hair, "but I have no idea when those

1    were taken."

2            I guess my question is did he ever tell you

3    when the other picture, the third picture was taken?

4            THE WITNESS:  No, Your Honor.

5            THE COURT:  All right.  And you didn't ask about

6    that, correct?

7            THE WITNESS:  No, Your Honor.

8            THE COURT:  And then later on that page, at Line 18

9    you ask a question -- or you state, "So same facial features.

10   Same."  "Answer:  Yeah."

11           You agree with me that that -- your statements,

12   "So same facial features.  Same," is not in the form of a

13   question, is it?

14           THE WITNESS:  I believe my train of thought at that

15   point was I was going to ask more questions -- like, more

16   questions, and then he cut me off and just answered "yeah".

17   And then I didn't go back to --

18           THE COURT:  Well --

19           THE WITNESS:  -- my other statement.

20           THE COURT:  -- I mean, I've got to ask you, I

21   mean -- I mean, you and I both have eyes, we both have a nose,

22   we both have a mouth, so in that general respect we have the

23   same features.  But what -- but either during the recorded

24   interview or during the discussion that preceded it, did you

25   ever ask Mr. Freeland, what do you mean by "the same

1    features"?  Did he describe a nose, did he describe a

2    thickness of lips?  Did they have thin lips, thick lips, big

3    nose, little nose, you know, eye color?  Did he give you any

4    information?

5             THE WITNESS:  No, Your Honor.

6             THE COURT:  All right.  So that wasn't discussed

7    before the recorded interview; is that right?

8             THE WITNESS:  No, Your Honor.

9             THE COURT:  On that same page, Page 4, Exhibit B,

10   there's a question.  And this is you speaking.  "And you know

11   him from years of being his --" and before you could complete

12   the sentence, he jumps in and says, "Yeah, being in the same

13   hall, being his RA."

14            THE WITNESS:  Yes.

15            THE COURT:  If he hadn't interrupted you, you were

16   going to note those facts, were you not; that he knew him from

17   college as an RA and being in the same hall?

18            THE WITNESS:  I mean, I may have -- like, for being

19   in college, we're sitting in the college security office.

20            THE COURT:  But clearly you were about to recite

21   something that you had learned, because you say, you knew

22   him -- you know him.  You were about to recite something that

23   you learned before this interview.  Because that's not

24   covered.  Right?

25            THE WITNESS:  Not -- yes.  Yes, Your Honor.

1          THE COURT:  On Page 5, there's a question, again in
2    the form of a -- declarative statements.  "You didn't hear
3    anything being said.  It didn't look like anything was being
4    said."
5               When did you learn that, such that you sought
6    confirmation that Mr. Freeland did not hear anything being
7    said and it didn't look like anything was being said?
8          THE WITNESS:  I guess it's just how I worded the
9    question at that point.  I wasn't -- I -- I see where you're
10   saying it looks declarative, but I don't -- that's just
11   apparently how I talk, unfortunately.
12         THE COURT:  Yeah.  As opposed to saying, did you
13   overhear anyone saying anything.
14         THE WITNESS:  Yes.
15         THE COURT:  All right.  There's a difference in my
16   court transcription from this one.  It may explain --
17   actually, it's not material.
18              Other than Duncan Freeland, did you interview
19   any other witnesses?
20         THE WITNESS:  No, Your Honor.  No one came forward.
21         THE COURT:  What about the bartender, Kristen
22   Ferguson?
23         THE WITNESS:  I talked to her the next day, and our
24   Detective also talked to her, and she stated that she was
25   intoxicated and doesn't remember anything from that night.

1           THE COURT:  All right.  And what about Rhett Happel?
2  Did you interview Rhett Happel with his mother?
3           THE WITNESS:  We have a recording, but I don't -- I
4  don't -- I spoke to him over the phone with his parents at the
5  hospital, just to follow up with him quickly and see if he
6  remembered anything.
7           THE COURT:  Do I understand you, then, there is a
8  recorded -- some statement from Rhett Happel, but it was not
9  taken by you?
10          THE WITNESS:  I don't -- don't remember.
11          THE COURT:  Did any other officer or member of the
12  Meadville Police participate in this investigation, conduct
13  any investigation other than what you personally performed?
14          THE WITNESS:  I'm trying to think.  At least --
15  Assistant Chief Stefanucci would be the main other person, I
16  believe.  Our detectives were at training that whole week.
17  Chief Tautin may have been involved.  I don't --
18          THE COURT:  Are there investigative materials
19  gathered or generated by either of those individuals in the
20  records of the Meadville Police Department?
21          THE WITNESS:  Unfortunately, at this point I don't
22  know, because the record has been expunged, and we don't -- we
23  have to --
24          THE COURT:  I see.  All right.  And going back to
25  Mr. Freeland, either before the interview itself, during your

1   discussion immediately preceding the interview, or during the

2   recorded interview, did Mr. Freeland tell you anything about

3   where he was standing relative to the assault?  In other

4   words, how -- for example, the difference between himself and

5   the assault upon Mr. Happel.

6           THE WITNESS:  I believe he said he was directly

7   behind Mr. Happel.

8           THE COURT:  Did he tell you that before or after the

9   recorder was turned on?

10          THE WITNESS:  I -- I don't remember.

11          THE COURT:  If it's not in the transcript, does that

12   mean he told you before?

13          THE WITNESS:  I mean, it could have been after as

14   well.  I don't -- I don't -- I don't recall.

15          THE COURT:  All right.  Did he tell you anything

16   about -- did he identify any other witnesses who were in the

17   immediate vicinity; in other words, friends, college -- other

18   college students who might have been standing close to the

19   assault when it occurred?

20          THE WITNESS:  *No, Your Honor.*

21          THE COURT:  Because they were in line at the

22   bathroom, right?

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  All right.  What about the lighting or

25   anything like that in the bar at the time?  Did he tell you

1      anything about that?

2              THE WITNESS:  No, Your Honor.

3              THE COURT:  Either before or during your interview.

4              THE WITNESS:  No, Your Honor.

5              THE COURT:  Okay.  Did you consider any other

6      investigative materials prepared by anyone else, anyone other

7      than yourself when you prepared your Affidavit of Probable

8      Cause?

9              THE WITNESS:  No, Your Honor.

10             THE COURT:  All right.  Attorney Carey?

11             MR. CAREY:  Your Honor, just for the record, I think

12     we're well beyond what the scope was of his original testimony

13     and what's relevant for today.  I'm certainly not going to

14     object to your questioning.

15             THE COURT:  You can.

16             MR. CAREY:  Well —

17             THE COURT:  And I understand your concern.  I will

18     tell you that the only thing relevant — and I actually almost

19     stopped Attorney Raynor, you know, when we started to get

20     into, you know, the reasonableness or, you know, the

21     assumptions that may have been made.  He came close, but I

22     don't think he crossed the line.

23             And the point -- my questions and the responses

24     that were given by Officer Frum will be considered solely

25     based upon -- I asked them -- let me rephrase that.  I asked