1    them because I think they bear on the issue of completeness.

2    And the reason -- you know, so when I see a general statement,

3    I want to know is there anything further discussed before or

4    during.

5            When I see a declarative statement that appears

6    to be based upon prior knowledge, knowledge pre-dating the

7    interview, I want to know what was discussed before.

8            So I understand -- I understand your concern,

9    but that was the reason for my questions.

10           MR. CAREY:  Well, since we went down these other

11   roads here, if I can go back.

12           THE COURT:  Absolutely.

13                   REDIRECT EXAMINATION

14   BY MR. CAREY:

15       Q.    Officer Frum, other than initially coming upon Rhett

16   Happel when he's injured with his buddies that night and then

17   your later interview of Duncan Freeland, did you have any

18   involvement in this investigation?

19       A.    No, Your Honor -- or no.

20       Q.    I didn't get that promotion.

21           THE COURT:  Mr. Carey is an honorable man, so --

22       Q.    But your answer is no, correct?

23       A.    No.  That's correct.

24       Q.    So you're not sure, I guess, what other

25   investigation was done by other officers as we sit here today?

1       A.    That's correct.

2       Q.    Back then you might have, but today you're not sure?

3       A.    That's correct.

4       Q.    All right.  So let's go back through this

5    transcript.  Let's give some of these questions you asked some

6    context.  All right?

7            If you go to Page 3 of that transcript in front of

8    you.  All right.  So it's been established that you were shown

9    a picture -- excuse me.  That's incorrect.  Duncan Freeland

10   referenced that he was shown a picture by Evan -- was it Evan

11   Haines?

12      A.    That's correct.

13      Q.    And that he identified two people that were in that

14   photograph; one being Jared Shaw, the other Kobe Pinkney.

15      A.    That's correct.

16      Q.    He didn't have that picture with him when you were

17   interviewing him, did he?

18      A.    Not to my knowledge.

19      Q.    You didn't show him that picture, did you?

20      A.    No.

21      Q.    Okay.  Did you know who Jared Shaw and Kobe Pinkney

22   were?  Did you know that they were students?

23      A.    Yes.

24      Q.    Did you know that Duncan Freeland was a student?

25      A.    Yes.

1          Q.   So at the bottom of Page 3, you ask a question:

2   "And those are the only two individuals in the picture," and

3   Freeland says, "Yeah."

4          A.   That's correct.

5          Q.   And then this is where the context comes in.  You

6   ask a question at the very bottom of Page 3, and the answer is

7   at the top of Page 4.  "Question:  And from that picture, did

8   you recognize anybody?"

9               Did I read the question correctly?

10         A.   That's correct.

11         Q.   And the answer at the top of Page 4, "Answer:  I

12  recognized Kobe as looking an awful lot like who I saw throw

13  the punch at the bar."

14              Did I read that correctly?

15         A.   That's correct.

16         Q.   So when Duncan Freeland uses the term "looking an

17  awful lot like", he was referring to the picture he was shown

18  by Evan Haines.

19         A.   That's correct.

20         Q.   Which was the reason why you were there to interview

21  Duncan Freeland.

22         A.   That's correct.

23         Q.   The top of Page 4, then you follow up.  "Okay.  Did

24  it have -- what was he -- did he have braids in the picture?

25  Do you remember that?"

1          Did I read the question correctly?

2     A.   Yes.

3     Q.   Your answer:  "It looked like he had something, so

4   maybe," dot dot dot.

5          Did he tell you it was braids, cornrows?  I mean,

6   did he describe?

7     A.   No.

8     Q.   "Question:  Sim -- similar to what he had on

9   Saturday night?"  And the answer was, "Yeah."

10         Did I read that correctly?

11    A.   Yes.

12    Q.   And then you've indicated -- you indicated in your

13  testimony that -- continuing, starting on Page 9, the "okay"

14  is actually you saying okay.

15    A.   Yes.

16    Q.   And then Freeland continued on.  "He sent, like --

17  Evan also sent two other pictures which looked like they

18  were -- he had shorter hair in those, but I have no idea when

19  they were taken, so."

20         That was his answer.

21    A.   That's correct.

22    Q.   Continued answer, right?

23    A.   That's correct.

24    Q.   You asked, then, "How many pictures did Evan

25  actually show you or send you," and he said, "Three."  Is that

1    correct?

2        A.    That's correct.

3        Q.    And you -- you asked in your manner of doing so,

4    "And all three of them," the photos you were talking about,

5    "looked like the gentleman who was at the bar Saturday night."

6            Did I read that question correctly?

7        A.    Yes, that's correct.

8        Q.    And the answer was:  "Matched the hair in the last

9    two, but yeah."

10           Correct?

11       A.    That's correct.

12       Q.    So, again, Freeland's telling you about what he saw

13   in the photographs.

14       A.    That's correct.

15       Q.    And the people in the photograph -- the person in

16   the photographs, all three of them, looked like the one who

17   threw the punch.

18           MR. RAYNOR:  I'm going to object to that.

19           THE COURT:  Yeah, I'm going to sustain that.

20           MR. CAREY:  All right.

21   BY MR. CAREY:

22       Q.    So on Line 18, you ask, "So same facial features?"

23   Are you referring to the person that Freeland saw in the

24   photographs?

25       A.    Yes.

1       Q.   And he says, "Yeah."  Same facial features.

2            You asked him who the other person was in the

3  picture.  Again, you said it was Jared Shaw.  He says, "Yeah."

4  Correct?

5       A.   That's correct.

6       Q.   And then you established right after that, that

7  Duncan Freeland knew Jared Shaw and maybe Kobe Pinkney from

8  going to school together.

9       A.   That's correct.

10      Q.   In fact, Freeland was at least one of their RA's;

11 resident advisors.

12      A.   That's correct.

13      Q.   So the next question that starts at the bottom of

14 Page 4 and goes to the top of Page 5, the question is:  "Okay.

15 And -- but you said you just seen him tap --" should be

16 Rhett "-- on the shoulder, look around.  You seen Kobe throw

17 the punch," and the response was, "Yeah."

18      A.   That's correct.

19      Q.   When -- when he said that, did you make any

20 determinations in your own mind as to whether you had probable

21 cause?

22           THE COURT:  Well, now, that's -- that's not the

23 issue, though.

24           MR. CAREY:  Okay.  All right.

25           THE COURT:  That would be -- I would not -- I would

1   not let Mr. Raynor ask a question, you know, along the lines
2   of that doesn't establish probable cause.  That's really --
3   really not the issue.  I understand -- I understand your
4   point.
5           MR. CAREY:  And in fairness, Judge, you were -- you
6   were hinting in the bushes of should you have done more of an
7   investigation, should you have asked questions this way versus
8   that way --
9           THE COURT:  Okay.  You know what, I'll -- I'll let
10  you ask.  Because I guess my questions could be interpreted as
11  going down that route.  So go ahead.
12          MR. CAREY:  Okay.
13  BY MR. CAREY:
14      Q.  At that point in time, when you asked Duncan
15  Freeland, "You seen Kobe throw the punch," at the top of
16  Page 5, and he said, "Yeah," was that response -- let me ask
17  it this way:  Was that response unsure?  Did it appear unsure
18  on the part of Duncan Freeland in any way?
19          MR. RAYNOR:  Objection.  Calls for a conclusion.
20          MR. CAREY:  It's his conclusion.  That's why we're
21  here.
22          THE COURT:  Yeah, I -- I was more comfortable,
23  Attorney Carey, with your first question, as to whether at
24  that point he determined he had probable cause.
25          MR. CAREY:  That's part of what goes into the

1   determination; is the eyewitness' identification equivocal or

2   unequivocal.  Did it waver; was it sure; was it certain.

3           MR. RAYNOR:  That's a question for the jury.

4           MR. CAREY:  It's not.  It's a question for the

5   Court.

6           THE COURT:  Well, you're asking in his personal

7   observation, based on his observation, did he consider there

8   to be, what, equivocation in the answer?

9           MR. CAREY:  Or doubt on the part of Duncan Freeland

10  when he said that, correct.

11          THE COURT:  Okay.  You can answer that.

12          THE WITNESS:  There wasn't a doubt.

13          MR. RAYNOR:  Again, note my objection, Your Honor.

14          THE COURT:  It's noted.

15  BY MR. CAREY:

16      Q.   Now, on Page 5, down -- starting with Line 10, this

17  is Duncan Freeland speaking, correct?

18      A.   That's correct.

19      Q.   He says, "It looked -- it looked like it was random

20  to me at first."

21          What was he -- do you know what he was referring to?

22          MR. RAYNOR:  I'm going to object to that.

23          MR. CAREY:  All right.  Let me just -- let me just

24  go through what he said.

25  BY MR. CAREY:

1      Q.   "It looked like it was random to me at first, but,

2   yeah.  But after hearing there was some back story, it kind of

3   made more sense."

4           Do you know what he's talking about, about the back

5   story?

6      A.   Yes, I do.

7      Q.   What is it?

8      A.   I believe it was the night -- or the day prior --

9      Q.   The day prior to what?

10     A.   To this incident.

11     Q.   To Happel being assaulted?

12     A.   Yes.  The day prior.

13     Q.   Okay.

14     A.   Jared Shaw's girlfriend allegedly was -- had her

15   drink Roofied; date rape drug into it.  And from her

16   description, it was Rhett Happel that gave her that drug.

17     Q.   Okay.  And what happened when she gave a description

18   of Rhett Happel as being the person who did that?

19     A.   That -- the description was given the next -- the

20   same day as this incident during the day at a college party at

21   a house where Jared Shaw and Kobe Pinkney were both at.  There

22   was --

23          MR. RAYNOR:  I'm going to object.  I object to that.

24   I object to Kobe Pinkney being at a frat party.  That is --

25   that calls for facts that are not in the evidence at this

1   point.

2          MR. CAREY:  It brings -- it brings perspective and

3   context to Duncan Freeland's statement and how he connected

4   the dots.

5          MR. RAYNOR:  Well, it should have been mentioned as

6   part of the interview.  He should have went into it.  You

7   know, it says --

8          THE COURT:  You know, I'm going to provisionally

9   allow the testimony, and I will consider your objections as

10  part of when I consider the decision in this matter.

11              All right.

12          MR. CAREY:  Thank you.

13  BY MR. CAREY:

14     Q.   So to pick up, so the day before the assault of

15  Rhett Happel, Jared Shaw's girlfriend allegedly had something

16  slipped into her drink.  A date rape drug or Roofied or

17  however -- whatever the term is.  Correct?

18     A.   That's correct.

19     Q.   And she believed --

20          THE COURT:  Just so we're -- I am going to interrupt

21  you here and follow up on the objection.  This is what you've

22  been told by others, correct?

23          THE WITNESS:  That's correct.

24          THE COURT:  All right.  Just so we're clear --

25          MR. CAREY:  Right.

1          THE COURT:  -- he's saying the other individuals

2    reported to you X, Y, and Z.  Got it.

3          MR. CAREY:  This is the back story to the assault.

4          THE COURT:  Well --

5    BY MR. CAREY:

6       Q.   Your information, correct?

7       A.   That's correct.

8       Q.   So Jared Shaw's girlfriend gave a description of the

9    person she thought did that, and it matched who?

10      A.   Rhett Happel.

11      Q.   Rhett Happel.  Earlier in the day, before the

12   assault of Rhett Happel, was there an incident between any of

13   the parties here?

14      A.   I believe there were words spoken to each other at

15   this frat party between --

16      Q.   Between who and who?

17      A.   Jared Shaw, Kobe Pinkney, and --

18          MR. RAYNOR:  Objection.  Again, I'm going to object

19   to that.

20          MR. CAREY:  This is the back story, Judge.  This is

21   how -- this information is received by him and is put together

22   in his mind.

23          MR. RAYNOR:  Well, the back story should have been

24   gone into detail during the interview.

25          THE COURT:  Yeah.  Look, I'm not sure this is

1   helping the defense in this case.  Just to be clear, I am

2   listening intently.  Because none of this is in the Affidavit

3   of Probable Cause.  None of it.  None of it has been subjected

4   to discovery.

5               So, Attorney Raynor, you can object all you

6   want, but you might want to listen.  Because we're still on a

7   Motion to Dismiss.  And what does it tell you when we're

8   hearing all sorts of testimony about a back story, and there's

9   *no description of the back story in this transcript?  There's*

10  a question.  When I heard there was a back story, no one ever

11  asked what it was.  You can assume that maybe they all knew

12  what it was.

13              But when I'm hearing all sorts of testimony to

14  provide, quote, context, where the Plaintiff has not had an

15  opportunity to take one lick of discovery, when I -- when you

16  haven't seen a single initial disclosure, I ask you, Attorney

17  Raynor, do you really want to object to this, for purposes of

18  *this argument?*

19              MR. RAYNOR:  No, Your Honor.

20              MR. CAREY:  Your Honor, respectfully, and in

21  fairness, there's been discovery conducted today which is far

22  beyond the scope of this evidentiary hearing.  I didn't object

23  to it because the Court was interested in these things.

24              THE COURT:  I am interested, and only for what was

25  asked and what wasn't asked.  And it doesn't -- it doesn't

1  commit you or anyone else.

2        But, look, I will tell you what has bothered me

3  from the outset.  And as I indicated, I have no problem

4  dismissing a case at the pleading stage.  And, in fact, based

5  on that original Complaint, I still believe that my decision

6  to dismiss, if that were the operative Complaint in this case,

7  was absolutely correct.  Because for whatever reason, there

8  was a pleading that said there was a definitive identification

9  of the individual as -- the Plaintiff in this case as the

10  assailant.

11        Then when it came forward that there was some

12  equivocation or qualification or the phrase "looks an awful

13  lot like," then in my mind -- well, let's back up.  I think we

14  all agree on this.  I think, Attorney Carey, you would largely

15  agree and maybe Attorney Raynor.

16        When you have a -- especially a victim's

17  eyewitness identification, but even a witness' definitive

18  identification, even if there's slight flaws and even if

19  there's some problems and the hair is a little different or

20  they missed the height, but when it's definitive, that's the

21  guy or gal that assaulted me or what have you, that's usually

22  game, set, and match for probable cause.  And that was my

23  conclusion after the original Complaint.

24        When I see language that is conditional or

25  qualifies that, then I -- then I think we need to take a

1    broader perspective.  Well, what else was out there.  Because

2    I think you'll also agree with me that an officer has no

3    obligation to continue investigating after he or she

4    determines there's probable cause.  He or she is correct on

5    that.  The fact that further investigation would have revealed

6    exculpatory evidence is beside the point.

7              But if you have an equivocal or conditional

8    identification, then there's -- you should probably take a

9    broader view and look at the rest of the investigative

10   information to see whether it corroborates that, whether -- at

11   that point you're alerted that perhaps further investigation

12   might be necessary.

13             So that -- you know --

14        MR. CAREY:  But the issue is what makes it

15   definitive.  And that's what I'm getting into from this

16   officer's perspective.  From the perspective of a reasonable

17   police officer is that, number one, the "looks an awful lot"

18   was not equivocal because he was referring to a photograph and

19   the reason why Duncan Freeland was there to meet with the

20   police to begin with.

21             And then when you get this back story, you now

22   understand why the witness has pointed the finger at Kobe

23   Pinkney.  And in this officer's mind, it wasn't equivocal.  It

24   was definitive.

25        THE COURT:  All right.  I understand.

```
 1              MR. CAREY:  If I could have him just for the record,
 2      for completeness, finish that last part.
 3              THE COURT:  Sure.  I'll let you do it.  I mean, and
 4      subject to the -- to the objection.  I guess you're saying
 5      that I opened the door, which maybe I did.
 6              MR. CAREY:  I might of hinted when I said you
 7      were -- yeah.
 8              THE COURT:  Well, look, I'm reading this transcript
 9      and asking myself, is this complete or is there more
10      information.  And as I understood the mandate from the
11      Circuit, I can analogize -- sorry.  I'm talking to Officer
12      Frum.  I can analogize, because, Attorney Carey, you and I
13      know, and Attorney Raynor probably knows, that let's say we
14      have an assault of a prisoner, an incarcerated person, and on
15      a Motion to Dismiss, the Court will routinely, in an excessive
16      force case, will routinely watch the video because the Circuit
17      has held -- I mean, that's the definitive evidence of, you
18      know -- and as long as it covers the relevant time frame, you
19      know, it doesn't matter what the Plaintiff has pleaded as far
20      as, you know, getting roughed up by the -- by the corrections
21      officers.  If it doesn't show that in the video, you know,
22      that's it.
23                  It's a little different in a transcript of an
24      interview.  Not -- not completely, but it's a little bit
25      different.  Because, you know, here the whole story is not
```

1    necessarily told.

2              MR. CAREY:  But I think you're off on a tangent,

3    Your Honor, respectfully.  And I don't mean that --

4              THE COURT:  That's all right.

5              MR. CAREY:  -- any other way.

6                   When you're talking about completeness, the

7    issue is the completeness of the statement from the beginning

8    to the end.

9              THE COURT:  Well, I do it differently.  I will tell

10   you, I do it differently.

11             MR. CAREY:  Well, not in terms of authentication,

12   and that's what we're here for, is authentication.  Is the

13   statement authentic; is it complete, has it been altered, has

14   it been edited.  That's what the completeness is in terms of

15   the relevance for today's proceeding, not the complete

16   investigation.

17                  The issue is can you -- or should you have

18   considered the recorded statement.  And the other issue is did

19   he challenge its authenticity.  So in terms of authenticity

20   and plausibility, is it complete.

21             MR. RAYNOR:  At the outset --

22             THE COURT:  Yeah, I guess the question is, though,

23   if there's more information out there that formed the inquiry

24   regarding probable cause, doesn't he have the right to know

25   it?  Doesn't he have the right to discover it?

1          In other words — and, look, I didn't — I

2   didn't try to call anybody out on this, because I know

3   information comes to counsel and sometimes in dribs and drabs.

4   But we started this case where the only thing that Mr. Raynor

5   and Mr. Pinkney had apparently was the — I think it was the

6   Criminal Complaint and Affidavit of Probable Cause.

7          MR. RAYNOR:  Right.

8          THE COURT:  Then in connection with their motion —

9   his motion to — Rule 60(b) motion to set aside my summary

10  judgment, the Defendants, not the Plaintiff, came forward with

11  the investigative notes.  I remember that clearly.  And I'm

12  like, okay, where did these come from.  In fact, you know, an

13  argument was made that he should have conducted pre-Complaint

14  discovery in State Court.  I'm not sure how you do that to get

15  this stuff; he would have known about it.  So here comes that

16  next dribble of investigation from the investigation file.

17  All right?

18          Then we go through months — I mean, the

19  Complaint — Exhibit 4, the audio cassette, was not filed on

20  or submitted to the Court until over 13 months after this

21  action is filed.  And there were repeated instances where the

22  issue of probable cause was clearly embraced and clearly put

23  at issue by the Defendants, and they didn't see fit to use it

24  then.

25          And now we're at this hearing determining the

1    completeness of that transcript.  And this witness is telling

2    us, well, wait a minute, there's a heck of a lot more that was

3    part of the investigation, but we had -- we had other officers

4    involved.  I don't know what they found out.  You know, I

5    think he indicated he spoke with them.  In fact, there's an

6    affidavit -- I know this docket well.  There's an affidavit

7    where Officer Frum discusses his reliance upon information

8    from -- is it Captain -- what is the guy's name?

9              THE WITNESS:  Stefanucci.

10             THE COURT:  Stefanucci.  That was submitted in

11   response to an earlier Motion to Dismiss.

12             So the reason why I'm getting a little worked

13   up here is I feel like the defense is releasing favorable

14   information in dribs and drabs to the extent it serves their

15   purposes, but the rest of the story is still in their files.

16   And that concerns me.

17             And so, yeah, when I talk about the

18   completeness of this transcript, I'm looking a little broader.

19             MR. CAREY:  Well, that might be, Your Honor.  But

20   from our perspective, the issue of completeness has to do with

21   the recording --

22             THE COURT:  We're on a Motion to Dismiss.  We are on

23   a Motion to Dismiss.  You know.  And when someone tells me,

24   hey, Judge, you need to know a lot more to understand how we

25   got to the probable cause determination, there's a lot of

1    context here, that may very well be the case, but it seems to

2    me this is an awfully -- it can't be done in this context.

3    All this serves, in my mind, is to identify that there is

4    inquiry possibly to be had.

5                 Now, I will say this:  And this in no way in

6    intimates my decision on the Motion to Dismiss.  But my -- the

7    more this goes, I think the more it creates genuine issues

8    that at least -- maybe they won't be genuinely disputed, but

9    they are at least -- the Plaintiffs are at least entitled to

10   have some discovery on it.

11        MR. CAREY:  But, again, I think that that's what

12   we've done today.  Because the Court, with all due respect,

13   started asking a bunch of questions that are discovery in

14   nature.

15                This officer has qualified immunity, and so the

16   background of why he happened --

17        MR. RAYNOR:  I object to that.

18        THE COURT:  Look, Attorney Carey can argue that.

19        MR. CAREY:  And so his determination of

20   definitiveness of the eyewitness identification is at the crux

21   of this case.

22        THE COURT:  Yeah.  And there's two components to

23   qualified immunity.  And the other is objective

24   reasonableness.  And those are arguments that can and should

25   be made in connection with the Motion to Dismiss and any

1   further -- further motions in the matter.

2           The issue here, as I see it, in what is

3   properly the record, without a doubt, as the Circuit, the

4   Court of Appeals made clear, this recording is part of the

5   record on the Motion to Dismiss and will be considered by me.

6           But, you know, the question is:  Does that mean

7   no further inquiry is necessary or appropriate?

8           MR. CAREY:  Well, I think the inquiry would be on

9   the taking of the statement, which is what we've done today.

10  That's the only discovery that's relevant, because that goes

11  to probable cause, whether this statement is reliable, whether

12  it's authentic.  I think we've done that today.

13          MR. RAYNOR:  I disagree that's the only evidence for

14  discovery that is relevant.  I mean, you're talking about

15  probable cause.

16          And, again, as Your Honor said, completeness

17  goes to the totality of the circumstances.  Even if we

18  stipulate that everything in that recording is authentic and

19  accurate --

20          THE COURT:  That's your -- again, that's your --

21          MR. RAYNOR:  Yeah, but they have --

22          THE COURT:  That's your legal argument on the Motion

23  to Dismiss.

24          MR. RAYNOR:  Then we need to have a preliminary

25  hearing, Judge, because --

1           THE COURT:  What I'm talking about — all I care

2   about today is what's in the record, what's properly in the

3   record, and what areas of inquiry potentially exist that make

4   the decision on this issue appropriate or inappropriate for

5   treatment on Rule 12(b)(6).  That's all I care about today.

6           MR. CAREY:  Well, then there's one other issue

7   that's in the record, and it's been in the record because it's

8   part of his incident report.  I can either tell you what it is

9   or ask him about it.  However you want to proceed.

10           THE COURT:  Well, when you say it's in the record —

11           MR. CAREY:  Yes.

12           THE COURT:  — you can identify it and then you can

13  ask him about it.

14           MR. CAREY:  It's in his incident report.

15           THE COURT:  Go ahead.  I mean, that's part of the

16  record.  Do you want to ask him a question about it or just

17  bring it to my attention?

18           MR. CAREY:  I can bring it — I can do it either

19  way.  But let me bring it to your attention for the sake of

20  brevity.

21           THE COURT:  All right.

22           MR. CAREY:  On Page 2 of his incident report he

23  wrote — Officer Frum wrote, "On Thursday, April 11 I received

24  a call from Chief Tautin, who stated that District Attorney

25  Schultz had stated to charge Pinkney with aggravated assault,

1    simple assault, harassment, and disorderly conduct.  I then

2    applied for and was granted an arrest warrant for Pinkney on

3    the aforementioned charges."

4              THE COURT:  That's in the investigative report,

5    correct?

6              MR. CAREY:  Yes.  And so -- so, ultimately, a

7    decision to charge wasn't --

8              THE COURT:  Was that recorded?  Was that — was the

9    District Attorney's statement recorded?

10             MR. CAREY:  No.

11             MR. RAYNOR:  No.  There was, however --

12             MR. CAREY:  This is a report made contemporaneous --

13   this is information that's contemporaneous --

14             THE COURT:  Yeah, it's hearsay.

15             MR. RAYNOR:  It's not in their probable cause.

16             THE COURT:  Putting it in an official report does

17   not convert it --

18             MR. CAREY:  Okay.

19             THE COURT:  In other words, so what you're telling

20   me -- well, let me rephrase that.

21                  Are you telling me that this witness did not

22   make the independent assessment of probable cause and to

23   charge, but reacted to an instruction from the District

24   Attorney?

25             MR. CAREY:  I don't know whether he made his own

1    independent assessment.  He told me a minute ago, when the

2    identification was made by Duncan Freeland, he felt there was

3    probable cause.  But the decision to charge came from the

4    District Attorney of Crawford County.

5           THE COURT:  And, look, I've never been a police

6    officer, so I don't know.  And it may very well be that

7    actually Officer Frum made the charging decision in

8    consultation with the District Attorney.  That may -- that may

9    be the fact.  And maybe that's probative, maybe it's not.

10   But, again, I can't accept that as a matter of fact

11   based upon --

12           MR. CAREY:  I understand.

13           THE COURT:  Do you understand what I'm saying?

14           MR. CAREY:  I understand.  I mean --

15           THE COURT:  I mean, those are --

16           MR. CAREY:  To me, Your Honor, this doesn't change

17   the issue of whether he had probable cause, whether -- and/or

18   whether he materially misstated anything in his affidavit.

19           THE COURT:  No, I understand.

20           MR. CAREY:  Based upon the context and everything

21   else that went -- was today, he did.  He had probable cause.

22   He didn't materially misstate anything because the

23   identification was not equivocal.

24           MR. RAYNOR:  I disagree.  Based on that transcript,

25   Mr. Freeland never said Kobe Pinkney was the assailant.

```
 1   Trooper Frum makes the statement --
 2              (Mr. Raynor asked for clarification.)
 3              THE COURT:  And actually, well, go ahead.  Repeat
 4   what you just said.
 5              MR. RAYNOR:  Trooper Frum made some declarative
 6   statements.  And apparently Mr. Freeland said yeah, yeah, but
 7   he never said Kobe Pinkney did it.  It was Trooper Frum who
 8   articulated the facts underlying the assault, put in Kobe
 9   Pinkney's name, and Mr. Freeland said, yeah, but he's also
10   said he looked like him.  He also said his hair is different.
11   Clearly based on that transcript and recording, there's
12   nothing definitive or conclusive to establish probable cause
13   at this point, particularly where they're saying that there's
14   a back story of Shaw and Pinkney being upset about Mr. Happel
15   trying to give Shaw's girlfriend a Roofie.  I mean, if that's
16   the case, that should be part of the transcript.  It wasn't.
17   It wasn't part of the interview.
18              We ask for this -- we ask for a chance to go
19   forward, Judge.  I mean --
20              THE COURT:  I really do understand your respective
21   positions, and I guess I'm not surprised that we lapsed into
22   merits arguments on the Rule 12(b) motion itself rather than
23   exclusively on the issues outlined in my Order.  And poor
24   Officer Frum has been sitting up here as we're having this
25   really interesting discussion.
```

```
1                    Does anyone have any further questions for
2    Officer Frum at this time?
3              MR. CAREY:  I don't.
4              MR. RAYNOR:  I don't either.
5              THE COURT:  All right.  Officer Frum, thank you,
6    you're excused.
7                    All right.  Since we talked about it, is anyone
8    asking for the opportunity to further brief the issues on the
9    Motion to Dismiss?  The Circuit's vacating of my decision did
10   not reach the merits.  It simply instructed me to consider the
11   audio recording of the interview of Duncan Freeland.
12   Obviously, I can do that without further submissions and run
13   it through the -- hopefully the proper analysis.  But if you
14   wish to be heard further, I'll allow it.
15                   Attorney Carey, do you wish to supplement?
16             MR. CAREY:  Yes.  Yes, Your Honor.
17             THE COURT:  All right.  Why don't we -- Attorney
18   Raynor, do you have any problem doing simultaneous briefing so
19   I can move this along, or do you need to see what he --
20             MR. RAYNOR:  I have no problem with simultaneous
21   briefing, but I don't see the point of briefing at this point.
22   I mean, to me --
23             THE COURT:  Well, I've indicated I'm going to hear
24   it.
25             MR. RAYNOR:  Okay.
```

```
1              THE COURT:  You know, if --
2              MR. RAYNOR:  Sure.
3              THE COURT:  The Court wishes to be fully informed on
4    these issues.
5              MR. RAYNOR:  Understood, Your Honor.  Understood.
6              THE COURT:  So I will stagger the briefing, then.
7                 Attorney Carey, how much time do you need?
8              MR. CAREY:  I hate to do this, Judge, but I need 30
9    days.  I've got separate daughters moving to two separate
10   cities in a couple of weeks.
11             THE COURT:  That's actually one of the better
12   justifications for 30 days I've heard.
13             (Discussion held off the record.)
14             THE COURT:  30 days is fine.  And to be equitable,
15   Attorney Raynor, how about 30 days after that to file your
16   response?
17             MR. RAYNOR:  That would be fine.
18             THE COURT:  All right, then.
19                 All right.  I always -- your first time, I
20   think arguing in person, Attorney Raynor, but --
21             MR. RAYNOR:  Yes, it is.
22             THE COURT:  I always enjoy my arguments with
23   Attorney Carey, because we take the deep dive.
24             MR. RAYNOR:  I see.  I see that, Judge.
25             THE COURT:  All right.  Thank you both.
```

1          (Discussion held off the record.)

2          THE COURT:  I previously admitted -- or, excuse me,

3  previously identified the transcript of the interview of

4  Duncan Freeland prepared by Ms. Ferguson as Court Exhibit 1.

5  Recognizing that the actual audio recording ultimately

6  controls, and that neither transcript -- neither party is

7  bound by either transcript, for the convenience of the

8  parties, since it's been identified, I'm going to file the

9  transcript of record as a court note so you're aware that it

10  exists and that so that our record is complete.

11          Fair enough?

12          MR. CAREY:  Yes.

13          MR. RAYNOR:  Yes, Your Honor.

14          (Discussion held off the record.)

15          THE COURT:  I had always assumed, gentlemen, that as

16  part of the Court of Appeals remand and instructions and

17  mandate, that it effectively reopened the Motion to Dismiss.

18  In other words, it would be ministerial on our part to

19  reactivate that motion rather than maybe refile a new one,

20  because the Court said, look, you should have considered this

21  in connection with the motion; you know, it's coming back,

22  this time consider it.  So I think that effectively reopens

23  the motion, and I'm allowing supplemental briefing.

24          MR. CAREY:  Right.  That's how I saw it, was that

25  the motion is back on the table.  And I intend to limit my

 1  brief to the issues discussed today, even if we did go beyond

 2  what I think was intended.  So, yeah, I see it the same way.

 3           THE COURT:  I think it -- yeah.  Well, look, on the

 4  Motion to Dismiss, I'm not going to tell anyone how to handle

 5  that, because I haven't thought it through and that's really

 6  for, you know, your judgment.

 7           MR. CAREY:  There may be some overlap back into

 8  the -- back into the issues in the motion itself, but I'm

 9  going to try and limit it, for the most part, to what we've

10  gone over today.

11           THE COURT:  All right, very well.

12           All right.  Attorney Raynor, anything further

13  for the benefit of the Court at this time?

14           MR. RAYNOR:  Well, just that I'm from a different

15  part of the country, so I'm going to have to rein in my

16  accent, and I will next time.  I promise.

17           THE COURT:  Attorney Raynor, we were able to follow

18  you, but you Philadelphians just -- you don't talk like us

19  yins Pittsburghers.

20           MR. RAYNOR:  Not quite.

21           THE COURT:  Yeah, that's fine.

22           And I wanted to mention to you, in further

23  arguments, given your distance, unless there's an objection, I

24  would allow any lawyer to argue by video.

25           Now, here, this was an evidentiary hearing, so

1    you had to be here.  But arguments, you know, I'm not -- if

2    Attorney Carey were even coming from Pittsburgh, I wouldn't

3    make him come up here.  I certainly not going to make you come

4    from Philadelphia for an argument.

5              MR. RAYNOR:  Thank you, Your Honor.

6              THE COURT:  All right, then.  Thanks, everyone.

7    Have a nice weekend.  We'll be adjourned.

8                   (Hearing concluded at 11:45 a.m.)

9

10

11                   C E R T I F I C A T E

12        I, JANIS L. FERGUSON, RPR, CRR, certify that the
     foregoing is a correct transcript from the record of
13   proceedings in the above-entitled case.

14

15   \S\  Janis L. Ferguson          08/15/2022
     JANIS L. FERGUSON, RPR, CRR     Date of Certification
16   Official Court Reporter

17

18

19

20                   I N D E X

21   WITNESSES                                PAGE:

22   JARED MICHAEL FRUM

23        Direct examination by Mr. Carey        23
          Cross-examination by Mr. Raynor        34
24        Redirect examination by Mr. Carey      50

25

78