IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KOBE PINKNEY, | ) ) ) | Case No. 1:19-cv-00167 (Erie) |
| Plaintiff | ) ) | |
| v. | ) ) | RICHARD A. LANZILLO Chief United States Magistrate Judge |
| MEADVILLE, PENNSYLVANIA, et al, | ) ) ) | OPINION ON DEFENDANT JARED |
| Defendants | ) ) ) | FRUM'S MOTION TO DISMISS (ECF NO. 86) |

## I.   Introduction

Plaintiff Kobe Pinkney commenced this action against Jared Frum, a police officer

employed by the City of Meadville, Pennsylvania, Police Department, and other defendants

alleging, among other claims, that Officer Frum arrested him without probable cause in violation

of his rights under the Fourth Amendment to the United States Constitution.[1]  Pinkney's Second

Amended Complaint ("SAC") seeks redress of this violation pursuant to 42 U.S.C. §1983.

Officer Frum moved to dismiss Pinkney's clams against him, including Pinkney's false arrest,

false imprisonment, and malicious prosecution claims, pursuant to Fed. R. Civ. P. 12(b)(6).  He

argued that these three claims failed as a matter of law because probable cause supported the

criminal charges Officer Frum initiated against Pinkney and, alternatively, qualified immunity

shields him from these claims.

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636.  ECF Nos. 39, 40, 45, 48, 51, 52.

The Court denied Officer Frum's motion as to Pinkney's false arrest, false imprisonment, and malicious prosecution claims, and Officer Frum appealed the denial of qualified immunity to the United States Court of Appeals for the Third Circuit. Without reaching the merits of Officer Frum's qualified immunity defense, the Court of Appeals vacated this Court's Order on the grounds that the Court should have considered an audio recording of a witness, Duncan Freeland, in deciding the motion and remanded the case for further consideration.[2] *See* ECF No. 112; *Pinkney v. Meadville, Pennsylvania*, 2022 WL 1616972 (3d Cir. May 23, 2022). Having reviewed the audio recording of the Freeland interview as well as the allegations of the SAC and the exhibits thereto, the Court will again deny Frum's motion.

## II.   Procedural History

The procedural history of this case before remand from the Court of Appeals is set forth in the Court's prior Opinion and Order on Officer Frum's motion to dismiss. *See* ECF No. 106. In summary, by prior orders, the Court dismissed all claims against all defendants except Officer Frum and the City of Meadville. *See* ECF Nos. 70, 71, 81, 106, 107. The sole remaining claim against the City of Meadville is a state law conversion claim over which this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a). *See* ECF No. 106. This claim was previously addressed and not presently before the Court. *Id*. The only remaining claims against Officer Frum are Pinkney's false arrest, false imprisonment, and malicious prosecution claims,

---

[2] The recording of Freeland's interview was referenced in an investigation report prepared by Officer Frum. Pinkney appended the investigation report to his SAC (ECF No. 83-1), and Frum later produced the audio recording in connection with his motion to dismiss. ECF No. 93. Pursuant to the remand instructions and Mandate of the Court of Appeals, the Court conducted an evidentiary hearing to determine whether Pinkney had waived his right to challenge the authenticity of the recording of Officer Frum's witness interview of Freeland, and if he had not, whether the recording is, in fact, authentic and complete. *See* ECF Nos. 113, 116, 121. Based on the evidence adduced at that hearing, the Court found that Pinkney did not waive his right to challenge the audio recording. The Court further found that the recording is indisputably authentic but not indisputably complete. ECF No. 125.

which are the subject of his pending motion. *Id.* Pinkney's operative pleading is his SAC. ECF No. 83.

### III.   Standard of Review and Scope of Record

#### A.   Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, (2009). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 (rejecting the traditional Rule 12 (b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41 (1957)). In making this determination, the court must accept as true all well-pled factual allegations in the complaint and view them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). The court may also "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

While a complaint does not need to include detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing

3

*Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint.  *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).  Nor must the court accept legal conclusions disguised as factual allegations. *Twombly*, 550 U.S. at 555.  *See also McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

### B.  Scope of Record

As a preliminary matter, the Court must address which materials comprise the record on Officer Frum's motion to dismiss.  This is necessary because Officer Frum has filed numerous documents, affidavits, and other materials, many of which are not properly considered on a motion pursuant to Fed. R. Civ. P. 12(b)(6).  Officer Frum has not requested that the Court convert his motion to one for summary judgment and, to the extent his filing of such materials is an implied invitation to do so, the Court declines.[3]

When ruling upon a motion to dismiss pursuant to Rule 12(b)(6), the court must "generally consider only the allegations in the complaint, exhibits attached to the complaint,

---

[3] "The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citation omitted).  A properly filed motion for summary judgment includes procedural requirements that ensure that the party opposing the motion has a reasonable opportunity to respond to the moving party's assertions of fact.  These procedural requirements include that the moving party file a concise statement of material facts with supporting evidence, in response to which the party opposing the motion files a responsive concise statement in which he admits or denies each such assertion of fact, states additional facts relevant to the matter, and provides evidence in support of his denials and additional facts. LCvR 56(B), (C); Fed. R. Civ. P. 56(c).

matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361

F.3d 217, 222 n.3 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1426 (3d Cir.1997)). As this summary indicates, "the court may consider certain narrowly

defined types of material without converting the motion to dismiss to a summary judgment

motion, such as a document that is integral to or explicitly relied upon in the complaint." *Jones*

*v. Middletown Twp.*, 253 Fed. Appx. 184, 187 (3d Cir. 2007) (citing *In re Rockefeller Center*

*Properties, Inc. Securities Litig.*, 184 F.3d 280, 287 (3d Cir.1999)). Such materials also include

"an undisputedly authentic document that a defendant attaches as an exhibit to a motion to

dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White*

*Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). However, the Court may not consider

"extraneous evidence submitted by the defense" when ruling on a motion to dismiss. *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F. 3d at 1426.

The following materials filed by Officer Frum are properly considered as part of the

record on his motion:

- The criminal complaint and affidavit of probable cause that Officer Frum submitted on April 11, 2019, charging Pinkney with aggravated assault, simple assault, harassment, and disorderly conduct. *See* ECF No. 86-1. Pinkney also attached these documents to his SAC and explicitly relied upon them in support of certain of his claims. ECF No. 83-1, pp.4-5;

- Officer Frum's investigation report concerning the assault on Rhett Happel. Pinkney also attached this report to his SAC (ECF No. 83-1, pp.1-3) and relied upon it in support of certain of his claims; and

- The audio recording of Officer Frum's interview of Duncan Freeland on April 10, 2019. ECF No. 86-4. This interview was referenced in Officer Frum's investigation report, which Pinkney attached to his SAC. ECF No. 83-1, p.3. Although the Court has determined that the audio recording is not indisputably complete, the recorded portion of the interview is authentic and, therefore,

properly part of the record.[4]  *See* ECF No. 125.

The following materials appended to Officer Frum's motion and briefs are extraneous to

the pending motion and are not properly part of the record for its resolution:

- An affidavit that Officer Frum prepared and submitted in support of his motion to dismiss and in which he makes representations concerning the contents of an unproduced report prepared by another officer. *See* ECF No. 86-3, ¶7.

Officer Frum's reliance upon this affidavit and the hearsay-on-hearsay it includes in

support of his motion to dismiss is improper on multiple levels.  First, an affidavit is not properly

considered on a motion pursuant to Fed. R. Civ. P. 12(b)(6).  *See Rose v. Bartle*, 871 F.2d 331

(3d Cir. 1989).  Second, the affidavit purports to quote from another officer's report despite that

Pinkney has never relied upon or referenced that report in his original, amended, or second

amended complaints.  Third, while Officer Frum's affidavit asserts that he is quoting the

"pertinent part" of the other officer's report, he did not attach the report to his affidavit or

otherwise produce it to the Court or Pinkney.  *See* ECF No. 86-3, ¶7.  Thus, Officer Frum seeks

to have the Court consider his hearsay representations concerning selected portions of a

document prepared by another officer (and not cited or relied upon by Pinkney) without

disclosure of the document itself.  This tactic is facially improper.

- A search warrant, supporting affidavit of probable cause, and search inventory ("Search Warrant Documents") issued after Pinkney's arrest and pursuant to which a ring apparently worn by Pinkney was seized. ECF No. 86-2, pp. 1-3.

---

[4] Counsel for Officer Frum submitted a transcript of the audio recording of Officer Frum's interview of Freeland during a hearing and argument conducted by the Court on July 15, 2022.  The Court's official court reporter also prepared a transcript of the audio recording of the interview.  Upon reviewing the two transcripts, the Court found several material discrepancies between them.  This prompted the Court to again carefully listen to the audio recording to ascertain the accuracy of the transcripts.  The Court found one error in the official court reporter's transcript.  This was the addition of the word "did" on line 18 of page 4 of the transcript.  At the Court's request, the Court's official court reporter again reviewed the audio recording.  Upon doing so, she confirmed that the addition of "did" was erroneous and issued a corrected transcript, which the Court has filed at ECF No. 124.  The transcript submitted by Officer Frum's counsel included several significant errors, certain of which materially changed the substance of Freeland's statements.  Therefore, the Court will rely exclusively upon its review of the actual audio recording and its official court reporter's transcript.

This search warrant and supporting affidavit of probable cause were prepared and submitted by Assistant Chief Michael D. Stefanucci on April 11, 2019, after Pinkney's arrest. Although Pinkney referred to the results of a search performed pursuant to a warrant in his SAC (ECF No. 83, ¶¶61, 156-158), he attached neither of these documents to his SAC and relied upon neither as a basis for his claims. As alleged in the SAC, the results of the search constituted some of the evidence gathered by the police immediately after his arrest that exonerated him from the assault on Happel. ECF No. 83, ¶158.

- A photo of Jared Shaw and Kobe Pinkney that Officer Frum appended to his motion to dismiss. ECF No. 86-2, p. 4.

Officer Frum filed this photograph as an attachment to his motion to dismiss Pinkney's amended complaint (ECF No. 55-2) and again as an exhibit to his pending motion to dismiss the SAC. ECF No. 86-2, p. 4. Although Pinkney's complaint, amended complaint, and SAC discuss a Facebook photograph, Pinkney's pleadings never identified the photograph or attached the photograph produced by Officer Frum as the one in question. *See* ECF Nos. 1, 49, 50, 83, 95, 105, 123. Officer Frum presented a photograph as if it was a part of the Search Warrant Documents he filed as an exhibit to his motion to dismiss, but the record does not support that it was, in fact, a part of those documents. The photograph produced by Officer Frum is not indisputably authentic and the Court has no basis to conclude that this photograph is the same photograph Pinkney mentioned in his pleadings. Rather than being a document on which Pinkney bases his claims, the photograph referenced in his pleadings, once properly identified and authenticated, may be considered as one piece of the evidence to be considered in evaluating the merits of those claims. *See Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 441–42 (6th Cir. 2012) (discussing the difference between documents that have independent legal significance, such as a contract, and those that evidentiary but not conclusive weight).

- A transcript of the evidentiary hearing conducted by the Court on July 15, 2022, which Officer Frum attached to his supplemental brief. ECF No. 122.

The purpose of the July 15, 2022 hearing was to determine whether the audio recording of Officer Frum's August 10, 2019 interview of Duncan Freeland was authentic and complete. *See* ECF Nos. 113, 121, p. 2. It was not a mini-trial on the merits of Pinkney's claims or an opportunity for any party to add their un-scrutinized testimony to the record properly considered on a motion to dismiss. Yet, Officer Frum attached the entire transcript of the hearing to a supplemental brief filed after the hearing and repeatedly referred to his own hearing testimony in support of his motion to dismiss. ECF Nos. 122-1, 122-2. The Court will not consider the hearing transcript or Officer Frum's representations based on that hearing when assessing the instant motion. *See In re Burlington Coat Factory*, 114 F.3d 1410, 1424–25 (district court improperly "cite[d] to an affidavit proffered by Defendants" when it decided Defendants' motion to dismiss). To do otherwise would not only contravene the Federal Rules of Civil Procedure and well-established precedent, but it would also be fundamentally unfair and prejudicial to Pinkney.[5]

---

[5] Officer Frum has attempted to selectively add portions of the police investigation file as support for his motion. For example, Officer Frum's improperly submitted affidavit in support of his motion purports to quote the "pertinent part" of another officer's investigation report that he says he considered in deciding to file the charges but did not include in his affidavit of probable cause. *See* ECF No. 86-3, ¶7. While making representations concerning the content of this investigation report, Officer Frum did not attach or produce a copy of it. Officer Frum also disclosed during the hearing on the authenticity of the Freeland interview recording that additional investigation materials generated before Officer Frum charged Pinkney remain to be disclosed. *See* ECF No. 121, p. 47. Officer Frum may not pick and choose what extraneous materials to add to the record, and certainly may not do so to the exclusion of other potentially relevant materials. As discussed below, the Court is required to evaluate probable cause based on the totality of the circumstances known to the officer, including any exculpatory information. This "necessarily fact-intensive" evaluation, *see Harvard v. Cesnalis*, 973 F.3d 190, 200 (3d Cir. 2020), is frustrated where the totality of circumstances known to the officer is only selectively disclosed.

8

IV.     **Material Facts**

The following facts derive from Pinkney's SAC, the exhibits thereto, and the audio

recording of the Freeland interview.  Except where contradicted by the audio recording, the facts

alleged in the SAC are considered as true for purposes of the pending motion.

Pinkney, then a junior at Allegheny College, was attending a philosophy lecture on

April 11, 2019, when Officer Frum and personnel from the Allegheny College security

department entered his classroom and placed him under arrest for various criminal offenses

arising out of a violent assault upon an individual named Rhett Happel at a local bar during the

early morning of April 7, 2019.  ECF No. 83, ¶44.  Pinkney's arrest was made pursuant to a

warrant issued based on an affidavit of probable cause prepared and submitted by Officer Frum.

*See* ECF Nos. 86-1, pp. 5-6; 55-1.  Before a preliminary hearing could be conducted on the

charges, however, the Commonwealth of Pennsylvania withdrew all charges against Pinkney.

ECF No. 83, ¶59.  The material facts concerning Officer Frum's preparation and submission of

the affidavit of probable cause upon which Pinkney's arrest was based are detailed below.

On April 7, 2019, at approximately 1:30 am, Officer Frum was on patrol near the

Meadville Academy Theatre when he observed four men walking near an establishment known

as Julian's Bar.  *Id.*, ¶24.  Two of the men were carrying a third man, later identified as Rhett

Happel.  Officer Frum observed that Happel had sustained serious injuries to his face and

summoned an ambulance to the scene.  *Id.*, ¶¶25, 28.  While the group waited for the ambulance

to arrive, one of the men volunteered that he believed that Happel had been assaulted and that the

attack had been motivated by a report that Happel had drugged a female patron of Julian's Bar

who the police had found unconscious in the bathroom of that establishment the previous night.

*Id.*, ¶¶26-27; ECF No. 83-1, p. 1-2.

9

According to an investigation report prepared by Officer Frum, another officer interviewed the bartender at Julian's Bar, Kristen Ferguson, shortly after the attack. She reported that Chloe[6], "the female [who Happel allegedly drugged] last night was the one that punched Happel" while both were present in the bar. ECF No. 83-1, p. 2. Officer Frum's report further recorded, however, that he personally spoke to Ferguson by telephone during the evening of April 7, and that she stated that "after thinking about it she could not say for sure that it was the female [Chloe]" who struck Happel, although she did recall that on the night of the assault Chloe identified Happel as the person who drugged her ("the female stated that was him" as Happel walked by them in the bar) and that "out of her peripheral vision she saw what looked to be a fight" and then "saw Happel on the ground." *Id.* Ferguson did not identify Pinkney or anyone matching his description as involved in the assault or present in Julian's Bar on the night of the assault, at least the report includes nothing to indicate that she did so. *See id.*; ECF No. 83, ¶¶ 37-39. According to the SAC, Chloe and another individual named Jared Shaw had followed Happel to the men's bathroom where Happel was attacked. ECF No. 83, ¶39.

Officer Frum's report states that he next spoke by telephone with Happel and his mother and father and that "[t]hey gave [Officer Frum] the names of Jared Shaw and Joe Hayes as two individuals that threatened [Happel] at approximately 13:00 hours [1:00 pm] on April 6, 2019," approximately twelve hours before the assault upon Happel. *Id.* Officer Frum recorded that Happel told him that Shaw had questioned him and "said he was going to hit him" and that "Shaw's friends had to push him away." ECF No 83-1; ECF No. 83, ¶36. Happel did not identify Pinkney or anyone matching his description as being present during this confrontation or

---

[6] Neither the SAC nor Officer Frum's investigation report includes Chloe's last name, but Officer Frum has acknowledged that he was aware during the investigation of the attack on Happel that Chloe's last name is Najjar. *See* ECF No. 86-3, ¶3. Because the SAC and Officer Frum's report refer to this individual only as "Chloe," the Court will do the same.

in Julian's Bar at any time on April 6-7, 2019, at least the report includes nothing to indicate that

he did so. *See id.*

Officer Frum's report also records that the police later obtained surveillance video from

Julian's Bar and that "Sgt. Gredler advised that there was no camera angle that covered the

hallway where the incident took place…." ECF No. 86-1. The report further notes, however,

that multiple cameras were present in the bar and that the owner would try to provide video from

those cameras. *Id*. Officer Frum's report includes no information indicating that the video

surveillance recordings showed Pinkney or anyone matching his description present at Julian's

Bar on April 6-7, 2019. According to the SAC, a video surveillance recording from Julian's Bar

was obtained after Pinkney's arrest. ECF No. 83, ¶62. The video did not show Pinkney in the

bar on the night of the assault but did show Happel and a black male named Josiah Williams in

the bar. *Id.* Unlike Pinkney, Williams wore his hair in braids. *Id.*

Three days after the assault, on April 10, 2019, Officer Frum interviewed Duncan

Freeland, a Residential Advisor and student at Allegheny College who indicated that he was

present at Julian's Bar on the night of the assault. *Id*., ¶29. Officer Frum conducted the

interview at the Allegheny College Public Safety Building. *Id*. According to the SAC, Freeland

told Officer Frum that the assailant was an African American male, approximately six feet tall,

with braided hair, who walked up to Happel when he was in the bathroom of Julian's Bar, tapped

Happel's shoulder from behind and then punched Happel on the left side of his face as Happel

turned around. *Id*., ¶30. According to Freeland, the assailant walked to another area of Julian's

Bar and later exited the establishment. *Id*., ¶31.

After the assault, Freeland was contacted by Happel's friend, Evan Haines, who sent

Freeland a Facebook photo of Jared Shaw, the white male who had threatened Happel earlier on

April 6.  The photograph also included a black male, later identified as Pinkney.  *Id.*, ¶32.  Both

Shaw and Pinkney are football players at Allegheny College.  *Id.*, ¶35.  During his interview,

Freeland told Officer Frum that the black male (Pinkney) depicted in the photograph "looked an

awful lot like who I saw throw the punch at the bar."[7]  *Id.*, ¶33; ECF No. 124, p. 4, lines 1-3.

Haines showed Freeland two additional photographs of Shaw and Pinkney together, and "both

times the witness described the Pinkey (sic) as having shorter hair than the assailant."  ECF No.

83, ¶34 (citing ECF No. 83-1, p. 2).  In contrast to the description provided by Freeland, Pinkney

has never worn his hair in braids and is not six feet tall.[8]  *Id.*, ¶¶ 54, 64, 92.

The audio recording of Officer Frum's interview of Freeland is materially consistent with

the allegations of Pinkney's SAC.  However, the precise words used by Freeland and Officer

Frum during the interview are significant.  After Freeland acknowledged that he had been shown

a single picture that included Pinkney, a black man, and Jared Shaw, who Officer Frum already

knew to be the white male who had threatened Happel earlier that day, Freeland stated that "I

recognized Kobe [Pinkney] as looking an awful lot like who I saw throw the punch at the bar."

ECF No. 124, p. 4, lines 2-3.  When Officer Frum asked Freeland whether Pinkney, as shown in

the photograph, had braids like the assailant, Freeland stated, "Looked like he had something, so

maybe."  *Id.*, p. 4, line 6.  Officer Frum then stated: "Similar to what he had on Saturday night,"

to which Freeland responded, "Yeah."  *Id.*, p. 4, lines 7-8.  Then, Freeland volunteered that he

reviewed two other photographs that included Pinkney and specifically advised Officer Frum

that Pinkney, as shown in those additional two photographs, had shorter hair than Happel's

---

[7] The SAC alleged that Freeland stated that the images of Pinkney in one or more of the pictures "looked a lot like" the assailant. ECF No. 83, ¶33.  As noted below, the audio recording of the interview records that Freeland stated that Pinkney "looked an awful lot like" the person who struck Happel.

[8] The SAC does not identify Pinkney's actual height.

attacker. *Id.*, p. 4, lines 10-12. In response to this information, Officer Frum stated: "And all three of them look like the gentleman who was at the bar Saturday night?" *Id.*, p. 4, lines 18-19. Freeland then responded, "Minus the hair in the last two, but yeah." *Id.*, p. 4, line 20. Immediately after this response, Officer Frum stated: "Okay. Those same facial features, same--," to which Freeland again responded, "Yeah." *Id.*, p. 4, lines 21-22. Officer Frum's statement to Freeland was the first and only reference to "facial features" during the interview. Freeland did not describe the attacker's facial or other features during the interview or contrast how they were similar or dissimilar to Pinkney's, and Officer Frum never asked him to do so. Officer Frum also did not ask Freeland to identify the picture or pictures in which Pinkney's hair style or length matched that of the assailant. *Id.*, p. 4, lines 9-17. In fact, nothing in the transcript of the interview supports that Officer Frum or Freeland examined or even possessed any of the three photographs at the time of the interview.

Officer Frum then stated: "Okay. And—but you said you just seen him tap Rhett on the shoulder, Rhett looked around. You had seen Kobe [Pinkney] throw the punch." *Id.*, p. 5, lines 3-5. Freeland once again responded, "Yeah." *Id.*, line 6. In fact, the audio recording confirms that Freeland did not say he saw Pinkney throw the punch, only that the image of Pinkney in a picture "looked an awful lot like" who he saw throw the punch.

Freeland also stated that he "was standing in line at the bathroom" of Julian's Bar when he saw the attack. *Id.*, p. 2, line 16. Officer Frum did not ask Freeland any questions regarding his opportunity to observe the incident, such as how long he observed the assailant or his distance from him or Happel, the lighting or crowd size in the bar, or the identity of other persons who may have witnessed the assault. Officer Frum also did not ask Freeland whether

other patrons were also standing in line with him and, if so, whether he knew their names. He also did not ask whether any individuals were between him and the assault. *Id.*, *passim*.

Officer Frum's investigation report also records that he was aware of another individual who had been identified as a witness to the incident, Chioma Alaka. *See* ECF No. 83-1. His report records that, on the same day he interviewed Freeland, he left messages by telephone and through the Allegheny College Public Safety Office for Alaka to contact him to schedule a time for her to provide a statement. *Id.* Officer Frum's report further relates, however, that he filed charges against Pinkney the following day, without speaking with Alaka.

On April 11, 2019, Officer Frum filed a criminal complaint and affidavit of probable cause against Pinkney charging him with aggravated assault in violation of 18 Pa. C.S.A. § 2702(a)(1), simple assault in violation of 18 Pa. C.S.A. § 2701 (a)(1), harassment in violation of 18 Pa. C.S.A. § 2709(a)(1), and disorderly conduct in violation of 18 Pa. C.S.A. § 5503(a)(1). *See* ECF No. 86-1. Officer Frum's affidavit of probable cause stated that a witness had described Happel's attacker as "an African American male approximately six feet tall with braided hair" and implied that multiple eyewitnesses had identified Pinkney as the assailant:

> On April 10, 2019, at approximately 16:30 hours, I interviewed a witness [now known to be Freeland] at the Allegheny College Public Safety building. The witness provided an audio recorded statement and stated that they were standing in line for the bathroom. *They stated* that an African American male *approximately six feet tall with braided hair* walked up to Happel. *They stated* that he then tapped Happel on the shoulder and when Happel looked around the male punched him once in the left side of the face. *They stated* that the male then walked to the town tavern side of the establishment. They stated a short time later they walked into that area and did not see the male anymore.
>
> The witness stated that they were contacted by Happle's (sic) friend, Evan Haines, and was sent picture of a white male and a black male. *they* recognized the white male as Jared Shaw and the

14

> black male as Kobe Pinkney. *they recognized Pinkney as the black
> male that punched Happel*. *They stated* that Haines sent two more
> pictures and they were both pictures of Pinkney.

ECF No. 55-1, p. 6 (emphasis added).

Pursuant to the criminal complaint and affidavit of probable cause, a warrant for
Pinkney's arrest was issued on April 11, 2019.  That same day, Allegheny College Police
Sergeant William Merchbaker removed Pinkney from a philosophy lecture, and Officer Frum
placed him under arrest. *Id.*, ¶44.  Pinkney was taken before Crawford County Magisterial
District Judge Samuel V. Pendolino and arraigned on the charges of aggravated assault, simple
assault, harassment, and disorderly conduct. *Id.*, ¶46.  Judge Pendolino set bail at $5,000.00. *Id.*,
¶47.

Immediately after Pinkney's arrest, several witnesses came forward attesting to his
innocence and non-involvement in the assault upon Happel. *Id.*, ¶¶45, 49-56.  At least one such
witness stated that he was present in Julian's Bar on the night of the assault and that he did not
observe Pinkney in the bar.  This witness went on to identify another individual, Josiah Williams,
as the likely assailant. *Id.*, ¶50.  Williams is a black male who, unlike Pinkney, wore his hair in
braids. *Id.*  This information and other exculpatory evidence were relayed to Assistant Chief of
Police Michael Stefanucci. *Id.*, ¶¶51-56.

Shortly before Pinkney's preliminary hearing, another witness provided an affidavit to
Pinkney's criminal defense lawyer stating that he was present outside of Julian's Bar during the
early morning hours of April 7, 2019.  He further attested that he saw Josiah Williams approach
the men carrying Rhett Happel from the bar and heard him tell the men that he was the person

who beat up Happel. According to the witness, Williams then threatened to fight the entire group. *Id.*, ¶57.

On May 15, 2019, before Pinkney's defense counsel could provide the exculpatory evidence to the Meadville Police Department, the Commonwealth withdrew all charges against Pinkney. Pinkney believes this decision was based upon the Commonwealth's own investigation. *Id.*, ¶59. "Apparently, Defendant Freeland got cold feet and recanted his allegation that [Pinkney] looked like the assailant that assaulted Rhett Happel." *Id.*, ¶60. The investigation that exonerated Pinkney also included forensic testing results from a ring that police had confiscated from Pinkney based upon suspicion it was "a foreign object utilized in the assault against Happel." *Id.*, ¶61. The test results were negative for any evidence implicating Pinkney. *Id.* The exculpatory evidence also included the video surveillance recording obtained from Julian's Bar, which showed the presence of Happel and Williams, but not Pinkney, in the establishment on the night of the assault. *Id.*, ¶62.

In reviewing the material facts relevant to the pending motion, it is necessary to address several factual assertions made by Officer Frum in his supplemental brief that have no support in the record properly before the Court. *See* ECF No. 122, pp. 5-7, 9, 11. These assertions are that (1) Chief Tautin directed Officer Frum to talk to Freeland and told him that Freeland had recognized Pinkney in photographs sent to him by Haines; (2) Freeland had "prior knowledge and familiarity" with Pinkney and this history factored into Frum's questioning and credibility assessment; (3) "prior to Rhett Happel's assault, there was an incident at a frat party between Jared Shaw, Kobe Pinkney and another person"; (4) Pinkney had motive because of the "back story," which consists of the unsubstantiated frat party incident, Pinkney's unsubstantiated friendship with Shaw, and the alleged date rape of Shaw's girlfriend; and (5) Officer Frum also

"relied upon the District Attorney's independent determination that probable cause existed." *Id.* Officer Frum relies upon his testimony during the hearing on July 15, 2022, to support most of these undeveloped and untested factual assertions. As previously discussed, the purpose of that hearing was to determine whether the audio recording of the Freeland interview was authentic and complete. None of the foregoing factual assertions are included in Officer Frum's affidavit of probable cause, his investigation report, the audio recording of Freeland's interview, or any other material properly considered on Officer Frum's motion to dismiss. Accordingly, the Court will not consider any of Officer Frum's factual assertions based on his testimony during the hearing of July 15, 2022.

Officer Frum also makes misleading and unsupported representations concerning the application for a search warrant and affidavit of probable cause relating to a ring owned by Pinkney. As noted, these documents are not properly part of the record on Officer Frum's motion to dismiss because Pinkney did not attach or rely upon them in his SAC. Nevertheless, Officer Frum states that "[a] copy of the first photo relied upon by Duncan Freeland to identify Kobe Pinkney was attached to the Application and/or Affidavit of Probable Cause." ECF No. 86, ¶ 35. The application and affidavit of probable cause for a search warrant was submitted by a different officer *after* Pinkney was arrested as evidenced by the other officer's signature on the application and its reference to Pinkney previously being "taken into custody." *See* ECF No. 86-2. Thus, the Search Warrant Papers are not part of the record on Officer Frum's motion or relevant to the motion. Furthermore, Officer Frum's assertion that a photograph of Pinkney was submitted with the application for a search warrant is unsupported by the Search Warrant Documents themselves. Neither the application nor the affidavit of probable cause for the search warrant states that a photograph was attached to or otherwise submitted with those papers.

Instead, Officer Frum cites to the affidavit he improperly filed on May 20, 2020, ECF No. 86-3, as evidence that a particular photograph was submitted with search warrant papers.  ECF No. 86, ¶ 35 (citing Exhibit 3, filed at ECF No. 86-3).  This affidavit includes no reference whatsoever to the search warrant or the photograph.  *See* ECF No 86-3.

V.    **Pinkney's Legal Claims**

Pinkney's SAC included five counts that named Officer Frum as a defendant:[9]

| | |
|---|---|
| Count I | False Arrest; |
| Count III | False Imprisonment; |
| Count IV | Malicious Prosecution; |
| Count IV-A | Violation of Title VI of the Civil Rights Act of 1964, 1972, 42 U.S.C. §2000d, and the Equal Protection Clause of the Fourteenth Amendment; and |
| Count VI | Intentional Infliction of Emotional Distress under Pennsylvania State Law. |

The Court previously dismissed Counts IV-A and VI (*see* ECF No. 106), which leaves only Pinkney's false arrest, false imprisonment, and malicious prosecution claims pending against Officer Frum.  Officer Frum's brief in support of his motion to dismiss argues that all three claims fail as a matter of law because the SAC, the exhibits thereto, and the recorded interview of Freeland establish that probable cause existed for Officer Frum's arrest of Pinkney as a matter of law.  Alternatively, Officer Frum argues that qualified immunity shields him from these claims.

---

[9] The SAC does not include a Count II.  It does include two counts label as "Count IV," one for malicious prosecution and the other asserting violations of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment.  The Court previously dismissed Pinkney's Civil Rights Act/Equal Protection claim, which the Court has labeled as Count IV-A to avoid confusion.  "Count IV" as used in this Opinion refer to Pinkney's malicious prosecution claim.

VI.    **Analysis**

A.    **The legal viability of Pinkney's false arrest, false imprisonment and malicious prosecution claims hinges on whether the charges against him and his resulting arrest were supported by probable cause.**

"To bring a claim for false arrest, a plaintiff must establish '(1) that there was an arrest; and (2) that the arrest was made without probable cause.'" *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012)). Similarly, to state a claim for false imprisonment, a plaintiff must establish: (1) that he was detained; and (2) that the detention was unlawful. *James*, 700 F.3d at 682 (citing *Wallace v. Kato*, 549 U.S. 384, 389 (2007)). "[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995). Conversely, "[f]alse arrest and false imprisonment claims will 'necessarily fail if probable cause existed for any one of the crimes charged against the arrestee.'" *Harvard*, 973 F.3d at 199 (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 477 (3d Cir. 2016)).

"To prevail on a malicious prosecution claim, a plaintiff must demonstrate that: '(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.'" *Harvard*, 973 F.3d at 206 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). *See also Stafford v. Morris*, 816 Fed. Appx. 712, 715 (3d Cir. 2020) (citing *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005)). Thus, the absence of probable cause is an essential element of each of the foregoing claims. Officer Frum's sole

19

challenge to the sufficiency of Pinkney's factual allegations to state a claim is that they fail to support the absence of probable cause.[10]

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Dempsey*, 834 F.3d at 467 (citation omitted). Probable cause is assessed based upon the "totality-of-the-circumstances" available to the arresting officer. *Harvard*, 973 F.3d at 200 (citing *Dempsey*, 834 F.3d at 467-68).

As part of this assessment, the Court "must determine whether the plainly exculpatory evidence available to the arresting officer 'outweighs the probable cause otherwise established' through inculpatory evidence." *Harvard*, 973 F.3d at 200 (citing *Dempsey*, 834 F.3d at 478, 490). Because this totality-of-the-circumstances inquiry is "necessarily fact-intensive," whether probable cause existed is normally a question for the jury. *Id.* (citing *Dempsey*, 834 F.3d at 468; *Merkle*, 211 F.3d at 788) ("Generally, the question of probable cause in a section 1983 damage suit is one for the jury.") (internal quotation marks and citation omitted). The analysis of probable cause is to be undertaken on a crime-by-crime basis. *Harvard*, 973 F.3d at 200.

As noted, the criminal complaint and affidavit of probable cause charged Pinkney with aggravated assault, simple assault, harassment, and disorderly conduct. Under Pennsylvania law "[a] person is guilty of aggravated assault if he: (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life...." 18 Pa. C.S.A. § 2702(a)(1). A

---

[10] The related legal issue presented by Frum's assertion of qualified immunity is addressed, *infra*.

person is guilty of simple assault "if he: (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." 18 Pa. C.S.A. § 2701(a)(1). A person is guilty of "harassment when, with intent to harass, annoy or alarm another, the person: (1) strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same." 18 Pa. C.S.A. § 2709(a)(1). "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly created a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 42 Pa. C.S.A. § 5503.

Based on the foregoing elements, the sufficiency of Officer Frum's affidavit of probable cause and legality of the resulting arrest of Pinkney for the offenses charged turns on whether probable cause existed to believe he committed the assault upon Happel. Pinkney was not accused of any conduct that could have implicated any of the four charges against him other than the actual assault. Viewing the record, as defined above, in the light most favorable to Pinkney, the SAC states a plausible claim that probable cause did not exist for his arrest or the charges against him.

> **B. Freeland's tentative identification of Pinkney from a photograph that included him as the only black male is insufficient to support probable cause, particularly in light of Officer Frum's highly leading and suggestive interview.**

The only inculpatory evidence against Pinkney was Officer Frum's interview of Freeland, which included Freeland's statement that he recognized images of Pinkney in a photograph or photographs as "*looking an awful lot like* who [he] saw throw the punch at the bar." ECF No. 124, p. 4, lines 2-3; ECF No. 83, ¶33. An eyewitness's positive identification of a suspect is

generally sufficient to establish probable cause. *See Wilson v. Russo*, 212 F.3d 781, 793, 795 (3d Cir. 2000) (where victim "positively and without hesitation" identified person "as her assailant" the identification alone supported probable cause to arrest); *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 874 (6th Cir. 2012); *Hargroves v. City of New York*, 411 Fed. Appx. 378, 383 (2d Cir. 2011) ("Ordinarily, the identification, by an eyewitness, of a suspect will likely be sufficient to establish probable cause for an arrest."). Similarly, "[a] positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest." *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) (citing *Bail v. Ramirez*, 2007 WL 959045, at *8 (S.D.N.Y. Mar. 29, 2007)). But "an identification cannot be used to support probable cause if the 'identification procedure was so defective that probable cause could not reasonably be based upon it.'" *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (cleaned up) (quoting *Stansbury v. Wertman*, 721 F.3d 84, 91 n.7 (2d Cir. 2013) and *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007)). In addition, discrepancies between a witness's description and the appearance of the suspect also may weigh against probable cause and "significant discrepancies" may negate probable cause based on the identification. *United States v. Evans*, 851 F.3d 830, 836 (8th Cir. 2017).

Here, Freeland's statement was tentative rather than positive or certain. Freeland did not positively identify Pinkney as the person who struck Happel but, instead, stated that a photograph of Pinkney "looked an awful lot like" the assailant.[11] Freeland never stated with any

---

[11] In contrast to Pinkney's SAC, his initial and first Amended Complaints alleged that Freeland positively identified him as the assailant, not once but twice. The alleged definitive nature of Freeland's identification was a material factor in the Court's earlier decision to grant Frum's motion to dismiss the claims of the first Amended Complaint against him. *See Pinkney v. Meadville, Pennsylvania*, 2020 WL 1667241, at *7 (W.D. Pa. Apr. 3, 2020), *vacated in part*, 2020 WL 1984721 (W.D. Pa. Apr. 27, 2020). Pinkney's subsequent presentation of evidence demonstrating that his prior allegations were misinformed, and that Freeland's identification was tentative prompted the Court to reconsider its dismissal of the claims against Frum and allow Pinkney to file his SAC based upon newly discovered

degree of certainty that he recognized Pinkney as the person who struck Happel.  And his equivocal identification came only after Happel's friend, Evan Haines, showed him photographs that included Pinkney as the only black male.  Such tentative identifications, standing alone, do not support probable cause.  *Smith v. Gildea*, 1998 WL 703677, at *8 (N.D. Ill. Sept. 30, 1998) (Victim's statement that person in "a photo lineup" "closely resembled" one of the individuals who robbed him was a "tentative identification," not a "positive identification," and standing alone did not support probable cause).  They do not have the same legal effect or weight as identifications that are "positive and unequivocal" for purposes of assessing probable cause.  *Id.* (citations omitted); *Mayes v. City of Hammond, Ind.*, 442 F.Supp.2d 587, 648 (N.D. Ind. 2006) ("the suggestive and tentative nature of [the victim's] identification" precluded a holding that probable cause existed as a matter of law); *Daughtry v. New York*, 2015 WL 2454115, at *3 (E.D.N.Y. Feb. 23, 2015) ("'identification that is tentative or uncertain may, on its own, be insufficient' to give rise to probable cause") (quoting *Williams v. City of New York*, 2012 WL 511533, at *4 (E.D.N.Y. Feb. 15, 2012) ), *report and recommendation adopted sub nom. Daughtry v. City of New York*, 2015 WL 2454117 (E.D.N.Y. May 21, 2015).  Based upon relevant precedent, the Court concludes that a witness's statement that two black men look "an awful lot alike" without any meaningful inquiry regarding the basis for that assessment and with the witness's acknowledgment of differences in their appearance cannot be considered a reliable identification for purposes of determining probable cause.

Officer Frum contends that other portions of the audio recording of his interview of Freeland included his positive identification of Pinkney as Happel's attacker.  But here, the

---

evidence.  *See Pinkney v. Meadville, Pennsylvania*, 2020 WL 1984721, at *1 (W.D. Pa. Apr. 27, 2020).

"identification procedure" used by Frum "was so defective that probable cause could not reasonably be based upon it." *Dufort*, 874 F.3d at 348. First, a review of the audio recording of the interview reveals that Freeland never expressed in his own words that he recognized Pinkney as the attacker. Instead of following-up on Freeland's tentative statement that Pinkney "looked an awful lot like" the assailant, Officer Frum presented Freeland with a series of leading and suggestive questions that expressly assumed Pinkney was the assailant. Indeed, Officer Frum's most critical inquiries were in the form of declarations rather than questions, and where Freeland's responses were equivocal, ambiguous, or potentially exculpatory of Pinkney, Officer Frum followed-up with declarative statements that ignored the equivocation and ambiguity and instead suggested confirmation that Pinkney was the assailant.

    After Freeland stated that Pinkney "looked an awful lot like" the attacker, Officer Frum did not ask Freeland any questions to ascertain the extent to which Pinkney resembled or differed in appearance from the attacker. Instead, Freeland followed-up with declarative statements such as, "Those same facial features, same— ," to which Freeland responded, "Yeah." *Id.*, p. 4, lines 21-22. Officer Frum's statement to Freeland was the first and only reference to "facial features" during the interview. At no point did Freeland describe the attacker's facial or other features or contrast how they were similar or dissimilar to Pinkney's, and Officer Frum never asked him to do so. When Officer Frum asked Freeland whether Pinkney had braids like he observed worn by Happel's attacker, Freeland equivocated, stating, "Looked like *he had something*, *so maybe*." *Id.*, p. 4, line 6 (emphasis supplied). Rather than follow-up on this equivocation, Officer Frum immediately reverted to another leading declarative "question." Officer Frum stated, "Similar to what he had on Saturday night?" *Id.*, p. 4, line 7. Then, after Freeland stated that he reviewed three photographs that included Pinkney, *id.*, lines 13-15, Officer Frum declared: "And all three

of them look like the gentleman who was at the bar Saturday night?" *Id.*, p. 4, lines 18-19.

Despite this prompting by Officer Frum, Freeland provided a response that was ambiguous at

best. He responded, "Minus the hair in the last two, but yeah." *Id.*, p.4, line 20. Officer Frum

never asked Freeland to identify the two pictures where Pinkney's hair style or length allegedly

matched that of the assailant even though Freeland had previously stated in the interview that

Pinkney "had shorter hair" than the assailant in two of the pictures. *Id.*, p. 4, lines 10-12.

After Freeland stated that he "was standing in line at the bathroom" of Julian's Bar when

Happel was attacked, Officer Frum did not ask Freeland any questions regarding his opportunity

to observe the incident, such as how long he observed the assailant or his distance from him or

Happel, the lighting or crowd size in the bar, or the identity of other persons who may have

witnessed the assault. Officer Frum never asked Freeland whether others were in line at the time

of the assault or whether any individuals were between him and the assault. Faced with

Freeland's qualified, tentative, and ambiguous answers to several questions critical to identifying

Happel's attacker, such follow-up or clarifying questions appear not only logical, but obvious

and essential. "For [an officer's] belief to be reasonable under probable cause, it cannot be based

on inadequate investigation of the circumstances of the alleged criminal conduct." *Rosario v.*

*Lynch*, 2017 WL 4098709, at *5 (E.D. Pa. Sept. 15, 2017) (citations omitted).

The incredibly leading and suggestive nature of many of the critical "questions" Officer

Frum asked Freeland significantly undermines any potential for a reliable identification. Indeed,

the use of leading or suggestive questions materially increases the potential for a false

identification. *See* 2019 Report of the Third Circuit Task Force on Eyewitness Identifications

("Task Force Report"), p. 17. Among other things, "[l]eading questions can alter memory." *Id.*

"The use of suggestive wording and leading questions [also] tend[s] to result in answers that

more closely fit the expectation embedded in the question." *State v. Lawson*, 291 P.3d 673, 709 (Or. 2012).  Given such considerations, the Third Circuit Task Force "recommend[ed] that witnesses be interviewed as soon as possible, prior to an identification procedure, using nonleading and nonsuggestive questions."  Task Force Report, p.17 (footnote omitted).

The foregoing critique of Officer Frum's interview of Freeland and citation to the Task Force Report are not intended to imply that a police officer's failure to follow best practices when interviewing a witness negates probable cause reasonably supported by the witness's statements.  Here, the problem is not that Officer Frum deviated from best practices.  Rather, it is that Officer Frum's consistent use of leading and suggestive questions in response to Freeland's equivocation and his repeated failures to follow-up on responses that indicated the witness's uncertainty and potential knowledge of exculpatory facts materially undermine the reliability of Freeland's identification and raise issues concerning Officer Frum's good faith.  According to the SAC, Freeland recanted his identification of Pinkney as the attacker soon after Pinkney was arrested.  ECF No. 83, ¶60.  Generally, the Court examines only that information known to the officer at the time of the arrest in assessing probable cause.  *See Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (noting that "once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest").  But Freeland's prompt recantation raises a plausible inference that Officer Frum's leading and suggestive interview of Freeland and his ignoring of Freeland's tentative and qualified responses materially contributed to Freeland's erroneous "identification" of Pinkney as Happel's attacker.

The closest Freeland came to identifying Pinkney as Happel's attacker in his own words (rather than responding "Yeah" to Officer Frum's leading question) was when he said a picture

that included Pinkney as the only black man looked "an awful lot like" the assailant.  Officer

Frum's argument that this statement supports probable cause is further undermined by the

discrepancies in appearance between the attacker and Pinkney that Freeland acknowledged

during his interview.  Freeland stated that Pinkney had shorter hair than the assailant and that,

unlike the assailant, Pinkney did not wear his hair in braids.  Freeland did not say how much

longer the assailant's hair was compared to Pinkney's; nor did he provide any description of the

"braids" worn by the assailant, and Officer Frum did not inquire regarding either.  Minor or

immaterial discrepancies between a witness's description of a suspect and the suspect's actual

appearance do not negate probable cause where a witness otherwise expresses a reasonable

degree of certainty in his or her identification.  *See Wilson*, 212 F.3d at 794.  But here, Officer

Frum's questioning of Freeland elicited no information to assess whether the discrepancies

between Pinkney's hair and that of the attacker were minor or material.

When assessing "whether an identification was reliable even though the confrontation

procedure was suggestive" for purposes of determining admissibility of the identification, the

Court "look[s] to the totality of the circumstances."  *Brownlee*, 454 F.3d at 139 (citing *Neil v.

Biggers*, 409 U.S. 188, 199 (1972)).  While assessing the totality of the circumstances for

purposes of admissibility is a distinct inquiry, the factors identified in *Brownlee* provide

guidance for evaluating the reliability of an identification when assessing probable cause to

arrest.  *See Morrison v. Schultz*, 270 Fed. Appx. 111, 116 (3d Cir. 2008).  Factors relevant to this

assessment include:

> (1) the opportunity of the witness to view the criminal at the time
> of the crime; (2) the witness' degree of attention; (3) the accuracy
> of the witness' prior description of the criminal; (4) the level of
> certainty demonstrated by the witness at the confrontation; and (5)
> the length of time between the crime and confrontation.

*Brownlee*, 454 F.3d at 139 (quoting *Biggers*, 409 U.S. at 199). *See also, Morrison*, 270 Fed

Appx. at 116 (holding that in determining whether a show-up identification is reliable for

purposes of probable cause, "courts must consider: (1) the witness's original opportunity to

observe the suspect; (2) the degree of attention during the initial observation; (3) the accuracy of

the initial description; (4) the witness's degree of certainty when viewing the suspect at the

confrontation; and (5) the lapsed time between the crime and the identification procedure)

(citations omitted).

Officer Frum argues that even if the investigation was flawed, the totality of the

circumstances known to him at the time provided "absolutely no evidence of any unreliability of

Duncan Freeland as a witness." ECF No. 87, p. 7. The recording of Freeland's interview belies

this assertion. Freeland stated that he saw the assailant approach Happel, tap him on the

shoulder, strike him, and then leave the area. But Freeland provided no meaningful information

concerning his distance from the attack, the amount of time he had to observe the assailant,

whether any individuals stood between him and the assailant, the lighting in the bar, or any other

of the multitude of factors that could affect his opportunity to observe the assailant. In fact,

Freeland stated that he did not hear or see any interaction between the assailant and Happel

before the assault, and he did not observe the assailant before he approached Happel or after the

he left the area. Officer Frum did not ask any questions concerning Freeland's opportunity to

observe the assailant. And he ignored the tentative nature of Freeland's identification and the

discrepancies between his description of the assailant and Pinkney, instead opting to pose leading

questions to Freeland that assumed he was the assailant.

C. **Nothing else in the totality of circumstances known to Officer Frum supported probable cause to arrest Pinkney.**

Furthermore, nothing in the totality of circumstances known to Officer Frum outside of Freeland's interview potentially supported probable cause to charge Pinkney. No other witness, including those in Julian's Bar and those physically close to the assault, placed Pinkney or a person matching his description in the bar on the evening of April 6 or early morning hours of April 7, 2019. Ferguson, the bartender, was close enough to the assault to observe Chloe point out Happel as the person who allegedly drugged her, to observe her follow Happel, and then to see Happel on the ground. Despite this proximity to the assault, Ferguson never identified Pinkney or anyone matching his description as participating in the assault or even being present in the bar. Similarly, Happel, the victim, was able to identify Shaw and Hayes as the two individuals who threatened him hours before the assault and Shaw as being sufficiently aggressive towards him that he had to be physically restrained. But he never identified Pinkney or anyone matching his description as being present in the bar on the day or night of the assault. Officer Frum's investigation report also records that he knew of Chioma Alaka, another individual who had been identified as a witness to the incident. His report also acknowledges that despite his knowledge of this witness, as well as the failure of anyone else to place Pinkney or anyone matching his description in the bar, he proceeded with the filing of charges against Pinkney before contacting Alaka.

Cases where victim or eyewitness identification has been found to support probable cause as a matter of law have involved at least one positive identification and corroborative circumstances included in a developed summary judgment record. In *Stafford v. Morris*, *supra*, for example, the Court of Appeals affirmed the entry of summary judgment for a state trooper

based upon a child eyewitness' "one hundred percent positive" identification of the plaintiff as the person who attempted to lure him into a pickup truck. 816 Fed. Appx. at 714. *Stafford* arose out of four separate reports of child luring by four different children in the same neighborhood. Each child described the suspect as a white male with salt and pepper grey hair and a beard. These incidents prompted police to issue a press release that included a description of the suspect and the vehicles involved. *Id.* The day after the issuance of the press release, the plaintiff's wife and son reported to police that the plaintiff had acted stressed and then went missing. The investigating officers then determined that the plaintiff matched the description of the suspect and arranged a photo line-up that included a photograph of the plaintiff and photographs of several other individuals matching the description of the suspect. *Id.* One of the four child victims positively identified the plaintiff as the perpetrator and expressed that "he was 'one hundred percent positive' that [the plaintiff] had tried to lure him.'" *Id.* Another child stated that the suspect looked like two of the men shown in the photo line-up, one of whom was the plaintiff. A third child was unable to identify the suspect from the photo line-up and the fourth child did not participate in the photo line-up. *Id.* The Court held that the one child's positive identification combined with the totality of the circumstances known to the trooper at the time of the arrest supported probable cause even accounting for the failure of the two other minor victims to identify the plaintiff. *Id.*

In *Morrison v. Schultz*, *supra*, the Court of Appeals upheld the district court's finding of probable cause and entry of summary judgment for the defendants based on an eyewitness' positive identification of the suspect despite omissions and ambiguous statements in the police officer's affidavit of probable cause. 270 Fed. Appx. at 116. In that case, however, the summary judgment record established that the eyewitness closely observed the suspect for approximately

ten minutes, engaged the suspect in a verbal confrontation, and positively and "without

hesitation" identified the suspect as "the passenger that was sitting in the car that had the gun.

*Id.* at 117.  In finding that the eyewitness' identification was reliable and supported probable

cause to arrest the plaintiff, the Court of Appeals stated:

> [T]he record shows that Schwambach [the eyewitness] observed
> the suspects at a relatively close proximity for approximately ten
> minutes before engaging in a verbal confrontation with the
> individual she ultimately identified as Morrison [the suspect].
> Additionally, the fact that she made multiple calls to the police,
> while she continued to observe the suspects, suggests that she was
> sharply focused at the time of her initial observation.
> Schwambach's certainty that Morrison was the suspect she had
> observed, as well as the relatively short period of time between her
> initial observation and the "showup," also suggest reliability. In
> her deposition testimony, Schwambach stated that she was able to
> immediately and without hesitation identify Morrison as the
> suspect she had observed. Similarly, Schwambach's identification
> at the showup occurred—at most-—within forty-five minutes after
> she first observed the two suspects. Finally, it is significant that
> Ms. Schwambach was well-known to the police department as a
> neighborhood crime activist who had a history of providing
> reliable information.

*Id.  See also Young v. City of Wildwood*, 323 Fed. Appx. 99, 102 (3d Cir. 2009) (entry of

summary judgment based on probable cause upheld where record established that "Young fit the

description of the suspect provided by an eyewitness, was positively identified by the witness at

the scene, was located by the police approximately 500 feet from the parking lot shortly after

they received a call about an attempted burglary in that same lot and remained uncooperative

with the officers who were conducting a valid investigatory stop.").  Unlike the present case,

each of the foregoing cases involved at least one positive identification of the suspect coupled

with other circumstances that corroborated the reliability of the identification.

**D.  The record supports that Officer Frum's affidavit of probable cause included several material misrepresentations and omissions.**

In the present case, the warrant for Pinkney's arrest was issued by a Magisterial District Judge of the Pennsylvania minor judiciary.  An arrest warrant issued by a judicial officer "does not, in itself, shelter an officer from liability for false arrest."  *Wilson*, 212 F.3d at 786 (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).  "Rather, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'"  *Wilson*, 212 F.3d at 786-87.  Thus, when an arrest is based on a valid warrant, courts conduct a two-pronged analysis to determine whether probable cause existed.  *See Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017).  They ask, "first, whether the officers, with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for the warrant, and second, whether those assertions or omissions were material, or necessary, to the finding of probable cause."  *Id.* (citing *Wilson*, 212 F.3d at 786–87 (internal quotation marks and alteration omitted)).

Regarding the first element, an assertion is made with reckless disregard for the truth when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information reported."  *Id.* at 698 (quoting *Wilson*, 212 F.3d at 788).  To determine whether information was recklessly omitted, the inquiry is whether the officer withheld "a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'"

*Dempsey*, 834 F.3d at 470 (citing *Wilson v.*, 212 F.3d at 786–87 (internal quotation marks and alteration omitted)).   If the court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless disregard for the truth, the second element requires that the Court "perform a word-by-word reconstruction of the affidavit" and determine whether the reconstructed affidavit would establish probable cause. *Dempsey*, 834 F.3d at 470.

Whether Officer Frum acted recklessly when he failed to convey the nature of Freeland's "identification" of Pinkney accurately and completely presents a factual issue that cannot be determined on a motion to dismiss.  In his internal police incident report, Officer Frum recorded Freeland's statement that Pinkney "looked a lot like" the assailant and noted the discrepancies in how Pinkney and the assailant wore their hair.  ECF No. 83-1, pp. 2-3.  In contrast, Officer Frum's affidavit of probable cause presented Freeland's identification of Pinkney as positive and definitive and omitted the discrepancies in hair style.  *Id.*, pp 5; ECF No. 55-1.  These facts indicate that Officer Frum was conscious of his misstatement and omissions when he submitted his affidavit.  In addition, Frum's affidavit of probable cause repeatedly stated or at least implied that multiple witnesses had identified Pinkney.  His affidavit repeatedly used the pronoun "they" when relating that Pinkney had been positively identified as Happel's attacker.  He twice attested that "they [in an apparent reference to Freeland and Haines] recognized Pinkney as the black male that punched Happel."  Frum also wholly omitted the failure of multiple persons in the immediate area of the assault to identify Pinkney or anyone matching his appearance as the attacker or even being present in the bar, the information concerning Chloe's apparent motive for the attack and Ferguson's identification of her as the attacker or at least the person who followed Happel and then was present at the time he was attacked, and Happel's identification of Shaw and Hayes as two persons who had threatened him early in the day.  Given the totality of the

information known to Frum, a jury may reasonably find that Officer Frum was reckless in his presentation of the facts in his affidavit of probable cause. Therefore, the SAC states a plausible claim on this issue.

Having found that the SAC satisfies the first element under *Wilson* and its progeny, the Court must conduct a word-by-word reconstruction of Officer Frum's affidavit and determine whether the reconstructed affidavit would establish probable cause. *Dempsey*, 834 F.3d at 470. This reconstruction focuses on Officer Frum's presentation of the information from his interview of Freeland, his references that falsely indicated that multiple witnesses had identified Pinkney as the attacker, and the omitted facts concerning Chloe, Shaw, and Hayes, each of who had an apparent motive to attack Happel and was confirmed to have been in the bar on the date of the attack. The first page of Officer Frum's affidavit recites primarily the evidence gathered on the night of the assault and does not speak to the identification of the attacker. The material portion of the affidavit is page 2, where Officer Frum attested that Freeland described the attacker as an "African American male approximately six feet tall with braided hair" and twice attested that "they recognized Pinkney as the black male that punched Happel." Accurately reconstructed to convey the facts known to Officer Frum, the affidavit would have included words conveying that Freeland stated that an image of Pinkney in a photograph "looked an awful lot like" the black male who punched Happel, except that Pinkney had shorter hair than the attacker and, unlike the attacker, did not wear his hair in braids. The affidavit also would have attributed this information only to Freeland and omitted the references to "they." The affidavit also would have noted that none of the other persons present in the bar who Officer Frum or other officers questioned identified Pinkney or anyone matching his appearance as the attacker or present in the bar on the date of the assault and that none of the video surveillance recordings showed him in

the bar on the date of the assault. So reconstructed, it cannot be said as a matter of law that the affidavit supported probable cause to arrest and charge Pinkney. With no evidence other than Freeland's highly questionable identification to link Pinkney to the crime, a jury may find that the facts set forth in the reconstructed affidavit did not support a reasonable belief that Pinkney committed the offenses charged. Therefore, the SAC states viable claims for false arrest, false imprisonment, and malicious prosecution against Officer Frum.[12]

### E. Officer Frum is not entitled to qualified immunity.

Officer Frum argues that even if he lacked probable cause to file charges and arrest Pinkney, qualified immunity shields him from suit under §1983 because "his belief that probable cause existed was reasonable." ECF No. 87, p.10. "The burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011). *See also*, *Harris v. Kellogg, Brown & Root Servs., Inc.*, 2016 WL 4720058, at *1 (W.D. Pa. Sept. 9, 2016) (Defendant "has the burden of proof on its affirmative defense of qualified immunity."); *Pruchnic v. Wright*, 2016 WL 1267812, at *10 (W.D. Pa. Mar. 30, 2016) (same); *Figueroa v. Mazza*, 825 F.3d 89, 113 (2d Cir. 2016) (police officer defendant had the burden of proof on his affirmative defense of qualified immunity).[13] Based on

---

[12] In reaching this conclusion, the Court has not considered the exculpatory evidence that Pinkney's criminal defense counsel gathered after Pinkney's arrest. As noted, however, an officer's belief is not considered reasonable in a probable cause analysis if it is "based on inadequate investigation of the circumstances of the alleged criminal conduct." *Rosario*, 2017 WL 4098709, at *5 (citations omitted).

[13] *Compare, Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022) ("In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong."); *Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) ("Once a defendant properly pleads qualified immunity, the burden of proof shifts to the plaintiffs to negate the defense."); *Wellington v. Daza*, 2022 WL 3041100, at *5 (10th Cir. Aug. 2, 2022) (same).

the record presently before the Court, Officer Frum has failed to demonstrate his entitlement to qualified immunity.

Qualified immunity "shield[s] [officers] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity defense is traditionally analyzed in two steps.  First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, make out the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   Next, the court must examine whether the right at issue was "clearly established" at the time of the challenged conduct.[14]  *Id.*

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up) (citations omitted).  "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).  "In determining whether a right is clearly established, [however,] it is not necessary that the exact set of factual circumstances has been considered previously." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259–60 (3d Cir. 2010) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Even where the officer faces novel circumstances, qualified immunity may be denied "as long as the law gave the defendant officer 'fair warning' that his conduct was unconstitutional." *Id.* (quoting *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004)).  But "[t]he rule's contours must be so well defined that

---

[14] The two prongs to the qualified immunity inquiry need not be analyzed in sequential order; courts have discretion to decide which of the two prongs to tackle first.  *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) (To be "clearly established," a right must be sufficiently clear such that a reasonable official in the position of the defendant would have known that his conduct was unlawful.).

Regarding the first step in the qualified immunity analysis, the Court has already determined that the facts alleged in the SAC support a violation of Pinkney's Fourth Amendment rights. Regarding the second step, in the context of a § 1983 action alleging a violation of the Fourth Amendment, "the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Sharrar*, 128 F.3d at 827 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). Police officers "who reasonably but mistakenly conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity." *Id.* at 826 (citations omitted). "In this way, the qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations omitted). "Even where probable cause is not found to exist, a police officer sued for false arrest is immune from suit under the doctrine of qualified immunity where 'arguable probable cause' exists." *Rodriguez v. New York City Transit Auth.*, 2009 WL 3817298 at *19 (S.D.N.Y. Nov. 10, 2009) (citing *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)); *Araujo v. City of New York*, 2010 WL 1049583, at *5 (E.D.N.Y. Mar. 19, 2010).

The Fourth Amendment requires that an arrest warrant be based upon probable cause and supported by oath or affirmation. *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (citations omitted). The issuance of the warrant by a judicial officer and the police officer's subjective

belief in the truth of the facts stated in the affidavit do not per se establish the objective reasonableness of the police officer's actions and his right to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 345 (1986). In this context, qualified immunity will not shield a police officer who applied for an arrest warrant where "the warrant application is so lacking in indicia of probable cause as to render [the] offic[er's] belief in its existence unreasonable[.]" *Id.* at 344–45, 106 S.Ct. 1092; *see also Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citing *Malley* and stating that police officer is entitled to qualified immunity where grounds for probable cause stated in warrant application were objectively reasonable). "[T]he standard for determining the reasonableness of an official's belief in the existence of probable cause is whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he therefore should not have applied for the warrant under the conditions." *Orsatti*, 71 F.3d at 483 (citing *Malley*, 475 U.S. at 345).

Officer Frum argues that he is entitled to qualified immunity because he reasonably believed that his affidavit and the resulting warrant supported probable cause to arrest and charge Pinkney. This argument fails, however, because it ignores the misstatements and omissions in his affidavit. Qualified immunity under *Malley* and its progeny is premised upon an officer's reasonable belief in the accuracy of the facts stated in his affidavit and the existence of probable cause based on those facts. This premise is negated "where a police officer causes an arrest to be made pursuant to a warrant that he obtained on the basis of statements he knew to be false or on the basis of statements he makes in reckless disregard of the truth…." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993).

Where "a police officer submits an affidavit containing statements he knows to be false or would know are false if he had not recklessly disregarded the truth, the officer obviously

failed to observe a right that was clearly established" and, therefore, "is not entitled to qualified immunity." *Id*, at 1504 (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986)). The SAC, the audio recording of the Freeland interview, and the exhibits to the SAC support plausible inferences that Officer Frum knowingly or in reckless disregard of the truth (1) presented Freeland's tentative identification of Pinkney as positive and certain, (2) engaged in interview techniques so leading and suggestive that they largely negated the potential for a reliable identification, (3) falsely implied that multiple witnesses had identified Pinkney as Happel's attacker, (4) failed to disclose that the victim and multiple witnesses who were present in Julian's Bar before and at the time of the attack did not place Pinkney or anyone matching his appearance in the bar, (5) failed to disclose the evidence that the assault was committed by a person other than Pinkney, and (6) failed to disclose that the video surveillance recordings showed the presence of other potential suspects present in the bar on the date of the attack but not Pinkney.

The right not to be arrested without probable cause based on statements a police officer knows to be false or concerning which he recklessly disregards the truth has been clearly established since at least 1989. *See Lippay*, 996 F.2d at 1495, 1502 (Applying this "clearly established" rule of law to an arrest that occurred in 1989). *See also Franks v. Delaware,* 438 U.S. 154 (1978); *Wilson,* 212 F.3d at 787. While absolute precision and completeness may not be required of police officers when preparing affidavits of probable cause, the allegedly false or misleading statements and omissions in Officer Frum's affidavit, if ultimately proven, would support findings that Officer Frum violated clearly established constitutional rights. *See Lippay*, 996 F.2d at 1502; *Strickland v. Haines City*, Fla2019 WL 4673712, at *10 (W.D. Pa. Sept. 25, 2019). The Court of Appeals for the Third Circuit has noted that "qualified immunity exists, in part, to protect police officers in situations where they are forced to make difficult, split-second

39

decisions." *Reedy v. Evanson*, 615 F.3d 197, 224 n. 37 (3d Cir. 2010) (citing *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir.2005) ("Under qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field [because they] must make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." (internal quotations omitted)).  In this case, Officer Frum was not called upon to make any "split-second" decisions.  He had time to deliberate over the content of his affidavit of probable cause.  Given his inaccurate and misleading statements and omissions in that affidavit, the Court cannot hold as a matter of law that he had a reasonable belief that probable cause existed for Pinkney's arrest.

In a further effort to support his qualified immunity defense, Officer Frum argues that "[he] relied upon the District Attorney's independent determination that probable cause existed for the filing of criminal charges against Pickney."  ECF No. 122 (Supplemental Brief), p. 11.  But Officer Frum cites nothing in the record to support this assertion, and the Court's review of the record confirms that it has no valid support.  The closest reference to any matter potentially related to this assertion appears in Officer Frum's investigation report where he states, "On Thursday, April 11, 2019, I received a call from Chief Tautin who stated that District Attorney Shultz had stated to charge Pinkney with Aggravated Assault, Simple Assault, Harassment, and Disorderly Conduct."  ECF No. 83-1, p. 3.  The portion of this report that attributes to Chief Tautin a statement that he in turn attributes to the District Attorney presents multiple layers of inadmissible hearsay.  "Statements of a victim, alleged perpetrator, witnesses and *even the prosecutor* contained within a police report constitute inadmissible hearsay." *Kubik v. Brown*, 979 F. Supp. 539, 544 (W.D. Mich. 1997) (emphasis supplied) (citing *Miller v. Field*, 35 F.3d 1088, 1091–92 (6th Cir.1994)).  "Because of reliability concerns, the rules expressly exclude police reports as inadmissible hearsay." *Krepps v. Gov't of Virgin Islands*, 47 V.I. 662, 672

40

(D.V.I. Apr. 13, 2006), *aff'd*, 438 Fed. Appx. 86 (3d Cir. 2010) (citing Fed. R. Evid. 801(a)-(b)

(defining hearsay). *See also Bailey v. White*, 2015 WL 13883912, at *2 (E.D. Pa. Mar. 19,

2015). While statements in police reports may be admissible if offered for a non-hearsay

purpose, such as an admission or to show knowledge or the state of mind of the officer, Officer

Frum offers the unattested hearsay report for the truth of a matter asserted therein—that the

District Attorney told Chief Tautin to tell him to file charges against Pinkney. This is hearsay

and, as such, inadmissible and not properly considered on a motion to dismiss.

    In addition to being based on inadmissible hearsay, Officer Frum's argument is not

supported by the authority he cites. He relies upon *Handy v. Palmiero*, 836 Fed. Appx. 116,

118–19 (3d Cir. 2020). In that case, the Court of Appeals held that "defendants are

'presumptively entitled to qualified immunity from claims. . .premised on a lack of probable

cause,' where they 'relied in good faith on a prosecutor's legal opinion' or the approval of a

neutral magistrate." *Id.* Officer Frum ignores, however, the Court of Appeals' reported decision

in *Kelly v. Borough of Carlisle*, where it held that "[r]eceipt of legal advice after 'mak[ing] *a full

presentation of the known facts* to a competent prosecutor' would provide the officer with a

'stronger reason to believe that probable cause existed.'" 622 F.3d 248, 255 (3d Cir. 2010)

(emphasis supplied). Nothing in the record shows what, if anything, Officer Frum disclosed to

the District Attorney. The record certainly does not support that he disclosed (1) the tentative

nature of Freeland's identification of Pinkney, (2) his highly leading interview of Freeland, (3)

his failure to interview a person he understood to be an eyewitness to the attack, (4) the failure of

any other person or video surveillance to identify Pinkney as Happel's attacker or place Pinkney

or anyone matching his appearance in Julian's bar on the date of the attack, (5) Happel's

identification of persons other than Pinkney who had threatened him on the day of the attack, or

(6) the statements by Ferguson that Chloe either attacked Happel or was physically present at the immediate scene of the attack. In other words, the record provides no reason to believe that Officer Frum's disclosure to the District Attorney was any less defective than the one included in his affidavit of probable cause. Given this, no basis exists for a finding that Officer Frum, in good faith, made a full disclosure to a competent prosecutor, obtained her legal advice, and reasonably relied upon that advice.

Accordingly, Officer Frum's request for dismissal of Pinkney's false arrest, false imprisonment, and malicious prosecution claims based upon qualified immunity must be denied.

## VII.    Conclusion

The allegations of Pinkney's SAC, the exhibits to the SAC, and the audio recording of the interview of Freeland support the material inaccuracy of Officer Frum's affidavit of probable cause and the absence of probable cause for his arrest sufficient to sustain Pinkney's claims for false arrest, false imprisonment, and malicious prosecution against Officer Frum, and the record, as presently constituted, does not support dismissal of those claims based on qualified immunity. Therefore, Officer Frum's motion to dismiss Counts I, II, and IV of the SAC will be DENIED. A separate Order follows.

Dated: January 3, 2023

RICHARD A. LANZILLO
Chief United States Magistrate Judge

42